Jane C. Mariani, SBN 313666
jcm@marianiadvocacy.com
LAW OFFICE OF JANE C. MARIANI
587 Castro Street, #687
San Francisco, CA 94114
(415) 203-2453

*Attorney for Plaintiffs,*
THOMAS NEAL MULLINS
JOHN R. SCHOLZ, III

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| THOMAS NEAL MULLINS, an individual; JOHN R. SCHOLZ, III, an individual; on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>INTERNATIONAL BROTHERHOOD OF TEAMSTERS, a labor organization; TEAMSTERS LOCAL 986, a labor organization; UNITED AIRLINES, INC., a Delaware corporation; UNITED AIRLINES HOLDINGS, INC., a Delaware Corporation,<br><br>    Defendants. | Case No. 3:23-cv-03939-EMC<br><br><br>**<u>CLASS ACTION</u>**<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

**SECOND AMENDED CLASS ACTION COMPLAINT**

1.       Plaintiffs, Thomas N. Mullins ("Mullins") and John R. Scholz, III ("Scholz), by and through undersigned counsel, as individuals, and collectively ("Plaintiffs"), on behalf of themselves and a class of similarly situated people currently or formerly employed as Technicians and Other Related employees of United Airlines, Inc. (the "Class," as defined below), bring this action against the International Brotherhood of Teamsters ("Teamsters"), Teamsters Local 986 ("Local 986" or collectively with the Teamsters as "Unions" or "Union Defendants"), United Airlines, Inc. ("United"), and United Airlines Holdings, Inc. ("UAH" or collectively with United as "United Defendants" ), complain and allege as follows.

## I.       INTRODUCTION

2.       Plaintiffs bring this class action for claims arising out of the contractual wage reporting rules and policies agreed to by the parties, within the applicable statutory periods, which have deprived Plaintiffs and the Class of contractually mandated wages, in an amount exceeding $100 million dollars through all Defendants intentional misrepresentation of Letter of Agreement #29 ("LOA #29") Adjustment Calculation result as 2.6%, or approximately $1.20, when the true and correct result was more than six-times that amount, or 15.7% or on average $7.35.

3.       Plaintiffs allege this unlawful reduction of their wages not bargained for, agreed upon, and/or ratified by Plaintiffs, or the Class, as is required pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-188. Plaintiffs further allege the governing documents of the Union Defendants, i.e., the Teamsters' constitution and the Teamsters Local 986 Bylaws, prohibit such conduct. The Defendants, through an illicit, secret agreement between them, made up, out of whole cloth, wage and pay rules and conditions in order to financially benefit the United Defendants in violation of RLA §§ 151, 152 First, Third, Fourth, and Seventh, and 184; and California Civil Code §§ 1559, 1709, and 1710, causing financial injury to Plaintiffs and the Class.

4.       Plaintiffs allege, the Union Defendants, by and through their conduct and role in this scheme, breached their owed duties of fair representation to Plaintiffs and the Class by using their position as exclusive bargaining representatives to bring severe financial harm to Plaintiffs and the Class and in failing to protect them from the illicit wage calculations proffered by United that the

1

Union Defendants knew to be false. In lowering the required raise from approximately $7.35 to approximately $1.20, the Union Defendants acted in an arbitrary, discriminatory, and bad faith manner under the recognized standards for judging a union's conduct in representing its members. Such conduct also violates the Union Defendants' own governing documents, i.e., the Teamsters' constitution, Local 986 bylaws, and the sworn oaths each member takes, by placing the Unions' interests, and those of the United Defendants, above the interests of Plaintiffs and the Class, allowing harm to befall Plaintiffs and the Class.

5.     Plaintiffs attempted to remedy these egregious wage violations, in accordance with the RLA and the parties' contractual grievance procedures and practices, by timely filing grievances. However, this process was thwarted and manipulated by the Defendants at every turn, categorically dismissing all grievances related to this errant and unlawful calculation result as lacking any merit.

6.     The Union Defendants not only failed to disclose material, relevant information truthfully to the Plaintiffs, the Union Defendants refused to take any reasonable action on behalf of Plaintiffs, failed to perform any meaningful investigation into the filed grievances, and actively blocked Plaintiffs from completing the grievance process, all of which effectively resolved the matter entirely in United's favor, to the detriment of Plaintiffs and the Class.

7.     United refused to provide requested, relevant information related to the grievances in violation of the RLA, Article 19.E.3 of the CBA, misrepresented facts, refused to accept evidence and witnesses to support Plaintiffs' grievances, and refused to complete the grievance process with Plaintiffs.

8.     Because efforts to resolve this matter through the required contractual processes have failed to such a degree, and left Plaintiffs' grievances unresolved, Plaintiffs have been left with no other choice but to seek a judicial forum for a remedy and therefore, bring this action, on behalf of themselves and the Class, seeking all permissible and applicable damages.

## II.    JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, because the causes of action arise under the Railway Labor Act, 45 U.S.C. §§ 151-188,

2

presenting federal questions, and pursuant to 28 U.S.C. §1337(a) as this action is a "civil action or proceeding arising under the laws of the United States, and Acts of Congress, affecting and regulating interstate commerce."

10.     Additionally, this Court has subject matter jurisdiction over this action because Plaintiffs allege a hybrid action – breach of the collective bargaining agreement by the United Defendants and breach by the Union Defendants of their owed duty of fair representation to Plaintiffs and the Class – which presents a federal question pursuant to § 1331 and § 1337.

11.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a), which confers federal subject matter jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Plaintiffs' state law claims arise from the same common set of operative facts as the federal claims, and are sufficiently related to the federal claims with original jurisdiction of this Court, such that the state law claims form part of the same case and controversy under Article III of the United States Constitution. Resolving all claims in a single action serves the interests of judicial economy, convenience, and fairness to the parties.

12.     This Court also has jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. §1332(d), the Class Action Fairness Act ("CAFA"), because the members from the Class exceed one hundred (100) members who are citizens of different states than Defendants and the amount in controversy exceeds the sum of five million dollars ($5,000,000).

13.     Venue is proper in this district, pursuant to 28 U.S.C. §1391(b) and (c) because Plaintiffs are all domiciled in this district, a substantial portion of the events or omissions giving rise to the clams occurred in this district and all Defendants conduct substantial business, maintain offices, and employ authorized officers and agents in this district.

## III.     INTRADISTRICT ASSIGNMENT

14.     Pursuant to Civil L. R. 3-2(c) and 3-2(d), this action is properly assigned to either the San Francisco Division or the Oakland Division because a substantial part of the events giving rise to the claims asserted herein occurred in San Mateo County and because Plaintiffs reside in San Francisco County (Plaintiff Mullins) and Alameda County (Plaintiff Scholz).

3

## IV.    PARTIES

15.    Plaintiff Mullins resides in San Bruno, California and is employed by United as a non-exempt aircraft inspector at United's maintenance facilities serving its airline operations at the San Francisco International Airport ("SFO"). Mullins has worked for United for almost 40-years and usually works the overnight shift, from 8:45 p.m. to 7:15 a.m.

16.    Mullins is a dues paying member in good standing of Local 986, which indirectly also makes him a member of the Teamsters. Mullins has been a shop steward for Local 986 in the past and his training for this position included handling and carrying out the grievance process under the RLA and the CBA.

17.    Plaintiff Scholz resides in Pleasanton, California and is employed by United as a non-exempt Hydraulic Mechanical Technician at United's maintenance facilities serving its airline operations at the San Francisco International Airport ("SFO"). Scholz has worked for United for over 25-years and usually works the first shift from 5:00 a.m. to 1:30 p.m.

18.    Scholz is a dues paying member in good standing of Local 986, which indirectly also makes him a member of the Teamsters. Scholz has been a shop steward for Local 986 in the past and his training for this position included handling and carrying out the grievance process under the RLA and the CBA.

19.    Defendant Teamsters is an unincorporated labor organization whose purpose is to represent member employees regarding their wages, terms, and conditions of employment. The Teamsters share representative duties with its autonomous affiliated local unions for Plaintiffs and the Class. The Teamsters' have a principal office and headquarters in Washington, in the District of Columbia, and regularly conduct and transact business in this district, and throughout California, in carrying out its duties and activities on behalf of Plaintiffs and the Class.

20.    Defendant Local 986 is an unincorporated labor organization and an autonomous affiliated local union of the Teamsters. Local 986 shares representative duties for Plaintiffs and the Class with the Teamsters. Local 986 has its principal office and headquarters in Covina, in the state of California but regularly conducts and transacts business in this district, and throughout California, in carrying out its duties and activities on behalf of Plaintiffs and the Class.

4

21.     Defendant United is an air carrier as defined by, and subject to, the RLA. United is incorporated in Delaware, with headquarters in Chicago, Illinois. United regularly conducts and transacts its airline operations in this district, which includes employing Plaintiffs and the Class, in this district. United is a wholly owned subsidiary of United Airlines Holdings, Inc.

22.     Defendant UAH is a Delaware corporation and the parent company of United. UAH regularly conducts and transacts business in this district in operating its wholly owned subsidiary, United Airlines, Inc.

## V.    RELEVANT FACTUAL ALLEGATIONS

**A.    Factual Allegations Common to All Members of the Class.**

**1.    <u>General Background.</u>**

23.     Plaintiffs and the proposed class ("Class"), of which Plaintiffs are members and which is more fully described below, are non-exempt, hourly, collectively bargained employees, as defined by the Section 202 of the RLA, 45 U.S.C. § 182, and California Labor Code ("Labor Code") § 1132.4. Cal. Civ. C. § 1132.4. Plaintiffs and the Class are directly hired by, and employed by, United. On information and belief, there are approximately 9,600 Class members employed by United throughout the United States, including approximately 2,500 members employed in this district, to operate and maintain United's facilities, planes, and equipment used for its operations.

24.     At all relevant times, United was an air carrier as defined by the RLA § 181, 45 U.S.C. § 182, and an employer as defined by Labor Code § 1132.2, employing, and continuing to employ, the Class throughout the United States, including in this district. Cal. Lab. C. § 1132.2.

25.     At all relevant times, the Teamsters and Local 986 are "labor organizations" as defined by RLA § 151 Sixth, 45 U.S.C. § 151, which provides a local union and its parent organization can be "labor organizations" within the meaning of the statute and Labor Code § 1117, which provides " 'labor organizations' means any organization ... or local unit thereof in which employees participate, and exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work ... ."

26.     As a condition of their employment with United, the Class are required to join affiliated local unions, currently, the affiliated local unions of the Teamsters.

27.     The Class is represented by various autonomous local unions, of which Local 986 is one, that are affiliated with the Teamsters. Each is a bargaining representative or agent of the Class as is evidenced by the Unions governing documents. True and correct copies of Teamsters' constitution and Local 986's Bylaws are attached as "Exhibit 1" and "Exhibit 2" respectively. The Teamsters' constitution and Local 986's bylaws are enforceable contracts between the Unions and the Class. <u>Moore v. Electrical Workers (IBEW) Local 569</u>, 989 F.2d 1534, 1545 (9th Cir. 1993).

28.     At SFO, where Plaintiffs are employed by United, there are two affiliated local unions of the Teamsters for the bargaining unit to which Plaintiffs and certain members of the Class must belong – Teamsters Local 856 ("Local 856") and Teamsters Local 986 ("Local 986") – and the division between the two local unions, on information and belief, is according to the first letter of their last name. Accordingly, Plaintiffs were both assigned to, and required to join, Local 986.

29.     This split union membership at a single station is unique to SFO. Local 856 and Local 986, however, often hold themselves out to Plaintiffs and the Class as "TeamstersSFO" or "TeamstersSFO 856/986," issuing joint statements, briefings, and updates on negotiations and administration of the contract; jointly handle grievances, including using the same electronic grievance tracking system; and sharing offices for their representational duties. There is almost no discernible division between Local 856 and Local 986 at SFO other than routing of dues monies.

30.     Article XIV, § 3 of the Teamsters' constitution provides in part, "[e]very member covered by a collective bargaining agreement at his place of employment authorizes his Local Union to act as his exclusive bargaining representative with full and exclusive power to execute agreements with his employer governing terms and conditions of his employment." Exhibit 1, art. XIV, § 3. Likewise, Local 986's bylaws similarly provide members of Local 986 authorize Local 986 "to act as his exclusive bargaining representative with full force and exclusive power to execute agreements with his employer governing terms and conditions of employment" and "in presenting, processing, and adjusting any grievance, difficulty, or dispute ... ." Exhibit 2, sec. 15.

31.     The Teamsters' constitution directs all officers and officials "to perform its legal and contractual obligations," expressly prohibits "doing any act contrary to the best interests of the Association or its members," and requires them "at all times, act solely in the interests of our

members, devote the resources of [the] Union to furthering their needs and goals, work to maintain a Union that is free of corruption, ..., and to protect the members' interests in all dealings with employers." Exhibit 1, art. I, sec. 2; II, sec.2(a); VIII, sec. 1. The oaths taken by all members, including officers and officials for both the Teamsters and Local 986, require the same. Exhibit 1, art. II, sec. 2(a); Exhibit 2, sec. 15.

32.     The Union Defendants were first certified as exclusive bargaining representatives at SFO for United's technicians in 2008. Following the merger with Continental Airlines in 2010, this status was confirmed in 2013 of the combined United-Continental technician bargaining unit. As a result, Plaintiffs and the Class are entitled to the benefits union membership provides, including fair representation, which is a substantive check on a union's power in both its negotiation and administration roles. Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192 (1944). Because the recipient of the RLA's designation as bargaining representative has the responsibility "to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them," an employer cannot rely on, or benefit from, an agreement with a RLA bargaining representative in which such representative has violated this duty. Steele, at 203.

## 2.     **The Parties Contractual Background.**

33.     At all material times, Plaintiffs and United have been parties to a written collective bargaining agreement, the "Collective Bargaining Agreement between United Airlines, Inc. and The Airline Technicians and Related Employees and Flight Simulator Technicians and Related Employees In the Service of United Airlines As Represented by The International Brotherhood of Teamsters" (hereinafter "CBA"), made effective from December 5, 2016 through December 31, 2022. A true and correct copy of the CBA is attached as "Exhibit 3."

34.     The CBA, ratified by narrow margin on December 5, 2016, establishes the wages, terms, and conditions of employment of United's "Airline Technicians and Related Employees and Flight Simulator Technicians and Related Employees" (hereinafter "Technicians") of which Plaintiffs and the Class belong. See Exhibit 3.

35.     The Union Defendants, along with other affiliated local unions, represented Plaintiffs and the Class in the negotiations for the CBA. Also included as part of the negotiating

committee were rank and file members from all affiliated locals across the system, as well as attorneys and outside advisors including Dan Akins.

36.     The Teamsters' constitution requires that all local unions bound by a national agreement must participate in bargaining and, upon the completion of negotiations, shall submit the agreement to the membership for ratification. Exhibit 1, art. XII, sec. 2(a). Further, Article XIV, § 3 provides in part, "[e]very member covered by a collective bargaining agreement at his place of employment authorizes his Local Union to act as his exclusive bargaining representative with full and exclusive power to execute agreements with his employer governing terms and conditions of his employment." Exhibit 1, art. XIV, sec. 3.

37.     "Members shall have the right to ratify the collective bargaining agreement negotiated by their Local Union ... with their employer." Exhibit 1, art. XII, sec. 1(b). And, have the right for a similar vote whenever a material change to a collective bargaining agreement will materially impact a whole group or discrete group of its members. Exhibit 1, art. XII, sec. 2(c), (e). Local 986's bylaws similarly require "ratification of agreements or amendments shall be subject to vote ... in accordance with the Constitution and rules adopted by such bargaining group, ... ." Exhibit 2, sec. 26(C).

38.     Thereafter, the local union will sign the agreement, generally by the local union negotiating committee member or other authorized agent, to indicate its intent to be bound. Exhibit 1, art. XII, sec. 2(a). Both the Teamsters, and Local 986 are signatories to the CBA, accepting all benefits and obligations therein. Exhibit 3, art. 24.

39.     Any changes to the CBA require RLA Section 106, 45 U.S.C. § 156, bargaining and notice in addition to, and as directed by the Teamsters constitution, ratification vote for any changes by the effected membership to be valid. Exhibit 1, art. XII, sec. 2; Exhibit 2, sec. 26(C).

40.     Article 21.D of the CBA provides that each member will be provided a copy of the CBA following ratification, which Plaintiff Scholz received sometime in 2017. Exhibit 3. Plaintiff Scholz also made a written request for the CBA on February 18, 2023, from the Union Defendants, and again on March 25, 2023. The copy provided to Plaintiff Scholz on or about March 18, 2023 was identical to the copy provided to Plaintiff Scholz in 2017.

41.     Article 1.A.2 of the CBA provides, "[n]o employee covered by this Agreement will be interfered with, restrained, coerced, or discriminated against by the Company, its officers or agents, because of membership in or lawful activity on behalf of the Union." Exhibit 3, art. 1.A.2.

42.     The CBA also has a Savings Clause to deem invalid, and to strike, any provisions found to be violative of the law now or in the future. Exhibit 3, Savings Clause.

43.     The Teamsters' constitution also protects Plaintiffs and the Class from agreements that can, or do harm their interests. Exhibit 1, art. XII, sec. 10. Where information is received that any agreement affecting a members' interests in the "working conditions or earnings ... with a particular company, or otherwise erodes the protections of employee rights embodied in existing [CBA]," the Union Defendants have the power to "direct" and "refrain from executing such an agreement, ... ." Id. In such a case, the Union Defendants can take any necessary action to prohibit any adverse results or actions to its members, including action against any persons or entities causing such adversely affects to the members. Id.

       **a.**     **CBA Provision - Grievance Procedures and Practices.**

44.     The CBA contains a multi-step grievance procedure culminating in final and binding arbitration of unresolved grievances strictly for interpretation and application of the CBA. See Exhibit 3, art. 19-20. However, such grievances, and ultimate grievance decisions, cannot "add to, subtract from, or alter in any way the [CBA], but may only interpret or apply it." See Exhibit 3, art. 20.F.

45.     The CBA expressly includes Plaintiffs and the Class as parties who can initiate, access, and participate in, the grievance process. Exhibit 3, art. 19-20.  There are no terms in the CBA that waive any statutorily provided grievance right or exclude Plaintiffs or the Class from this congressionally mandated grievance resolution process. *See* Exhibit 3.

46.     Section 204 of the RLA provides that when a dispute arises between "an employee" and "a carrier" and is not amicably resolved, "either party" may unilaterally bring that dispute before the adjustment board. 45 U.S.C. § 184.

47.     Local 986 Bylaws authorize it "to act as exclusive bargaining representative with full force and exclusive power to execute agreements with employers governing terms and

9

conditions of employment" and "presenting, processing, and adjusting grievances arising under any collective bargaining agreement out of his employment with such employer." Exhibit 2, sec. 20(E)(2). The Teamsters' constitution bestows these same powers onto any affiliated local union. Exhibit 1, art. XIV, sec. 3.

48.     Local 986 handles grievances for its members such as Plaintiffs, using its officials, including but not limited to its shop stewards, chief stewards, business agents, and a "Grievance Committee." The Teamsters are not involved in the grievance process provided for in the CBA; however, the Teamsters provide training materials for the local unions to use, such as the Teamsters Grievance Manual, which Local 986 trains its shop stewards with.

49.     Local 986 instructs its officials to request information to monitor the employer's compliance with the contract, investigate whether a grievance exists, prepare for a grievance meeting, and to decide whether to drop or prioritize a grievance. These are standard procedures.

50.     According to Local 986, the scope of information the employer is required to provide is extremely broad and includes all documents, data, and facts relevant to a grievance or contract interpretation issue, including but not limited to any bargaining notes; bonus records; contracts with outside contractors; correspondence; employer manuals, guidelines, and policies; investigative reports; memos; wage and salary records; or relevant lists, statistics, and data.

51.     For grievances involving disputed contract language, Local 986 instructs grievance officials to request an employer's bargaining notes from the session during which the clause was negotiated; the dates and contents of any union statements upon which the employer is relying; and descriptions which the employer claims supports its position.

52.     Local 986 uses an electronic "tracking" system for handling grievances at SFO. Only Local 986 officials have access to it. The members cannot access it independently even to file grievances as members are permitted to do under the CBA.

53.     Access to the system is also generally limited based on the level of the Local 986 official, i.e., a shop steward can only "access" or "see" First Step matters but a Chief Steward can "access or "see" First and Second Step. Business Agents for Local 986 can "access" or "see" First, Second, and Third Steps of the grievance process.

10

54.     Therefore, for a grievant at Local 986 to advance a grievance, up to and including completion of the Third Step of the contractual remedies, a grievant must seek assistance to do so from a Local 986 official. The process to do so has been to communicate orally, or in writing, by email or letter, of a grievant's intent to do so, that the grievant wants to move the grievance forward in the process. Local 986 then "initiates" the Local 986-only accessible administrative process to accomplish the advancement of the grievance.

55.     This controlled coordinated process is even more acute with respect to the Third Step System Board of Adjustment ("SBA"). While the CBA states the composition, general parameters, and projected scheduling of the SBA, it does not provide any necessary details to permit a grievant to independently access it. Exhibit 3, art. 19.D. The essential details required such as contact person, telephone number, email address, location, projected schedule, or even who comprises the SBA, are not stated in the CBA and are not available to the members or a grievant. Only Local 986 officials with a high enough rank can access such information to initiate referral of the grievance to the SBA, i.e., a business agent must advance a grievance to the Third Step.

56.     And, unlike the CBA provisions for the Board of Arbitration, the CBA does not contain any needed details to permit a grievant to independently petition the SBA or state what constitutes a "petition," as provided for in under the RLA. *See* Exhibit 3, art. 19-20. The practice has always been for Local 986 to inform United that a grievance was advancing to the Third Step SBA, after which the particulars regarding where and who would receive petitions, conduct the hearing, and constitute the panel were decided amongst the participating parties. This is also true for almost all affiliated local unions representing the Class throughout United's system.

57.     The CBA does not provide any process for an employee to remedy violations of the grievance process either with United or Local 986.

### b.     CBA Provision - Letter of Agreement #29 Industry Reset.

58.     The CBA includes Letter of Agreement #29 ("LOA #29"), which is the agreed upon objective, standardized method of calculating biennial wage increases for the Class in order to maintain a compensation level at 102% of the combined average compensation level of their counterparts at United's two main competitor airlines, American Airlines ("American" or "AA")

11

and Delta Airlines ("Delta" or "DL") through the use of an "Adjustment Calculation." *See* Exhibit 3, LOA #29.

59.     LOA #29 was negotiated and ratified at the same time as the rest of the CBA to establish an objective, standardized method for raises in order to reduce typical drawn out and contentious wage negotiations. At the bargaining table for the Class, as is relevant here, were the Teamsters' Airline Division officials; Principal Officers and Business Agents from all affiliated local unions including Local 986; rank-and-file members of all affiliated local unions, including Local 986; and Dan Akins, the Union Defendants' economist and actuary.

60.     LOA #29's elements, function, and application, were explained in detail in writing, in video presentations, and during in person meetings, by Akins, to the negotiators and to Plaintiffs and the Class. Akins repeatedly stated the metrics were finalized and derived from publicly available sources to allow for the highest level of transparency and ease of actually doing the Adjustment Calculation. Indeed, due to the comparative analysis requiring the information of United's two main competitor airlines, all information being publicly accessible was compulsory. Notably, several other air carriers use, or have used, a similar mechanism for years in their contracts to provide for wage increases for their technician employees, including American Airlines, Alaska Airlines and Southwest Airlines.

61.     LOA #29, in paragraph 2, describes how the Adjustment Calculation provides the biennial raise. "If the results of the analysis demonstrate that as of the Measuring Date, UALs Annual Wages and Benefits is less than 102 percent (102%) of the combined average of Annual Wages and Benefits under AA CBA [American Airlines CBA] and DL CBA [Delta Airlines CBA], then UAL shall adjust basic wages effective at the beginning of the first pay period after each measurement date to be 102 percent of the combined average. If it is determined that a one-time adjustment will take place, any subsequent pay increases will not take place until such time that the rates in the original UA CBA exceed those rates in the adjusted scale." Exhibit 3, LOA #29, para. 2.

62.     LOA #29, further defines the Adjustment Calculation formula as follows: "Annual Wages and Benefits" is the sum of Annual Employee Wages, Annual Employee Benefits and Time-

12

off Adjustment for 10, 20 and 30 years of service weighted 20 percent, 60 percent and 20 percent respectively." Exhibit 3, LOA #29, para. 1(h).

63.    LOA #29, Paragraph 1 Definitions, subsections e, f, and g, each provide the definitions for Annual Employee Wages, Annual Employee Benefits, and Time-off Adjustment, and how each is calculated. Exhibit 3, LOA #29, para. 1(e), (f), and (g).

64.    LOA #29 provides for a final adjustment, a "Scope Adjustment," which is a ratio of the number technicians and related crafts covered in the CBA per mainline aircraft. Exhibit 3, LOA #29, para. 1(i).

65.    On October 18, 2016, the Unions held an informational meeting or "roadshow" at SFO to explain the CBA rules, terms, and conditions, including LOA #29. At this meeting, Akins, as a negotiating committee member and economist, provided a comprehensive explanation of LOA #29, meticulously going over all of its elements, functions, and application, utilizing and providing a corresponding PowerPoint presentation Akins referred to as a draft of the Cost Model referenced in LOA #29. A true and correct copy of which is attached as "Exhibit 4." Akins referred to this first calculation as the "baseline calculation," explaining this was done to not only show how the Adjustment Calculation worked but also the value of the now CBA should the Technicians elect to ratify the Tentative Agreement. Below is slide 4, an overview of the Cost Model. Exhibit 4.

**Reset Model Architecture**

## Industry Reset Overview

- **Purpose:** The industry reset is designed as a mechanism to ensure that the sum value of United Technician's primary contract elements remain at least 2% above the average of the same contract elements for Technicians of American and Delta.
- **Timing:** Reset analysis will occur every 24 months after date of ratification over the course of contract, and every 12 months after the amendable date.
- **Mechanism:** A reset model has been created to measure and compare the value of a selected set of primary contractual elements covering pay, benefits, work rules and retirement contribution level for Technician's at United to that of the average of Technicians at American and Delta. The model's structure will not change, only the periodic updates of data elements being analyzed will change.
- **Application:** If the results of the reset model indicate that the sum value of the United's Technician's contractual elements do not exceed the average value at American and Delta by 2%, the United Technician's wages will be adjusted upwards by an amount needed to adjust United Technician's contract value to 2% above the average of DL and AA Technician's contract.
- **One-Way Valve:** The reset can only be used to improve wages for United Technicians and will not be used to reduce United Technicians wages under any circumstances.

4

13

66.     Akins stated the Cost Model was negotiated at the bargaining table as part of LOA #29 and would be put in a different excel format for ease of use to perform the mathematical formulations and computations. Akins emphasized the Adjustment Calculation was set, it was "not something that's under a dark sheet or something that is made up." Akins also confirmed, when asked, the 5-elements depicted will be the same 5-elements used in the future, and "they are known, they are not vague, that is what we fought for, real numbers you guys can look at." The Akins presentation provided a draft Cost Model for each of the elements making up the Adjustment Calculation, including the American / Delta comparisons. The slide below depicts the written summary of the elements of the Adjustment Calculation. Exhibit 4, slide #6.

**Model Comparative Elements**

## Contract Elements Included in the Reset Analysis

1) Pay
   • Technicians All-in Wages (Basic pay, A&P License Premium, Line and Longevity)
   • VEBA
2) Time Off
   • Annual Vacation, Sick and Holiday Hours
3) Benefits
   • Medical Cost Share
   • Retirement Contribution
4) Profit Sharing
   • Profit sharing % to annual UA pre-tax profits
5) Scope
   • Based on ratio of Technicians heads per mainline aircraft

Note: Model analyzes Pay and Time Off element values at 10, 20 and 30 years of service, weighted 20%, 40%, 20% respectively for headcount. Gaps in all elements besides pay converted to dollars per hour based on UA All-in rate for computability in comparisons.

67.     Another slide, found on the next page, grouped the summary values for all of the "Non-Pay Items," i.e., everything other than wages. This slide was also described as "baseline" for these items for the now CBA for the Adjustment Calculation. The sum value of the "Non-Pay Items" when added correctly is actually $1.01 not $1.02 as depicted on the slide. Nevertheless, Akins explained this was the baseline value for the CBA. Exhibit 4, slide #8.

**SECOND AMENDED CLASS ACTION COMPLAINT      CASE NO.: 3:23-CV-03939-EMC**



**Current Model Example of Non-Pay Items**

68.    Akins specifically went over each element and each slide. Of note was the explanation of the Retirement element later expanded upon in 20-minute video.

69.    Akins was clear the Retirement element was the value of what the pension payments to the Technicians would be. Bargaining notes also evidence "contributions" are direct reference to the defined contribution plans, a benefit which all three carriers provide to their technicians. With regard to how the defined benefit plan factored in, negotiation notes, the slides, and subsequently provided explanatory videos, show the retirement valuation for United Technicians at the baseline calculation, at the start of the CBA term, is allegedly 4.2% of annual pay as the defined contribution percentage was 3% at this time and the totally value depicted in 7.2%. Exhibit 4, slide #14.

70.    The amount United is required to contribute to properly fund the defined benefit plan does not change the value of the plan to a Technician. Akins stated the only way there is an increase in any element for any carrier under this Adjustment Calculation, by this "reset," is by changes in the CBAs or contracts of the measuring parties, i.e., United, American, and/or Delta.

71.    There is no provision in LOA #29 to alter, redefine, or recharacterize these elements of the Adjustment Calculation. Any variance occurs by an update to CBA terms by any of the three airlines, e.g., enactment of a new CBA with differing terms from the baselines measurement or

15

awarded wage increases, in between measuring periods. Since the baseline measurement, United has not amended, modified, or otherwise changed in any way its retirement obligations to the Technicians. This is evidenced by the CBA provided to Plaintiff Scholz in March 2023.

72.    In addition to Akins' detailed explanations and writings, as Akins himself stated, the information needed to do the Adjustment Calculation, to provide the data inputs, is all publicly available. One credible source for this information, beyond the actual CBAs of all three airlines and their required filings with federal and state governments, is the MIT Airline Data Project.

73.    The Massachusetts Institute of Technology (MIT), for over twenty years, curated this precise information as part of an Airline Data Project. The Airline Data Project, according to MIT's website, is "designed to support the goals of the MIT Airline Industry Consortium," which is a relatively small group of air carrier companies and adjacent organizations. United, American, and Delta Airlines are all members of this Consortium. One benefit of this membership is access to the research findings of the Airline Data Project. The project was put on hold during the pandemic, and is currently not updating; however, the data, its origins, and details of the project and the Consortium can still be viewed at http://web.mit.edu/airlinedata/www/default.html.

### 3.    Non-CBA Relevant Agreements and Provisions.

74.    LOA #29 states "Cost Model is an economic model, based in MS Excel, which calculates Annual Employee Cost. The model is to be agreed upon by economic experts from the company and the union within two months after the date of ratification of UA's agreement as Exhibit 'A.' If an agreement is not reached within this timeframe, the matter may be submitted for expedited arbitration as provided in Article 1 G." Exhibit 3, art. 1.G.

75.    Logically, the sum of all wages and benefits paid to United's workers by United is a cost to United. Therefore, the summation of such compensation can also be understood to be the Annual Employee Cost. Stated another way, the Adjustment Calculation determines the biennial raise and the Cost Model depicts the data used to arrive at the assigned values to do the Adjustment Calculation. All of this information was provided at the "roadshow" ratification meeting.

76.    LOA #29, Paragraph 2, a clause set apart from the Adjustment Calculation itself, also references the Cost Model. "The parties shall meet to review the Cost Model for the purposes

16

of reaching an understanding of the adjustment analysis. In the event the parties are unable to reach an understanding relative to the adjustment analysis, the matter may be submitted for expedited arbitration as provided in Article 1 G." Exhibit 3, LOA #29, para 2. Again, this "understanding would be having checked each other's math regarding the 5-elements of the Adjustment Calculation," according to Akins. It should be pointed out that arbitrators under the RLA only have jurisdiction over the interpretation and application of the CBA.

77.     Since the filing of the original complaint, the Union Defendants have stated in court filings, and represented in court proceedings, that the Cost Model was negotiated between the Teamsters and United shortly after ratification as required by LOA #29. This Court has deemed this agreement, however, to not be part of the CBA, or incorporated into the CBA by reference. Accordingly, the Cost Model is an independent agreement not subject to RLA preemption.

78.     All Defendants, as well Bob Fisher of the Teamsters and Javier Lectora of Local 856, have made statements to the membership and to this Court that sometime after the CBA was ratified, United required non-disclosure agreements ("NDA") United controlled to be entered into with, on information and belief, Dan Akins. Mr. Fisher and Mr. Lectora have stated as much to Plaintiffs; Fisher repeated this to Technicians affiliated with Teamsters Local 210. On information and belief, this NDA has allegedly recharacterized and redefined the terms of LOA #29.

79.     In addition to being prohibited by the RLA, any such material change bearing on the CBA, and on Plaintiffs' and the Class' wages would require a ratification vote of the membership, according to the Union Defendants' governing documents. No such vote has occurred.

80.     Wages are subject to mandatory bargaining and any change to wages can only be effectuated through bargaining between the exclusive bargain representative(s) and the employer. Under the RLA, this must be proceeded by notification of an intent to so bargain. 45 U.S.C. §156. Any changes to the CBA made outside of RLA § 156 negotiations is a civil, and criminal, violation. Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142 (1969).

81.     Therefore, any material impact or change to the wage rules the plaintiffs were subjected to would be required to be bargained for, and put to a ratification vote per the RLA, and the Union Defendants' governing documents, the Teamsters' constitution and Local 986's bylaws.

17

82.     Since ratification, the Technicians have agreed to, and ratified, one change related to LOA #29. In January of 2023, the Technicians agreed to, and ratified, an extension of the CBA. As is relevant here, in exchange for $5.74 of wage increases, the technicians extended the CBA for one-year, surrendered the 2023 Adjustment Calculation, and permitted additional outsourcing.

83.     The only complete Cost Model ever provided to the Class, including Plaintiffs, was the draft Baseline Cost Model provided on October 18, 2016.

84.     On information and belief, United has entered into at least two agreements that are not part of the CBA – the Cost Model referred to in LOA #29 and the NDA, both with Dan Akins.

85.     This Court has held the Cost Model is not part of CBA nor incorporated by reference into the CBA. Thus, the duty to perform the promise of the Cost Model, to effectuate the duty to perform the Cost Model in order to determine proper wage adjustment for Plaintiffs and the Class, arises from state law. As a result, any rights Plaintiffs and the Class might have with respect to the proper performance of these exchanged promises is not preempted by the RLA. The standard is that of common law contracts as to whether the parties who undertook to perform the calculations did so in good faith, adhered to their duties to act honestly, and if they acted fraudulently or not.

86.     Unions have a fiduciary duty to deal fairly with their members and that fiduciary duty includes a general duty to respond to an employee member's request for information regarding employment issues. By refusing to provide the information, the Unions directly impaired the employee-member's rights under the collective bargaining agreement. *See* Office of the General Counsel, division of Operations-Management, Memorandum ICG 18-09, dated September 14, 2018, and 19-01, dated October 24, 2018, entitled "General Counsel Instructions Regarding Section 8(b)(1)(A) Duty of Fair Representation Charges" (stating the General Counsel's position that a union's failure to "respond to inquiries for information or documents by the charging party ... constitutes more than mere negligence and, instead, rises to level of arbitrary conduct unless a reasonable excuse or meaningful explanation").

87.     Since at least October 18, 2016, Dan Akins, an actuary, has been retained by the Unions, in part, for purposes of handling the Adjustment Calculation and implementing the Cost Model, including reporting it out to the Unions. Akins therefore acts as an agent of the Union

18

Defendants, on their behalf. Akins has admittedly served in this role since at least 2013 acting on the Unions' behalf and for the benefit of Plaintiffs and the Class.

**4.     LOA#29 Measurements Performed.**

88.     The biennial Adjustment Calculations were allegedly all performed according to the measuring period schedule provided for in LOA#29, with results generally reported in November of each measuring period.

**a.     First Measurement - 2018 LOA #29 Adjustment Calculation.**

89.     At the first measuring period, there had been no changes to the CBAs of United or American. American remained in negotiations for its amalgamated contract following its merger with USAirways. The only discernible changes were actual profit-sharing monies of the three carriers and contractual wage scale increases. Delta had wage and profit-sharing increases.

90.     United, and the Unions, reported out the Adjustment Calculation result via email to the Technicians. United announced due to dramatic increases in the "Non-Pay Items," there would be no raise or "reset." Despite not a single change to any United CBA provision for the agreed upon "Non-Pay Items," and increases for both American and Delta in those elements, e.g., profit-sharing far superior to United, the "Non-Pay Items" net values provided in 2016 had increased in value in United's favor, from $1.01 to $3.67. Below is the partial Cost Model provided by the Unions, demonstrating that the Adjustment Calculation would produce no raise.

|  | United | Average of AA / D |
|---|---|---|
| **Wages** | $49.45 | $49.31 |
| **Non-Pay Items** | + $3.67 | |
| **Total Value** | $53.12 | $49.31 |
| **United   (+ / - )** | 107.7% | |

91.     A rudimentary calculation, however, applying the Akins explanations and methods, and assuming no change to the four unchanged "Non-Pay-Items" – Time Off, Medical Cost Share, Retirement, and Scope – given there had been no change to any CBAs or work rules but adjusting

**SECOND AMENDED CLASS ACTION COMPLAINT     CASE NO.: 3:23-CV-03939-EMC**

for Profit-Sharing which had seen a change, yielded an almost exactly opposite result. In order for United technicians to be paid 102% of the combined average of American and Delta technicians, an adjustment to United technicians' hourly wages of approximately $3.89 per hour would need to be made. See the chart below.

| | United | Average of AA/DL |
|---|---|---|
| **Wages (All-In According to Union Defendants)** | $49.45 | $49.31 |
| **Profit Sharing (Using Technician Wage Statements)** | $ 1.44 | $ 3.22 |
| **Benefits (Non-Pay Items)**<br>**[Used Baseline Numbers + new P/S Net]**<br>**[$1.56 + $0.11 + $0.47 + ($0.12) + ($1.44 - $3.22)]** | $ 0.24 | |
| **TOTAL WAGES + BENEFITS**<br>**[$49.45 + $0.24]** | $49.69 | $52.53 |
| **ADJUSTMENT CALCULATIONS** | | |
| **United All-In Wage Rate** | | $49.69 |
| **AA/DL Avg. x 102% [$52.53 X 1.02]** | | $53.58 |
| **ADJUSTMENT CALCULATION RESULT (UNITED +/- )** | | ($3.89) |
| **NET ADJUSTMENT CALCULATION REPORTED** | | $0.00 |

92.    The result is jarring. Admittedly, the calculation is estimated as the actual Cost Model or any Adjustment Calculation values do not account for the actual Non-Pay Item values allegedly used by United or the Unions in performing and reviewing the result. However, such variances would not be in dollars but closer to cents. None of the CBAs or contracted benefits other than Profit-Sharing had changed. This calculation does use publicly available profit-sharing reports, with weighting and conversion to a per hour figure based on annual wages accounted for.

93.    Many technicians across the system pressed for an explanation to substantiate the values reported by United and the Unions. Neither the Unions nor United responded.

94.    One SFO Technician, Jim Seitz, "checked the math" producing the chart above, which clearly shows a reasonable discrepancy. Believing the reported calculation to be wrong, Seitz

20

showed his calculation to his Local 986 representative, and asked for an explanation as to which one was correct. Local 986 could not explain it and would not explain it. As a result, Seitz filed a grievance to enforce LOA #29 contractual language against United to challenge the result of the Adjustment Calculation provided by United. The grievance requested that all data used to do the computation be provided to "check the math" as well as any other relevant information, including the Cost Model mentioned in LOA#29, if such information was used in the Adjustment Calculation. Other technicians based at LAX, O'Hare, Denver, Newark, Dulles, and Houston also filed grievances seeking an explanation to determine if they had been properly paid.

95.    Prior to 2018 Adjustment Calculation, Teamsters Airline Division Representative, and Local 210 Business Agent, Vinny Graziano, had advised the Technicians in a Teamsters posted letter that the Excel Cost Model would not be provided for the upcoming 2018 reset as previously promised. The reason provided was that the NMB had since ordered it kept secret on the NMB servers to protect the Cost Model's highly sensitive nature. At the time of the statement, months prior to the calculation, no Technicians had a reason to question this or think this was not true. However, when the 2018 Adjustment Calculation was reported, Seitz asked for the Cost Model to be provided to him in order to "check the math." The Unions refused his requests.

96.    Seitz' grievance was never answered by United. Local 986 simply withdrew the grievance, stating there was no violation because the Unions and United had met and reported the result. The Unions claimed this satisfied their duty under LOA #29 and their duty to the member Technicians, including Seitz. The Teamsters subsequently, without prior notification or consent, ordered all grievances filed across the system withdrawn on the grounds they were meritless.

97.    Despite Seitz' protests of the handling of his grievance, and requests to advance it according to his contractual and statutory rights, neither United or the Unions ever did answer Seitz' or  advanced his grievance.

98.    Under the Unions representation at United, since 2008, in a case where a grievant wanted to advance his or her grievance from the Second Step to the Third Step System Board of Adjustment, where the Union found it meritless and did not want to participate, Local 986 would notify United of the parties' positions – grievant proceeding and Local 986 releasing as a no-fund

21

case. This would initiate the Third Step process, if done timely, relieving Local 986 of any responsibility whilst respecting the grievant's rights. This is still the stated practice albeit applied at the subjective whim of Local 986 as to whether to honor the grievant's wishes.

99.    Despite making the timely requests to advance his grievance, Local 986 refused to advance his grievance, contrary to the CBA and Seitz' statutory rights to access and complete the congressionally mandated grievance process. Local 986 stated because Local 986 did not agree with Seitz' assessment of his grievance, they would not advance it. This again is contrary to the practice for all other grievants under the Unions representation at this time and the RLA.

100.    Some contextual background perhaps illustrates why such a divergent and seemingly impermissible action was taken. At the time of this measuring period, December 2018, tensions were high between United and the Technicians and incredibly strained between the Unions and its United Technician members.

101.    A few weeks prior to the 2018 Adjustment Calculation announcement, on October 31, 2018, the Technician-members sued the Unions and the United Defendants for depriving pre-merger United ("subUA") technicians of 7-years of pension rights and for diluting 7-years of subUA technicians profit-sharing monies.

102.    On information and belief, this lawsuit prompted United to change the agreed upon Adjustment Calculation formulation and to have the Teamsters assist United in doing so.

103.    The supporting documentation of that lawsuit supported claims that the Teamsters ignored CBA language for its own financial benefit so that it could gain control of the pension required to be part of the post-merger CBA, as well as illicitly gave profit sharing monies to then pre-merger Continental ("subCO") technicians in order to sway sub-CO votes in favor of Teamster pension plan offers.

104.    During the negotiations for the current CBA, and during the time of the pension and profit-sharing litigation, the Teamsters routinely called subUA technicians greedy, and not team players, for not wanting to share their profit-sharing monies with subCO technicians. The subCO technicians had voluntarily surrendered those rights in their previous CBA negotiations. SubUA technicians took the position that United had the power to give subCO profit sharing, and should

22

give subCO technicians profit sharing, but that United could not just dilute the monies destined for subUA technicians. SubUA technicians, particularly Scholz and Jim Seitz, routinely stood up to the Unions for purposely dividing and misleading subCO technicians on these issues.

105.    On information and belief, out of concern for an adverse ruling in the lawsuit that would require it to make restitution for the years' long failure to include subUA technicians in CARP, United began increasing their CARP contribution payments.

106.    On information and belief, in derogation of United's duties under the its Bankruptcy Exit Agreement with its subUA technicians due to United's merger with Continental, on December 10, 2010, United and the Teamsters secretly agreed United could delay compliance with the Bankruptcy Exit Agreement in exchange for agreeing subUA technicians would be enrolled in a Teamsters controlled or administered pension plan rather than putting this issue to a vote as required by the Bankruptcy Exit Agreement. The Teamsters admitted as much in a 2017 legal memo it provided to Scholz in finding his grievance, filed pre-lawsuit, over these issues lacked any merit.

107.    Surveys taken at the time of the subUA technicians revealed an almost unanimous preference (98% of subUA technicians surveyed) for a defined contribution plan albeit with better terms than a United sponsored defined benefit plan. The Teamsters ignored these surveys so as to ultimately control subUA technicians pension benefits. Instead, the Teamsters pushed for, and proposed, plan after plan to United of a Teamsters controlled multi-employer plan, a Teamsters controlled single employer plan, and a Teamsters controlled Adjustable Pension Plan.

108.    These secret dealings prevented and delayed for over 7-years subUA technicians from being enrolled in any pension plan – defined benefit or a better-defined contribution plan.

109.    In conjunction with this, in February 2011, a few short months after the secret deal to delay pension enrollment for the subUA technicians was agreed to, 4-months after the merger, the Teamsters turned a blind eye while United diluted subUA technician profit sharing pool monies, allowing United to include subCO technicians in the subUA technicians profit sharing pool monies.

110.    At this time, subCO technicians had no right to participate in any profit-sharing at United pursuant to the terms of the profit plan and subCO technicians' CBA, which the Teamsters had negotiated on the subCO technicians' behalf, which was ratified in 2010, after the merger.

111.    While the terms of the profit-sharing plan permitted United to add terms which would give an employee or employee group profit-sharing monies, United did not change the plan's terms to include employee groups with no contractual right to profit-sharing monies. Nor did United amend the plans terms to otherwise include the subCO technicians. Instead, United (which at this time was run by Continental) treated the subCO technicians as participants in the subUA profit sharing pool although the subCO technicians did not meet the plan's definition of participant. Thus, including the subCO technicians in profit-sharing plan distributions violated the plan's terms.

112.    The Unions, and United, also refused to process the grievances filed on these highly significant discrepancies. Both refused to convene the higher stages of the grievance process under similar pretextual and intentionally misleading basis – only the Union can participate at the higher stages of the grievance process. United, for its part, stated they were at the mercy of the Unions and could not permit the technicians to participate in the higher stages of the grievance process without the Unions. United also falsely claimed the grievances in this matter had been properly withdrawn, leaving United without a controversy to resolve. This led to the lawsuit in this district.

113.    Not only did the Unions sit back and do nothing to protect the subUA technicians' rights, but they sowed division and discord amongst the two technician groups. The Teamsters called the subUA technicians greedy, selfish, and rats for wanting the Teamsters to defend their rights. Seitz, in particular, was labeled a rat and run out of the union in a sham trial, one in which he was neither present nor represented, on the grounds that he was disloyal and his actions were not in the best interests of the Unions. As its basis for doing so, the Unions cited to the Teamsters' constitution and Local 986 bylaws, including the oath taken by all members.

114.    The Teamsters also spread legally and factually false "updates," insinuating that the subUA technicians were trying to steal subCO technicians profit sharing monies, adding that if the subUA technicians were successful, subCO technicians would have to pay all of the past profit-sharing monies they had received back, with interest and penalties. Sadly, this propaganda worked. The division was sowed. The two technician groups were now at war with one another. Instead of unifying and supporting all of its members equally and properly, as required, the Teamsters arbitrarily discriminated against one group or the other repeatedly for their own financial gain.

115.    Plaintiff Scholz was one of the named plaintiffs who sued the Union Defendants and United for these egregious breaches of trust just before the 2018 Adjustment Calculation was announced. Plaintiff Scholz, and many other technicians across the system, believe this lawsuit caused the Teamsters, and Local 986, to acquiesce to all kinds of changes to the work rules, to the CBA, at United's behest lest the full breadth and depth of the Unions betrayal of its membership be exposed by United, which would almost certainly exact a heavy financial penalty on the Unions, likely leading to the altering of the LOA #29 formula for United's financial benefit.

116.    In preparing for that litigation, the pension and profit-sharing litigation, Scholz learned that in 2017, six-months and one day after the CBA was ratified, on June 6, 2017, the Teamsters received a $1.5 million dollar payment from United. It is a violation under Section 102 Fourth of the RLA, 45 U.S.C. 152 Fourth, for a covered carrier to provide financial assistance to the labor organization in any amount. Neither the Teamsters nor United have ever accounted for this payment as a valid payment for legitimate reasons.

117.    Seitz subsequently filed a lawsuit over the handling of his grievance related to the 2018 Adjustment Calculation in this district; however, the lawsuit was ultimately dismissed. The Unions had moved for dismissal of the lawsuit on the grounds the action was untimely, which the court granted. The court never had an opportunity to reach the substantive issues of the dispute.

**b.    Second Measurement – 2020 LOA #29 Adjustment Calculation.**

118.    The second measurement did not fare any better than the first. American had ratified its CBA with its technicians in which significant improvements were obtained in all 5-elements of the Adjustment Calculation. Delta had provided substantial wage increases to its technicians and is posting record profits. However, these gains are somehow largely negated, at least with respect to the Adjustment Calculation as provided by United, whose CBA has not been modified, who have not provided substantial wage increases, and who had dramatically reduced its technicians profit-sharing percentage.

119.    On November 11, 2020, United, and the Unions, announced a 7.6% wage increase or approximately $2.94 on average for the technicians. There were no calculations provided, not even the partial Cost Model that was provided in 2018. United, and the Unions, summarily stated

the percentage and average dollar amount raise only. There were no numbers for American or Delta to establish whether the 7.6% increase did in fact put United's technicians at 2% above the combined average of American or Delta. At least that calculation was provided in 2018. Neither was the "Non-Pay Items" summary value provided. There was absolutely no basis whatsoever for a technician to know how, and if, they were being paid correctly or if the Adjustment Calculation was being done correctly.

120.    An elementary calculation using the publicly available wage rates of American and Delta to determine the combined average wage rate plus 2% yielded an hourly rate of close to $60 dollars, or $59.57, by most accounts. United's comparable wage rate at that time was $52.14, which was $7.43 dollars below that of the combined average of American and Delta plus the 2%.

121.    There was nothing but a full-throated endorsement by the Unions that United had done the calculation and it was correct. One comment rang truer to the Technicians than the others, without irony, the Unions stated, "the Adjustment Calculation is working exactly as intended."

122.    As they had before, Technicians across the system performed some form of the basic calculation from the publicly available information, all reaching results three sometimes four times higher than the purported $2.94. Many of these Technicians filed grievances.

123.    At SFO, Jim Seitz and Geoff Wik, were two Technicians who filed separate grievances. Once those grievances were lodged with Local 986, an announcement was made for no one else to file a grievance as these two grievances would cover everyone. Under the CBA, United "recognizes the right of the Union to file a group grievance when the issue is common and identical to those employees in the group." Exhibit 3, art. 19.E.7. The CBA however does not waive, expressly or otherwise, a grievant's right to proceed individually in such a case.

124.    Nevertheless, these grievances were closed without any investigation, notification, or consent. This was not without controversy however as the Unions actually revived the grievances after they had formally closed them, only to close them again. The timing of this was notable.

125.    On February 4, 2021, the same day Scholz and the other named plaintiffs in the pension and profit-sharing lawsuit had oral arguments on United and the Unions motions to dismiss that case, Local 986 business agent Mark DesAngles emailed Seitz and Wik stating the grievances

26

were now reopened. No explanation was provided nor did Local 986 cite to any contractual right under the grievance process to do this. Local 986, when asked, also refused to state who approved, or agreed to do this, on United's end. Neither question was ever answered by email or in the Second Step hearing that was convened on March 4, 2021 over the grievances.

126.    Local 986 did nothing to assist, investigate, prepare, or otherwise support these grievances, including refusing to provide any Adjustment Calculation information or data, even if to dispel Seitz' calculations and valuations. Seitz presented calculations, supporting documentation to support each of his calculation's mathematical assumptions, computations, and conclusions all culled from the known, publicly available and easily accessible, documents and information necessary to perform the calculation. The only evidence submitted or discussed by Local 986 were the grievances that had been filed by Seitz and Wik. United did not produce any competing evidence or any calculation to substantiate its position.

127.    Shortly thereafter the grievances were again closed without prior notification or consent to Seitz or Wik. Local 986, after the fact, sent a single sentence letter informing Seitz and Wik their grievances were withdrawn for a lack of merit and the decision was final this time. Again, Seitz insisted on advancing his grievance as he is entitled to do and again, Local 986 refused to do so. As a result, Seitz filed another lawsuit in this district for the conduct in handling the Adjustment Calculation and the grievance process.

128.    After deciding to file a lawsuit, and in anticipation of trial, in April of 2021, Seitz and Wik hired an attorney to assist in investigating the matters before the court. Specifically, they hired an attorney to make Freedom of Information Act ("FOIA") requests and review other financial reports, documents, including SEC filings for the three air carriers and IRS Form 5500s.

129.    One FOIA request result was notable. Responding to a request for the Cost Model stored on its servers, the NMB responded by letter that there was nothing to produce as their search had yielded no results. A follow-up conversation between Seitz' attorney and NMB representative attorney, John Gross, was even more enlightening. Mr. Gross definitively stated, "we never had the Cost Model on a server and never would ... we do not have a server like that, we do not use servers like that."

SECOND AMENDED CLASS ACTION COMPLAINT        CASE NO.: 3:23-CV-03939-EMC

130.    This information was introduced as part of Seitz' lawsuit. It was at this time that the reason for not providing the Cost Model shifted. United and the Unions now claimed in their motions to dismiss that the real reason there was no information available as to how United was calculating Technician pay was because the Cost Model actually contained highly confidential and proprietary information of the kind so sensitive, that if it were to be revealed to anyone, even the bargaining representative of Seitz in carrying out their representational duties, United would be put at immediate and perilous competitive disadvantage. This explanation went entirely unchallenged and was fully endorsed by the Unions both in court and to their membership despite the clear bargaining history to the contrary, i.e., everything, every element, every value, is publicly available. As Dan Akins had repeatedly stated, "we fought very hard to keep this very simple and all based on five publicly available elements." The Unions have not and cannot reconcile these statements. This fabricated and unsubstantiated theory persists today.

131.    Seitz' case was eventually dismissed by the court. The court concluded in relevant part Seitz had not stated a plausible enough claim for breach of the duty of fair representation as to the Unions, which effectively settled the claim in favor of United as without the breach of the duty of fair representation claim, the court had no jurisdiction to hear the breach of contract (CBA) claim against United. The court seemingly based its reasoning on its acceptance of the unsubstantiated and frivolous assertion that the Adjustment Calculation information, and the Cost Model, could not be disclosed because it contained confidential and proprietary information.

**c.    Third Measurement – 2022 LOA #29 Adjustment Calculation.**

132.    On November 23, 2022, United and the Unions each reported the 2022 Adjustment Calculation via separate electronic postings. This is the basis for the present controversy.

133.    United and the Unions both reported the Adjustment Calculation yielded a 2.6% wage increase or an approximate average raise of $1.20 per hour increase to the Basic Rate.

134.    In an undated letter from United to the Teamsters' Vinny Graziano, United discusses conducting the 2020 Adjustment Calculation in November 2020. The letter acknowledges the Cost Model is the Adjustment Calculation results, which the actuaries then review and confirm. The letter refers to the Cost Model "analysis results" as being the results of the Adjustment Calculation.

28

135.    The 2022 result, even on its face, was wildly out of sync with the very public, and known, wage and benefit gains by American and Delta. It did not seem even facially plausible. Neither the Unions, nor United, stated the result was anything other than the true, objective result.

136.    As had been the case with all of the other Adjustment Calculations, Technicians from across the system approached both United and the Unions, including other affiliated local unions, regarding the result asking for documentation or to show the math in order to confirm the amount that was reported was correct. All were rebuffed and no supporting information was given.

137.    Notably, this time around, lower-level United officials, supervisors and managers, first response was there was no violation of the CBA as the Adjustment Calculation was done. Not that the calculation was correct or even that it was entirely confidential. They basically stated they knew people were mad but it was done, and "above their pay grade," so nothing could be done about it. Even they had been told not to ask about the result process or conclusions.

138.    The Union Defendants, including other affiliated local unions, parroted the same response, i.e., no violation as United was not obligated to provide any information related to this result or to answer any questions as to how the result was reached. In California, under the Labor Code, an employee has a right to be able to calculate that they were properly paid and that should be readily discernible from the face of the provided wage statement. Cal. Lab. Code § 226.

139.    Some technicians, including Plaintiffs, "checked the math" in an attempt to verify the reported result. Unsurprisingly, the results were wildly divergent from the results provided by United, and allegedly reviewed and confirmed by the Union Defendants. Notably, all of the Class Technicians' results were within cents of one another; none were dollars apart. The same cannot be said in comparison to the reported results of United and the Unions.

140.    Thereafter, grievances were filed throughout the system by members of the Class, including by Plaintiffs, complaining of these severe computational anomalies. The exact number of grievances cannot presently be ascertained because, as detailed above, the Unions have wrested all information related to the grievance process throughout the system away from the Technicians and have squirreled it away onto an electronic only certain union officials can access. Not one union representative provided any kind of computational explanation, not even a rudimentary calculation,

29

as to how the result was arrived at, conducted, reviewed, or confirmed when presented with these grievances and inquiries.

141.     The grievances commonly charged United with having violated the LOA #29 and various provisions of the CBA. Each sought a basis for this result, and any lost compensation, as a remedy. Specifically, the grievances typically asked United to provide relevant documentation necessary to intelligently and rationally evaluate the result provided given certain mathematical variances. United did not provide any grievant or Class Technician with this information.

142.     The Unions refused to do anything, claiming United had tied their hands and they could therefore not disclose any information. The Technicians reminded the Unions that not only did the Unions have a right to information under the RLA, but also the parties had bargained for, agreed to, and the CBA expressly authorized, the Union to make requests for relevant information related to grievances, to which United was required to respond, particularly where United was relying on such information to support, or defend, its position. Exhibit 3, art. 19.E.3.

143.     The Unions' response was such requests were futile because United would refuse to respond. The Unions made no attempt to request the information or to make United comply to a request. As a result, many Technicians now firmly believe the Unions have entirely abandoned their representation of United technicians.

144.     It is well-settled labor law that an employer is obligated to provide information that is needed by a bargaining representative for the proper performance of its duties. NLRB v. Truitt Mfg. Co., 351 U.S. 149 (1956). Likewise, the duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement. NLRB v. C & C Plywood Corp., 385 U.S. 421 (1967). Such bargaining also includes rights to information to assess offers or the other party's position. Id.

145.     United's response as to why it would not provide any information, including CBA integrated documents, was "the information was confidential and proprietary, and so to provide the information would put United at a competitive disadvantage." This explanation is implausible. The same information would be needed from American and Delta to correctly perform the calculation as written and agreed upon. How could this information be confidential only to United?

1    **B.    Factual Allegations Specific to the Plaintiffs.**

2        146.    Two SFO Technicians, Plaintiff Mullins and Plaintiff Scholz, grieved the 2022

3    Adjustment Calculation. Conspicuously, Jim Seitz has not grieved this calculation. Seitz is no

4    longer a technician at United as he was terminated by United during the pandemic.

5        **1.    Plaintiff Mullins Grieves the 2022 Adjustment Calculation.**

6        147.    Mullins was present for many of the informational meetings held by both United,

7    and the Unions, where terms and conditions of the CBA, including LOA #29, were explained.

8    Mullins has first-hand knowledge of the October 18, 2016 "roadshow" meeting where the Unions,

9    specifically Akins, explained in great detail the working of LOA #29, its elements, functions, and

10    application of the LOA#29 Adjustment Calculation. Mullins also has first-hand knowledge that the

11    Cost Model was negotiated at the bargaining table, finalized at the bargaining table, albeit not in

12    MS Excel format, and would be provided to the Technicians after each Adjustment Calculation.

13        148.    Mullins recalls Bob Fisher, Edward Gleason, Dan Atkins, Peter Hardcastle, Vinnie

14    Graziano, Chris Griswold, Clacy Griswold, Joe Prisco, Mark DesAngles, Javier Lectora, and John

15    Laurin as being present to explain the CBA, and LOA #29. All emphasized the process was derived

16    from easily obtainable public information and was designed to keep United technicians paid at least

17    2% more than their counterparts at the other two legacy airlines, American and Delta.

18        149.    The Unions routinely stated Technicians were trading profit sharing pool money

19    share, and negotiating over wage increases, for the duration of the CBA for a set formula tied to

20    easily identifiable and available information to calculate wage raises on a biennial basis. Bob

21    Fisher, from the Teamsters Airline Division, specifically explained the idea was to not have the

22    historical drawn out and hostile negotiations with United when the CBA became amendable. He

23    explained this would also result in the Technicians not having to worry about retro pay because

24    when the CBA became amendable, LOA #29 provided for an annual Adjustment Calculation,

25    instead of biennial, until such time as a new CBA was entered into.

26        150.    All Union officials, including the outside economists and actuaries hired by the

27    Teamsters, all emphasized the parties would be able to "check each other's math," as such a process

28    was expressly provided for in LOA #29. Mullins is aware of at least two recordings of these

meetings – one is a voice recording and one is video that was posted online. The Teamsters and Local 986 also made videos for the Technicians that they provided every Technician with the CBA voting materials pre-ratification, on portable USB drives. In the videos, Dan Atkins and Peter Hardcastle, the two outside economists who valued the CBA on the Technicians behalf, explain LOA #29, the Adjustment Calculation, and the resultant Cost Model again.

151.    The stated goal expressed by both the Unions and United was for Mullins and the other United Technicians to always be paid more than United's two main competitor technicians, those technicians at American and Delta.

152.    Specifically, the stated goal was for United Technicians to be paid at least 2% more than the competitor technicians combined average of wages and benefits.

153.    This would be tested every two years during the CBA duration, or at three separate measuring intervals. When the CBA became amendable after 2022, the measurement, and any resultant raise, would be performed annually so as to provide for more efficient and fruitful negotiations with United with such a big issue largely resolved, or so the theory went.

154.    United's announcement, sent though intra company email for the 2022 Adjustment Calculation claimed  the calculation produced a 2.6% increase. For Mullins this was approximately $1.23. Mullins did not see this email announcement until December 5, 2023.

155.    Mullins immediately suspected something was off because in the past two years he knew there were many increases at American and Delta for all of the five categories for the calculation – wages went up, profit sharing was big, and significantly better benefits had been secured – yet, the United CBA was the same as it was not thus far amendable.

155.    This was the basis for Mullins suspicion and thus, Mullins "checked the math," i.e., he performed the calculation himself using public information such as LOA #29, the CBAs from American and United, Delta's Tech-Ops info and public press releases, all three airlines SEC documents and announcements, government websites, and the internet, to the best of his ability to at least get an idea if the numbers were right.

156.    Below is a mockup of the kind of calculation he did and his results.

|  | UNITED | AA | DELTA | AA/DL Avg. |
|---|---|---|---|---|
| **WAGES** | | | | |
| Basic Rate | $44.89 | $51.18 | $48.59 | $49.89 |
| License | $ 5.25 | $ 5.25 | $ 8.00 | $ 6.63 |
| Line | $ 1.00 | $ 1.00 | $ 3.00 | $ 2.00 |
| Longevity | $ 1.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| VEBA | $ 1.20 | $ 0.73 | $ 0.69 | $ 0.71 |
| Profit-Sharing | $ 0.40 | $ 0.00 | $ 0.60 | $ 0.30 |
| | | | | |
| **TOTAL WAGES** | **$53.74** | **$58.16** | **$60.88** | **$59.53** |
| | | | | |
| **BEENFITS (NET)** | **($ 0.44)** | | | |
| **ADJUSTMENT CALCULATIONS** | | | | |
| **United Wages + Benefits Rate** | | | | $53.34 |
| **AA/DL Avg. x 102% = $59.53 X 1.02** | | | | $60.72 |
| **Net Adjustment Calculation** | | | | **($7.38)** |
| **United Reported Adjustment Calculation** | | | | $1.23 |
| **Missing Wages** | | | | **$6.15** |

157.    Mullins calculation came out to approximately $7.18. Because it was so different, he went to United to confirm he had calculated correctly. Mullins also contacted his Local 986 union representative, Dale Mitchell, and asked for an explanation. Mitchell did not have one and said he would look into it. He was irritated that Mullins was asking for proof that the increase was only $1.23.

158.    Mitchell eventually agreed to file Mullins' grievance which Mullins had first written out by hand. Mitchell, a Local 986 Chief Steward, transferred the hand written grievance to, and entered it into, the electronic grievance system that only Local 986 officials can access. As stated above, rank and file members can no longer access, or see, any grievances, grievance process, such as initiating a grievance, or even they are in the process due to Unions' removal of all grievance information and access to the grievance system by placing it on a controlled computer system.

159.   United' answered Mullins' grievance in writing on January 4, 2023:

"LOA 29 of the UA/IBT CBA provides, among other things, that economic experts from the Company and the Union agree on a costing model to calculate the industry reset. The parties agreed on the model within the parameters set out in the LOA, and utilized the model for the 2018, 2020 and the 2022 industry reset calculations. Much of the data that the model utilizes is publicly available ... like the [American]. Some of the information is Company confidential and proprietary, and can't be shared publicly. And finally, the exact nature of the model and its operation is kept secure because it could put [United]at a competitive disadvantage if our competitors were to have access to it. It is for these reasons that the parties have agreed to maintain the confidentiality of the model."

160.   This response by United did not correspond with what Mullins was told at the informational meetings or with what he could read and calculate himself from the CBA or LOA #29 and therefore, on January 5, 2023, Mullins told Mitchell to appeal the decision. Mullins also told Mitchell he wanted to be present for the Second Step hearing, as is his right under the CBA grievance processes. See Exhibit 3, art. 19.

161.   Mitchell gave Mullins a copy of that appeal document after the union filed it; however, Mitchell had signed Mullins name to it. Mullins had intentionally left the signature line blank. Local 986 has changed the significance of signing a grievance. Previously, by signing a grievance, the grievant's signature acknowledged the grievant had filed the grievance and wanted it to be processed. But now, Local 986 had added a sentence above the signature line, without telling anyone and in 6-point font, stating in effect that by signing the grievance, the grievant agrees to waive their grievance rights and let Local 986 decide the grievance in any manner Local 986 "deems proper." Mullins had intentionally not signed the grievance because he did not want to waive his grievance rights or authorize the Union to take over and decide his grievance in any manner "deemed proper."

162.   For these reasons, Mullins immediately told Mitchell to remove his signature. Mitchell told Mullins that he had signed Mullins grievance because he saw no signature on it. Mullins reiterated his position and told Mitchell to remove his signature. On January 8, 2023, Mitchell told Mullins that he had removed Mullins signature from the grievance.

163.   Mullins reached out to Mitchell several times to check the status of his grievance, any investigation, and to meet with Local 986 to discuss Mullins grievance, particularly, Mullins

34

calculations. Mullins specifically asked whether Local 986 had requested United provide relevant information as permitted, and agreed to, in Article 19.E.3 of the CBA, for Mullins grievance, i.e., the summary values used by United in the Adjustment Calculation. Mullins called Mitchell several times but Mitchell never met with Mullins to go over the grievance or discuss its particulars.

164.    On January 16, 2023, Mitchell emailed Mullins during the day to say the Second Step hearing would be the next day. Mullins asked to reschedule the hearing given his work schedule (Mullins works overnight) but Mitchell refused. "I acknowledge your request but we are going forward tomorrow as scheduled." The CBA states, in Article 19.E.2, a witness' schedule should be accommodated and thus, a hearing of this nature can be rescheduled to accommodate a witness schedule. Local 986 refused to do so despite Mullins request. Exhibit 3, art. 19.E.2.

165.    Mitchell told Mullins that Mullins' presence would not matter because Local 986 had consolidated Mullins' grievance with a grievance filed by another Technician, John Scholz, the other named-Plaintiff in this lawsuit. Mitchell never let Mullins explain the calculation. Nor did Mitchell ever present any information on Mullins behalf at the hearing or try to access any information that would enable Local 986 to properly evaluate Mullins grievance, including not ever requesting any documents for Mullins from United.

166.    Mullins grievance was denied at the Second Step by United, on or about January 26, 2023, with the same answer verbatim as provided to Mullins at the First Step (¶159 above). Mullins is not certain of the exact date United sent the letter because United's Jesse Jandura sent multiple incomplete emails regarding United's Second Step answer, failing to attach the letter to the email. Scholz gave Mullins a copy of the Second Step answer on January 29, 2023.

167.    Mullins immediately requested Mitchell appeal United's answer to the Third Step. Mitchell said Scholz already had and Local 986 was considering it. Mullins did ask Mitchell what there was to consider since it was the exact same answer Mullins was given at the First Step, which Local 986 had already determined was unacceptable. Mitchell simply stated Local 986 was considering his grievance.

168.    On February 6, 2023, Local 986 sent Mullins a closeout letter stating his grievance had no merit, the matters could not be appealed, and the matter was closed. This made no sense

because the Second Step United answer was the exact same answer Mullins received at the First Step, which again, Local 986 had found unacceptable and sufficient to grieve.

169.    Mullins conferred with Scholz over how to proceed. They understood from their shop steward training and duties that the Third Step was initiated by Local 986 sending a request to United. As is detailed further below, Local 986 refused to do this. Out of options, Mullins hired present counsel to initiate this lawsuit.

**2.    Plaintiff Scholz Grieves the 2022 Adjustment Calculation.**

170.    Plaintiff Scholz also independently performed the calculation to confirm he was being paid correctly and according to the CBA and LOA #29.

171.    During the time of the negotiations and ratification of the current CBA and LOA #29, from 2015-2017, Scholz was a shop steward with Local 986. As part of his duties, he attended meetings where the CBA and LOA#29 terms and application were discussed in great detail, including how to present these unique wage adjustments to the membership.

172.    Scholz received some training in the basics of the Railway Labor Act ("RLA") and its legal impact on collectively bargained employees such as himself whose employment was in part governed by the RLA. Scholz also received training in reading and presenting the CBA, as this is part of a shop steward's duties.

173.    Scholz was also given extensive training on the governing documents of the Teamsters, and Local 986, and the CBA grievance procedures. The Teamsters have a guide to grievance handling that explains in detail how to handle a grievance pursuant to the RLA. This guide states it is the standard practice to request documents from the company to investigate a grievance either to support or disprove it. The guide also provides it is the standard practice to go over the CBA, any other documents or evidence the grievant might have to support his or her grievance, and to interview not only the grievant but any potential persons or witnesses who may have relevant information or evidence.

174.    Local 986, and more broadly Teamsters SFO 856/986, had a recognized practice to allow for a grievant to proceed with their grievance without union support through all of the stages of the grievance process. Local 986, or Local 856, would alert United to proceed directly with the

grievant for the higher stages of the process, either Third Step System Board of Adjustment, or the Final Step Board of Arbitration. This is commonly referred to as a "no-fund case." Since ratification of the current CBA, these practices have been erratic and unevenly applied to Local 986 members.

175.    Scholz was present for many informational meetings held by both United, and Local 986, where the terms and conditions of the current CBA were explained and discussed, including during the weekly shop steward meetings with then Chief Steward John Laurin.

176.    Scholz also attended the October 18, 2016 "roadshow" at SFO, where the Unions and negotiating committee members held an informational meeting to explain and pitch the CBA to the membership to vote on. Scholz recalls LOA #29, and its components were discussed by Dan Akins in detail, including how the then wages of United technicians compared to the other two airlines (American and Delta), how the parties had determined the parameters for what is now the Adjustment Calculation, and how that calculation was to operate and be performed. In addition to Akins, Bob Fisher stated all necessary information to perform the calculation would come from public information so that the members could see how it was being determined. A first calculation was demonstrated and each step explained. There are videos that demonstrate this.

177.    Scholz is aware of at least two airlines who use, or have used, this model format to do provide raises to their technicians – American Airlines and Alaska Airlines. At those airlines, United's information is used as part of the calculation. Notably, the name of LOA #29 in the first Tentative Agreement draft was "AA Industry Reset" because it originated at American Airlines. Both of those airlines show the basic summary values and calculations to their employees.

178.    Akins explained, and Scholz reasonably understood, of the five components – Pay, Time Off, Benefits, Profit Sharing, and Scope – not all would change between the measuring periods from the baseline calculation. For example, Time Off and Benefits, what Akins referred to as the Non-Pay Items, baseline values would remain constant unless the CBA was ratified to include changes to those components. This would be true for all three comparative airlines.

179.    Similarly, any positive changes made by American and/or Delta to a component for their technicians, would result in any difference between United and the other carriers in that particular component being reduced. This was by design so the Technicians could all see what was

37

happening. Akins repeatedly affirmed this process was entirely based on identifiable information, easily accessible, often emphasizing it was not based on any subjective decision by United or the Unions. This formula was spelled out, set, and finalized, if the technicians ratified the tentative agreement. Scholz understood checking the calculation would be like checking his paycheck each week by using his hours worked and wage rate and then deducting taxes. The result may not be exactly same but it would be close enough to appreciate if a possible error had been made.

180.    As detailed above, MIT gathered this same information needed for the calculation as part of an Airline Data Project, collecting information for at least 15-airlines including United, American, and Delta, for all of the components of the Adjustment Calculation.

181.    Scholz has used the MIT Airline Data Project data against his own data to "check the math" for the previous two measurements. In addition to the CBAs and work rules for all three airlines, Scholz has used Security and Exchange Commission ("SEC") financial filings and documents, and Department of Transportation ("DOT") Form 41 filings, to do his calculations. All of the information needed is, and always has been, publicly available and can be gathered from public sources, including those mentioned above. Scholz is aware of these sources because the Teamsters, primarily Dan Akins, told Technicians that these sources were where the information was gathered from, and where to find them, prior to ratification of the CBA in October 2016. Yet, in 2022, the Unions now told Scholz, and all Technicians that this information is now confidential and proprietary.

182.    Scholz did the calculation for the previous measurements and none were accurate. Scholz did not file any grievances, request any documentation, or in any way involve himself in the previous measurement discrepancies because he had heard other Technicians had filed done so and Local 986 told everyone to stop filing grievances over this. This includes making any requests for the Cost Model or any other Adjustment Calculation documentation. Scholz only confirmed what he feared was happening – the calculation was not accurate and the Technicians were being underpaid.

183.    Scholz did "check the math" for the 2022 Adjustment Calculation. A mockup of the calculation done by Scholz is reflected in the chart below.

|  | **UNITED** | **AA** | **DELTA** | **AA/DL Avg.** |
|---|---|---|---|---|
| **WAGES** | | | | |
| Basic Rate | $44.89 | $51.18 | $48.59 | $49.89 |
| License | $ 5.25 | $ 5.25 | $ 8.00 | $ 6.63 |
| Line | $ 1.00 | $ 1.00 | $ 3.00 | $ 2.00 |
| Longevity | $ 1.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| VEBA | $ 1.20 | $ 0.73 | $ 0.69 | $ 0.71 |
| Profit-Sharing | $ 0.40 | $ 0.00 | $ 0.60 | $ 0.30 |
| | | | | |
| **TOTAL** | **$53.74** | **$58.16** | **$60.88** | **$59.53** |
| | | | | |
| **BENEFITS** | | | | |
| Time Off | $1.56 | | | |
| Medical | $0.11 | | | |
| Retirement | ($1.85) | | | |
| Scope | ($0.12) | | | |
| | | | | |
| **TOTAL** | **($0.30)** | | | |
| | | | | |

| **ADJUSTMENT CALCULATIONS** | |
|---|---|
| **United All-In Wage Rate [$53.74 + $0.17]** | $53.44 |
| **AA/DL Avg. x 102% = $59.53 X 1.02** | $60.72 |
| **Net Adjustment Calculation** | **($7.28)** |
| **United Reported Adjustment Calculation** | $1.17 |
| **Missing Wages** | **$6.11** |

184.    On November 25, 2022, Scholz emailed Local 986 officials asking for the values for each component to compare to his result. Not the data, but the summary values plugged in for each the elements of the Adjustment Calculation formula. Scholz did not receive a response.

185.    Scholz emailed Local 986 several more times without a response until on December 5, 2022, Local 986 Chief Steward Maurice McDonald responded. McDonald did not provide any values and was unwilling to do so. McDonald told Scholz "we" cannot have that information.

186.    Scholz also tried to discuss the calculation with his immediate United supervisor, Mike Richardson, asking him to provide the information. Richardson similarly stated he did not have that information and could not provide it. Scholz appealed to Richardson by explaining the reason for requesting the information, i.e., the conflicting calculation result from the one offered by United; however, Richardson would not provide and explanation or any information.

187.    On December 8, 2022, Scholz conferred with his Shop Steward, Selvin Cabrera Najera, who agreed a grievance should be filed. Scholz gave Najera a written grievance. This was the first, and only, grievance Scholz has ever filed related to any Adjustment Calculation.

188.    On December 8, 2022, Richardson, answered the grievance, "I am not privileged to this information and/or the numbers." Shortly thereafter, Najera entered the grievance into the electronic database for it to be further processed. The grievance would idle for weeks.

189.    Between December 8, 2022 and December 19, 2022, Scholz asked repeatedly for assistance from Local 986 to support his grievance and to look into his calculation. The answer each time was the same – cannot see that information and have no right to it.

190.    On December 19, 2022, Local 986 apprised Scholz of United's answer to his grievance. The information was proprietary and secret and so it would not be provided. Local 986 accepted that at face value and recommended closing the grievance for lack of sufficient merit.

191.    Scholz declined to do so, instead requesting it be appealed to the Second Step of the grievance process. Scholz again pressed them to investigate his calculation, reminding them of their own prior statements about the availability of the information, and that the CBA provided United had to turn over relevant information for his grievance per the CBA Article 19.E.3. Local 986 took no action. Local 986 officials Maurice McDonald, John Johnson, and Dale Mitchell, all said it was United's call. This is wrong, the union of course can enforce the CBA for Scholz at any time.

192.    A Second Step hearing was scheduled and held on January 17, 2023. Prior to that hearing not a single person from Local 986 interviewed, coordinated with, provided assistance to, or requested any relevant documents on behalf of, Scholz despite dozens of requests of various Local 986 officials to do just that.

193.    On January 11, 2023, Dale Mitchell told Scholz the United answer was going to be the same one United provided as the First Step answer for another grievance filed related to the Adjustment Calculation, the grievance filed by Tom Mullins. This "insight" indicated to Scholz that the hearing was simply a pretext.

194.    Alarmed by Mitchell's cavalier attitude to this most serious matter, Scholz told Mitchell he would not accept an answer already considered unsatisfactory on Mullin's First Step

40

1    without a supported basis. Scholz also told Mitchell it was Local 986's job to represent him and not

2    United and to help substantiate, or even disprove, Scholz' grievance. Mitchell did nothing.

3        195.    Scholz asked for the hearing to be delayed until United responded as required to the

4    requests made for relevant information but Local 986 refused to do that. Mitchell and McDonald

5    both told Scholz "the hearing is the time and place to get the information from the company." That

6    never happened either.

7        196.    Jesse Jandura appeared for United. Scholz does not know if Jandura is a proper party

8    under the grievance procedures to have overseen the Second Step hearing as at that time, Paul Joklic

9    was the Managing Director of TechOps. Local 986 did not challenge this nor provide confirm to

10    Scholz that Jesse Jandura was the proper party. Exhibit 3, art. 19.B.4.

11        197.    Of note, at the hearing, Jandura refused to let Scholz play the Akins video Scholz

12    was provided with as part of the ratification voting materials related to LOA#29. The video clearly

13    supported Scholz' position and calculations, including that all of the information required to do the

14    calculation is public not proprietary or confidential. Scholz had a laptop to play it, but Jandura

15    refused to watch it. Jandura would not accept a copy of the video into the record either as evidence.

16    Mitchell said "the union" would give Jandura one instead.

17        198.    Scholz does not know if this ever occurred or if the video was viewed. Scholz was

18    alarmed Local 986 did not challenge United's refusal to accept evidence of the reasonableness of

19    the grievance. There is no basis for United to refuse to look at any supporting evidence and more

20    importantly, Local 986 was aware of the authenticity and value of the video to Scholz' claims.

21        199.    United's only evidence, presented by Cathy Abbott, was LOA#29 which she had

22    copied from the CBA. After reading the entirety of LOA#29 into the record, Abbott concluded that

23    United had done the Adjustment Calculation correctly. Abbot did not provide a single calculation,

24    offer any explanation, or supporting materials justifying United's answer to the two grievances –

25    that the information could not be provided because it was confidential and proprietary. Abbott also

26    failed to review or challenge the calculation offered by Scholz.

27        200.    Local 986 sat back and did nothing. Local 986 did not advocate for, or in any other

28    way, attempt to support Plaintiffs' grievances. Local 986 simply read the grievances and the LOA

41

into the record. As Dale Mitchell had known, the grievances were denied on January 25, 2023 by Jesse Jandura with the exact same answer Mullins was given at the First Step of his grievance.

201.    Following receipt of this letter, Scholz insisted on meeting with Local 986 in an effort to move the grievances to the Third Step. On January 27, 2023, and again on January 31, 2023, Scholz implored Local 986 to meet with him and start the Third Step process. The answer however was always the same – United controls this process and what we can do, be patient. The CBA-time limitation to initiate the Third Step was February 8, 2023.

202.    United correctly sent the Second Step answer on February 5, 2023, prompting Local 986 to insist to Scholz this altered the deadline to initiate the Third Step, extending it to February 15, 2023. When Scholz asked for proof of this, Local 986 said did not need it, this is how it is done.

203.    On February 6, 2023, Scholz sent an email at approximately 7 a.m., again asking Local 986 to initiate the process to appeal to the Third Step SBA, expressing his concern that the deadline to do so was only 2-days away (February 8, 2023) per the CBA. Within thirty minutes, of this email, Chief Steward McDonald informed Scholz the grievances would be discussed later that morning.

204.    Just shortly after 11:30 am, Scholz was informed by Mitchell that the grievance had been discussed and a decision reached by the Grievance Committee and thus, McDonald would be contacting Scholz shortly. McDonald sent Scholz an email two-hours later telling him "attached is a closeout letter." Without any discussion with or prior notification, Local 986 withdrew and closed the grievances, sending a closeout letter to Scholz stating, "It was determined the grievances did not having sufficient merit to advance to the next step. Therefore, the grievance is closed out." This is arbitrary and perfunctory handling of a grievance. See <u>Gregg v. Chauffeurs, Teamsters Helpers Union Local 150</u>, 699 F.2d 1015 (1983) (grievances considered and withdrawn on the same day were not carefully considered rendering the decision arbitrary). Grievances with such high value to the members, and accruing at a rate of $2.4 million dollars a week, warranted barely a few hours of deliberation, no meaningful review of the calculations, and no substantiation of United's proffered basis of proprietary and confidential, particularly when those words do not appear anywhere in LOA #29. Dan Akins, on behalf of the negotiating committee of which Local 986 was

42

a part, had repeatedly stated this would all be public, available, and accessible for Technicians to "check the math." Scholz was hard pressed to find any rational basis for this consistent with a reasoned, equitable resolution supportive of the members.

205.    As soon as he saw the email and closeout letter, Scholz emailed asking for an explanation because neither the email or the letter contained one. The more substantial a grievance, the more substantial of an answer a union must provide if settling a grievance without getting anything in return. Gregg Chauffeurs, 699 F.2d at 1016 (when a grievance is "important and meritorious," a union must provide a "more substantial reason for abandoning it."). Scholz asked who had made this decision and whether United had been notified that Local 986 had withdrawn the grievances. There is no process in the CBA to reopen a closed grievance. If Local 986 had closed the grievance, there would be nothing Scholz could do to force United to continue to participate in the grievance process. No one ever responded. On information and belief, Local 986 sent an email to United that same day, withdrawing and terminating the grievances.

206.    Scholz' email also asked for the process to be released by Local 986 to continue the grievance process with United but without Local 986 as a no-fund case. No one ever responded.

207.    On February 7, 2023, at 6:28 am, Scholz sent another email stating unequivocally that the email was to serve as his written request to appeal the grievance to the SBA as United's answer is not supported by the facts, the express language of the CBA, or the law. Scholz sent this email to Jesse Jandura and Cathy Abbot on behalf of United and to Local 986 officials Fred Wood (Grievance Committee), Josh Johnson (Chair, Grievance Committee), Maurice McDonald (Chief Steward), and Mark DesAngles (Business Agent).

208.    Only Mark DesAngles replied. He reiterated that the matter was closed, Scholz had received a close-out letter, and that the grievances had been thoroughly reviewed, where the "SFO Grievance Committee voted to close out your grievance for lack of merit." DesAngles did not expand or explain as to why the grievances lacked merit. DesAngles claimed, "according to Article 19.B.6 of the [CBA], "...if the decision is not satisfactory to the employee and his Union Representative, the Union may appeal such grievance to the System Board of Adjustment" and that Scholz did "not have the authority to unilaterally appeal a grievance to System Board of Adjustment

43

1  ... . Only the Union has the authority to appeal grievances past the 2nd Step. this (sic) email shall

2  serve as notice to you that the Union considers the matter closed."

3     209.   By DesAngles' own admission, the CBA states in part, "Union may appeal such

4  grievance ... ." It does not say solely nor does it bar a grievant from doing so nor is there any other

5  limiting language to suggest a grievant wanting to exercise their RLA-statutory rights cannot do

6  so. As stated in the Teamsters' and Local 986's own grievance handling training materials, the RLA

7  grants covered employees the right to pursue, and complete, the grievance process individually.

8     210.   Scholz responded by sending DesAngles a recent case, Bumpus v. Air Line Pilots

9  Assn. Int'l. & United Airlines, Inc., 2022 WL 2105872 (N.D. III June 10, 2022), explaining what

10  he was taught by the Teamsters – he had a right to pursue his grievance. Scholz continued to implore

11  Local 986 to respond to how to go about initiating the SBA without them and reiterating his

12  rejection of closing the grievances without prior notification or consent, which had the effect of

13  settling this grievance in United's favor, emphatically stating he did not agree with United's

14  assertion, now disproven, that the information is confidential and proprietary answer. None of the

15  recipients of those communications responded to Scholz' actual questions.

16     211.   Plaintiffs knew from their shop steward training and attendance at shop steward

17  meetings, the standard protocol for advancing a grievance was to have Local 986 send a written

18  request to United on behalf of the released grievant. Local 986 would not do this for these Plaintiffs.

19  Scholz followed the normal protocols that he was trained in, and understood to be the proper process

20  yet he was entirely unsuccessful.

21     212.   At United, the SBA is not a separate entity nor does it have its own office, separate

22  phone number, email address, or even any stated list as to who comprises it. At least none that

23  Plaintiffs can access or know about. A Technician can only ask his or her union representative to

24  initiate the process with United after which United and the union decide who will comprise the

25  board, when and where it will be held, and the time despite the CBA-provisions stating otherwise.

26     213.   Former Chief Steward John Laurin once told Scholz that the SBA is not really a

27  thing, it is just the same four people who get together when they decide to and resolve grievances.

28  Ed Kelly, Scholz' now retired previous Shop Steward, was a witness to this conversation.

1  **C.      Additional Factual Allegations Related to LOA #29 Grievances.**

2       214.    Since the filing of the original complaint, Plaintiffs were informed of significant

3  information related to this lawsuit, which Plaintiffs have independently verified.

4       **1.      Local 856, part of TeamstersSFO 856/986, Informs Scholz of Falsity.**

5       215.    On February 7, 2023, Local 856 Business Agent, Javier Lectora, approached Scholz

6  shortly after the start of his shift, around 6 am. Several co-workers overheard and/or witnessed this

7  conversation: Scott Hounsell, Mike Albertien, and John Johnson, Local 986 Grievance Committee

8       216.    Lectora was agitated, nervous, and pacing. He repeatedly said he "was here as

9  [Scholz'] friend" but "this is in total confidence between me and you and if you say it happened, I

10 will call you a liar." Lectora told Scholz United did not have to provide the values because of prior

11 grievances having been closed. Lectora told Scholz there was nothing he could do about it.

12      217.    Lectora told Scholz "there are grievances filed in other stations" and that the "union

13 did not agree with the company." He also said "it is all about the pensions" and that "we do not use

14 any accurate American or Delta information. We guess. The economist and United make it up.

15 United Airlines does not get the numbers. United analyzes public information and does not want to

16 give you any of the numbers because you will be able to reverse engineer and check it. It is not

17 about you or the union."

18      218.    Lectora went on to say there is language to keep it secret in LOA #29 and "that it is

19 in the legalese" and "once Jim's [Seitz] lawsuit is finalized the union is going to use that decision

20 to block this every time it comes up because as union reps we can just say we don't have to do this

21 and we will be ok." The conversation was almost one hour. Scholz, while taken aback by what

22 Lectora had told him, decided to file a lawsuit shortly after this conversation.

23      219.    At all material times, Javier Lectora worked for Local 856 as a Business Agent.

24 Local 856 is the other affiliated local union at SFO, which along with Local 986, jointly performs

25 representational activities as TeamstersSFO 856/986 at SFO. Lectora's general duties include

26 enforcing and administering the CBA negotiated for Plaintiffs and the Class, and representing

27 members working under that agreement. Inherent in these general duties is the authority to

28 communicate and act on behalf of Local 856, and even Local 986. It, therefore, is reasonable for

1  members to believe Lectora was acting and speaking truthfully on their behalf when he engaged in

2  the conduct at issue.

3  **2.    Teamsters Statements at Local 210 Craft Meeting.**

4  220.    On November 29, 2022, a noticed craft meeting of Local 210 was held in person

5  and via videoconference (Zoom). Local 210 is another affiliated local union of the Teamsters. Local

6  210 represents United technicians at Dulles Airport ("IAD"), John F. Kennedy Airport ("JFK"),

7  and Newark Airport ("EWR"). The meeting was recorded.

8  221.    Present in person in Newark were Teamsters' Airline Division ("AD") officials: Joe

9  Ferreira (then Teamsters AD Director, since resigned), Bob Fisher (Teamsters AD Deputy Director,

10 now Acting Director), Vinny Graziano (Local 210 EWR Business Agent and Teamsters AD

11 Representative). Also present in Newark were Local 210 officials: Dave Mahood (Local 210 Dulles

12 Chief Steward), Blake Silverstein (Local 210 Dulles Shop Steward), and Alan Cosides (EWR Local

13 210 Chief Steward). There were approximately 15-technicians present at each of the 3-scheduled

14 meeting times in person in Newark. Many others logged in to attend the meeting.

15 222.    The 2022 Adjustment Calculation had recently been released. The meeting was

16 highly contentious and the focus was on the announced Adjustment Calculation result. Those able

17 to speak at the meeting almost entirely directed their questions to the recent calculation result. Many

18 had, like the other Technicians across the system had done, estimated calculations and arrived at

19 substantially disparate results from the one announced by United and the Unions.

20 223.    As is relevant here, Ferreira, Fisher, and Graziano all made statements directly

21 related to the calculation that: it "was about 12% or more," "the actual result was $5 dollars higher,"

22 "by our calculations should have been almost $6."

23 224.    As is relevant here, Ferreira, Fisher, and Graziano all made statements "that we

24 know the reset is a disaster" "we know the scales are all messed up" "if you work at American and

25 go through the scales you make $150,000 dollars more than United Airlines and if you hire on at

26 Delta Airlines, you are going to make $175,000 dollars more going through the scale right." All

27 three men repeatedly stated, "we cannot provide you the breakdowns" "the information is United

28 confidential" "we do not use the pay scales for the calculation" "we don't have the numbers because

46

1    we did not sign the NDAs" "this has nothing to do with pay rates" and "the reset was just a buffer

2    that did not turn out right but it has nothing to do with the pay scales."

3    225.    As is relevant here, those rank-and-file members present asked to see some kind of

4    substantiation, some kind of proof that this was done according to the CBA, specifically the formula

5    provided for in LOA#29. Many were outraged that the union would not support them, not stand up

6    for them, in the face of the clear errors and the drastic reduction being forced upon them by United.

7    Things were so tense there was talk of putting Graziano's "head on a pike." No union official

8    offered any other explanation for such plainly observable discrepancies in the pay rates between

9    the three carriers or the obviously errant Adjustment Calculation result.

10    226.    As is relevant here, Teamsters officials Ferreira, Fisher, and Graziano expressly

11    stated that they had been on a Zoom call on November 22, 2022, the day prior to the release of the

12    2022 Adjustment Calculation results, with Dan Akins, all affiliated local business agents, and all

13    affiliated local principal officers. The point of the meeting was for Dan Akins to provide and

14    demonstrate the results of the 2022 Adjustment Calculation. Fisher stated Akins went through all

15    the elements, showing those present the Cost Model. Akins exact words were "you are not going

16    to like this but I have a s**t sandwich to share with you." The implication being United insisted on

17    reducing the number and the Unions were going to go along with it.

18    227.    At the November 29, 2023 meeting, Bob Fisher implicated himself and the others

19    in the secret scheme and admitted to a number of false statements. Fisher told those present in

20    Newark that Akins had shown them the Adjustment Calculation, the Cost Model, and explained in

21    detail the results yet, for years, as will be further detailed below, Fisher has repeatedly represented

22    to the membership that no information can be shared because only those who have signed United's

23    non-disclosure agreement can view any Adjustment Calculation or Cost Model material. This is

24    false given all of the information shared with all business agents and principal officers on the

25    November 22, 2022 Zoom call. Fisher statements acknowledge the day before the announcement

26    of the Adjustment Calculation result, all knew the proffered result was false.

27    228.    All Class members, including the Plaintiffs, received similar responses from the

28    Teamsters and their local union officials ranging from "this is wrong but I cannot do anything about

47

this" to "this is completely f\*\*ked and we are getting screwed again." Multiple grievances were filed throughout the system and all were denied on similar grounds of the unions can do what they want and you cannot do anything about it, your grievance is meritless. Requests to appeal these decisions are systemically and routinely denied, regardless of significance of documentary support or legitimate demonstrated errors, including denying requests to appeal the decisions through the provided intraunion appeal process provided for in the Teamsters' constitution. Exhibit 1, art. XIX, sec.2(a).

229.    An obligation to disclose information arising out of Section 2, First of the RLA is a legally enforceable one. *See* Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 577 (1971). The lack of any mandatory administrative body such as the NLRB permits a party with a disclosure dispute under the RLA to proceed as Plaintiffs here have done directly to court.

**3.    Teamsters' Statements Regarding Local 781 (ORD) Grievances.**

230.    The announcement for the 2022 Adjustment Calculation went out on November 23, 2022, the day after the Zoom call with Dan Akins. United posted its announcement on November 23, 2022, as well on its intranet, stating the calculation yielded a 2.6% raise. Those who did perform similar, rudimentary checks of the calculation like Plaintiffs did, also arrived at results between 15% and 16%, like Plaintiffs, with an average of about $7.35.

231.    Plaintiffs were not the only two technicians to file grievances contrary to United's representations to this Court. To date, to Plaintiffs knowledge, grievances were filed at United's stations throughout the system over the Adjustment Calculation in: Denver (DEN), Los Angeles (LAX), Houston (IAH), Newark (EWR), Dulles (IAD), and O'Hare (ORD). Most were never processed beyond the First Step. Some received responses from United that were verbatim the response Mullins received at the First Step. The only responses ever provided by the Teamsters, or any local union, were: (1) the information was proprietary and could not be disclosed; or (2) the grievances lacked sufficient merit. Neither response was ever expanded upon, supported by any objective facts or reasons. Just single sentence answers. These answers are also false.

232.    On information and belief, shortly after Plaintiffs filed their original complaint, the Teamsters ordered all grievances related to the 2022 Adjustment Calculation across the system to

48

be withdrawn, terminated, and removed from the system. Chief Steward Mike Pecoraro of ORD informed ORD technician Sally Dill that the Teamsters had sent Angel Cantu from the national office to ORD to demand all copies of all grievances. Pecoraro refused to do provide them without written orders / authorization and a substantiated basis to do so. Pecoraro maintained the Teamsters had no authority to do this as all grievances are handled by the local unions not the Teamsters. Cantu left without the grievances having been destroyed.

233.    Other affiliated local unions have reported to Plaintiffs previously filed grievances on the electronic grievance database are no longer there, not even as historical, closed grievances with corresponding paperwork. It appears the Teamsters attempted to purge all Adjustment Calculation grievances without any prior notification, consent, or authorization. Bob Fisher admitted in an email to ordering termination of ORD Dill's grievance and DEN Wik's grievance.

234.    Repeated protests to undo these actions were ignored, rejected, and generally not acted upon at all. Some were told that the Teamsters are the only ones to decide what to do with grievances. This is in direct conflict with the Unions' governing documents. *See* Exhibit 1, 2.

235.    The Teamsters also refused to provide information of how to exercise appeal rights that are found in the Teamsters' constitution. Bob Fisher expressly stated in an email on July 10, 2023, to Dill that if the Teamsters decide a grievance has no merit that is the end of the process, that there is no appeal process. This is contrary to the express terms of the Teamsters' constitution and the local bylaws. Exhibit 1, art. VI, sec. 2, 3; art. XIV, sec. 3; art. XIX, sec. 4 and Exhibit 2, sec. 10(k); sec. 20(E); sec. 15; and sec. 21(6). Bob Fisher wrongfully claimed the Teamsters have the power to arbitrarily nullify the Teamsters' constitution. He did so to mislead a member. It is a foundational tenet of the Teamsters' that they can advise, encourage, or otherwise assist when asked to do so by an affiliated local union but the Teamsters can never step on the local union's rights. Local autonomy is allegedly sacred to the international union and is fiercely protected in order for the local unions to remain autonomous.

236.    Fisher also asserted to Dill that because the membership ratified an extension to the CBA in January 2023, any issue of a discrepancy was "moot" and "that the new wage rates thereby render[ed] any calculation in accordance with LOA #29, moot." There is nothing in the CBA or the

49

ratified CBA-extension that nullifies or "moots a grievance." These are separate and independent events.

237.    The extension ratified by the Technicians, on or about January 30, 2023, made reciprocal promises for new consideration. The Technicians agreed to surrender the future 2023 Adjustment Calculation, agreed to extend the CBA for one year, and permitted United additional outsourcing rights. And in exchange, United increased certain wages in an average amount of $5.74 on average per hour. This exchange of promises and consideration is separate from the 2022 Adjustment Calculation. Moreover, there is nothing in this extension that states the wage increase nullifies the errors in the 2022 Adjustment Calculation or "moots" any grievance related to it. These are separate and independent events with separate consideration and promises.

238.    It is notable that the consideration offered by United is almost exactly the amount of wages Plaintiffs and the Class allege United's scheme with the Unions deprived them of.

**4.    Union Statements Implicate Secret Agreements and False Disclosures.**

239.    On November 22, 2022, Lectora, in his role as Local 856, attended the meeting with Dan Akins where the Adjustment Calculation result was reviewed and discussed in order to later inform the Class, which Lectora did, of the result, the investigation, and disclosure of information, including the refusal to pursue their grievances or challenge United's false result. Lectora had personal knowledge on February 7, 2023 when he made the above detailed comments of the falsity of United's representation of the Adjustment Calculation result and United's assertion the information used in the Adjustment Calculation was proprietary and confidential

240.    Bob Fisher, on November 29, 2022, in his comments at the Local 210 meeting to those present and those on Zoom, confirmed Local 986 Business Agent Mark DesAngles was also in attendance at the November 22, 2022 Dan Akins meeting where the true nature of the Adjustment Calculation was revealed, along with United's demands that the result be falsified.

241.    It is well-established and confirmed that as a Business Agent for Local 986, Mark DesAngles had the discretion to notify the principal officer of Local 986, Chris Griswold, or the Teamsters principal officer, Sean O'Brien, of the grievances based on the CBA, and of United's defiance, in order to represent and protect the membership as a whole. It is also well-established

and confirmed that DesAngles was aware that the statements he made to Scholz in relation to the grievances were false as DesAngles had been informed and was aware the day before any union official made the first 2022 Adjustment Calculation announcement to the membership, on or about November 23, 2022, that the announcement reporting the Adjustment Calculation result would be, and was false.

242.    Fisher's statements and actions, as well as those of Lectora and DesAngles made to and directed at Plaintiffs, are attributable to Union Defendants, regardless of whether they were explicitly authorized. *See* Teamsters Local 641 (Air Products, Inc.), 91 NLRB 1381, 1392 (1950).

243.    Plaintiffs' grievances are not limited to the acquisition of the Cost Model. Plaintiffs sought to challenge the calculation of their pay, and the now apparent illicit reduction of the actual agreed upon contractual wage rate, in order to prevent United from unilateral and arbitrarily reducing Plaintiffs and the Classes pay for United's financial windfall. This is wage theft. United has deprived Plaintiffs and the Class of tens of millions of dollars of earned, owed, and due wages by colluding with, and coercing, their union representation into adopting illegitimate contractual interpretations for United's benefit by secret fiat.

244.    On February 18, 2023, Scholz requested the complete CBA from the Teamsters and from Local 986. He got a response from Local 986 but it was incomplete and did not include any additional letters of agreement, memorandums, appendices, exhibits, or the Cost Model. Scholz is aware of over a dozen side letters that may have been entered into by the Unions with United since ratification. At the hearing on the Defendants' motions to dismiss in this action, United's counsel stated United and the Unions have entered into dozens of agreements and side letters but do not make them public. There can be no secret wages, terms, or conditions of a CBA under the RLA.

245.    Since the original filing of the complaint, United has now volunteered that the "confidential and proprietary information" is solely the amount of the funding contributions to the defined benefit plan, CARP, that are so sensitive that disclosure would put United at a competitive disadvantage. This is irrational. The IRS and the Department of Labor require this exact information to be not only publicly disclosed in mandatory reporting documents to the government but United is also required by law to provide such information to the Class as participants in the pension plan.

246.    As detailed above, the United Defendants and the Union Defendants specific handling of ERISA guarded pension and profit-sharing rights is at the core of this dispute as well.

247.    This evolving, willful, and knowing deception has gone entirely unchallenged by the Union Defendants who are supposed to be guarding the best interests, including the financial interests and the contractual rights, of Plaintiffs and the Class.

248.    United has taken this a step further by telling Plaintiffs and the Class that while there is undeniably an obligation to perform the calculation, this obligation does not extend or require it to substantiate that the calculation as done correctly.

249.    For their part, the Union Defendants similarly refused to provide any information to the members or any grievant, initially parroting United's fabricated excuse that the information was confidential and proprietary. The union representatives pulled short of endorsing that position but did state repeatedly that because United said the information was confidential and proprietary, the Unions had no choice but to go along. All whilst knowing these statements were false.

250.    The failure to substantiate the calculation in the face of obvious mathematical impossibilities, coupled with United's failure to produce any relevant material documents which have a substantial role in settling present contractual rights and obligations of the parties, has produced a situation in which Plaintiffs and Class do not know or fully understand what rights they currently enjoy as related to the CBA, including being paid their earned wages. Compounded by the Union Defendants abandonment, and United's apparent intent to destroy the Class' collective representation at United, the Class is unable to assert their rights, contract violations are not being reported or processed, and earned wages are being lost.

251.    And while the grievance process is the proper place to address these legitimate and substantial claims, both United and the Unions have blocked every effort by Plaintiffs and other members of the Class, to have this matter resolved using that process.

252.    This conduct has caused severe financial hardship for every affected Technician. For every nickel United deprives them of, it is almost $1,000,000 dollars in United's coffers. A nickel ($0.05) withheld from 9,600 technicians for a year's work (2080 straight time hours) equals $998,400. United has deprived these dedicated men and women of anywhere from $3.70 to $7.35

every year for the last six years. Conservatively, this is approximately $75 million dollars upwards of $145 million dollars, every year for the last six years.

253.    That this has been allowed to persist and increase as the years have gone on because of complicity with the Unions at least tacit blessing is a plausible claim for breach of the duty of fair representation, and a violation of their oath to the Teamsters' constitution, among other claims. The Unions categorical refusal to provide any defense against what appears to be clear wage theft is incomprehensible and likely motivated by a desire to stymie the Class and protect the Unions position of power than it is any function of honest, rational, fair dealings.

## VI.    CLASS ALLEGATIONS

254.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

255.    Plaintiffs bring this action on behalf of themselves and a nationwide class ("Class") defined below, pursuant to the Federal Rules of Civil Procedure 23 ("Rule 23"), subs.(a) and (b)(3):

> All current and former non-exempt hourly workers employed by United Airlines, Inc. in the Technician and Other Related bargaining unit, and based in the United States, at any time during the period from three-years prior to the filing of the original complaint in this action through the date of final judgment.

256.    For purposes of this Complaint, "Plaintiff Mullins" or "Plaintiff Scholz" shall refer to that particular Plaintiff only and "Plaintiffs" will refer to them collectively. Reference to the "Class" shall be deemed to include the Plaintiffs and each member of the Class.

257.    Plaintiffs reserve the right to establish subclasses as appropriate.

258.    Excluded from the Class are any Defendant, any parent companies, subsidiaries, affiliates, officers, directors, legal representatives, co-conspirators, or agents, and any member of the immediate family of, and any heirs, successors or assigns of, any such excluded party.

259.    <u>Ascertainability and Numerosity</u>. This action has been brought, and may properly be maintained, as a class action under Rule 23 because there is a well-defined community of interest in the litigation and the proposed class members are easily ascertainable, clearly defined, and can be identified and notified efficiently from reference to existing, objective criteria such as records

maintained by Defendants. This action is properly maintainable as a class action under Rule 23(a)(1) as Plaintiffs are informed and believe, and thereon allege, the potential members of the Class as defined herein is comprised of thousands of persons and is so numerous that joinder of all persons would be impracticable. The Class may be notified of the pendency of this action by mail, or other appropriate media.

260.    <u>Commonality</u>. This action is maintainable as a class action under Rule 23(a)(2) and (b)(3), as there is a well-defined community of interest and common questions of law and fact that predominate over any question affecting only individual members of the Class. These common legal and factual questions, which do not vary from members of the Class, and which may be determined without reference to the individual circumstances of any members of the Class, include, but are not limited, to the following:

(a)    Whether any Union Defendants' conduct in providing representation to Plaintiffs and the Class related to the 2022 LOA#29 Adjustment Calculation ("Adjustment Calculation") was arbitrary, in bad faith, or discriminatory;

(b)    Whether any Union Defendants' policies or procedures in reviewing, reporting, and disclosing the Adjustment Calculation results breached a duty of fair representation to the Class as required under the RLA and the Unions' governing documents;

(c)    Whether any Union Defendant's practices related to grievance processing, including access to the higher stages of the process, breach duties of fair representation owed to the Class as required under the RLA, the CBA, the Unions' governing documents;

(d)    Whether any Union Defendant violated the constitution of the Teamsters or the bylaws of Local 986, or the RLA, in failing to put to a vote for ratification material changes to the collective bargaining agreement the Unions entered into with United;

(e)    Whether any Union Defendant secretly agreed to permit the United to pay less than the earned, owed, and due wages to the Class, in violation of the common law, the CBA, the RLA, and the Unions' governing documents;

(f)    Whether United Defendants provided the correct Adjustment Calculation to the Plaintiffs, and if not, the reasons therefor;

(g)    Whether United secretly paid wages less than the agreed upon rate agreed upon, and according to, the CBA to each member of the Class for all hours worked;

(h)    Whether any failure to pay all wages due was willful, intentional, and knowingly;

(i)    Whether any Defendant's administration of the grievance process deprives any member of the Class their statutory due process rights by preventing access to, participation in, and completion of the grievance process;

(j)    Whether any of the Defendants have engaged in a fraudulent scheme and/or artifice to defraud the Class of earned, owed, and due wages.

261.    Typicality. This action is maintainable as a class action pursuant to Rule 23(a)(3), as Plaintiff's claims are typical of the claims of all other members of the Class as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal and state law that are complained of herein. The claims also arise from the same course of conduct and Plaintiffs seek the same types of penalties, and other relief, on the same theories and legal grounds as the Class.

262.    Adequacy of Representation: This action is maintainable as a class action pursuant to Rule 23(a)(4), as Plaintiffs are members of the Class and will fairly and adequately protect the interests of Class members because: (1) their interests do not conflict with the interest of the individual members of the Class they seek to represent; (2) they have retained counsel competent and experienced in employment class action litigation; and (3) they intend to prosecute this action vigorously. Plaintiffs have incurred, and during the pendency of this action will continue to incur, costs and attorney's fees, that have been, are, and will be necessarily expended for the prosecution of this action for the substantial benefit of each class member. Furthermore, class action treatment of this lawsuit will advance public policy objectives. Defendants in this class action violate employment and labor laws every day. Current employees and union members are often afraid to assert their rights out of fear of direct or indirect retaliation. Class actions provide class members who are not named in the complaint anonymity and allow for the vindication of their rights while lessening the aforementioned fear; it is also efficient and economical for the parties and the courts.

263.    The amount in controversy for the aggregate claims of the Proposed Class exceeds five million dollars ($5,000,000.00).

# VII.    CAUSES OF ACTION

<u>**Count I – Breach of the Duty of Fair Representation**</u>
**In Violation of the Railway Labor Act, 45, U.S.C. §§ 151-188**
**(On Behalf of Plaintiffs and the Class Against All Union Defendants)**

264.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

265.    The general duty of fair representation arises from the Railway Labor Act. 45 U.S.C. §§ 151–152; <u>Laturner v. Burlington N., Inc.</u>, 501 F.2d 593, 599 n. 12 (9th Cir.1974). The duty of fair representation requires the Unions to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." <u>Vaca v. Sipes</u>, 386 U.S. 171, 182 (1967). A union breaches this duty when its conduct toward a member is "arbitrary, discriminatory, or in bad faith." <u>Jones v. Union Pac. R.R.</u>, 968 F.2d 937, 941 (9th Cir.1992) (quoting <u>Vaca v. Sipes</u>, 386 U.S. 171, 190 (1967). If the union acts with "egregious disregard for the rights of union members," the union has violated the duty to fairly represent. <u>Peters v Burlington</u>, 931 F.2d 534, 538 (9th Cir. 1991) (quotation omitted). If a grievance is "important and meritorious," a union must provide a "more substantial reason for abandoning it." <u>Gregg v.  Chauffeurs, Teamsters and Helpers Union Local 150</u>, 699 F.2d 1015, 1016 (1983) (merits of the grievance are relevant to the sufficiency of the unions representations). A collective bargaining representative has no authority to bargain away vested rights without an employee's consent. *See e.g.*, <u>Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.</u>, 404 U.S. 157, 181 n. 20 (1971).  "Where the Union actions are governed by its interpretation of contractual provisions, bad faith may exist if the Union maintains an illegitimate contract interpretation and prevents employees from using established grievance procedures to challenge the interpretation." <u>Stupy v. U.S. Postal Service</u>, 951 F.2d 1079, 1083 (9th Cir.).

266.    By the acts alleged herein, the Unions breached owed duties of fair representation to Plaintiffs and the Class by acting arbitrarily, discriminatorily, and in bad faith. Among other things, the Union Defendants, the Teamsters and Local 986:

(a)    improperly consented to material modifications to the CBA, including LOA #29, without a ratification vote, as required by the Teamsters constitution;

56

(b)     secretly agreed to alter, modify, and/or reduce the Adjustment Calculation result for the United Defendants financial gain by secretly agreeing, and permitting the raise United was contractually bound to give the Class was $1.20 and not $7.35;

(c)     concealed from the Class knowledge and proof the computation for the Adjustment Calculation was significantly higher than reported;

(d)     failed to demand United bargain over these reductions, or any changes, unilaterally imposed by the United Defendants to the contractually agreed upon wages during the term of the CBA, including failing to put any such material changes to the mandatory ratification vote of the Class, as required by the Teamsters constitution;

(e)     failed to take any steps to protect the best interests of the Class, and safeguard their rights, without any legitimate union objective, from United's stated insistence to unilaterally change the wage rules and other terms of the CBA, including LOA #29;

(f)     failed to reasonably promote the best interests of the Class, without any legitimate union objective, by knowingly disseminating false statements, knowingly furnishing inaccurate information, and intentionally misrepresenting information, regarding raise and grievance processing;

(g)     failed to consider the interpretation of the Adjustment Calculation urged by Plaintiffs and the Class, or investigate the facts consistent with their positions, instead insisted on factually inconsistent and contradictory positions, and put forward false, material statements, with egregious disregard for the rights of, and to the detriment of, Plaintiffs and the Class in order to favor United;

(h)     failed to challenge United's illegitimate CBA interpretations of LOA#29, including that any part of the Adjustment Calculation was to be estimated, approximated, or ignored, while also preventing Plaintiffs from using the agreed upon, and established contractual grievance procedures to challenge those interpretations in order to assist United in its unlawful behavior;

(i)     failed to challenge United's illegitimate assertion that any part of LOA#29 is, or ever was, confidential or proprietary, including any of the required inputs to perform the Adjustment Calculation, any resultant output of the Adjustment Calculation, or the Cost Model, while also preventing Plaintiffs from using the agreed upon, and established contractual grievance procedures to challenge those interpretations in order to assist United in its unlawful behavior;

(j)     failed to enforce United's agreed to obligation to provide requested, relevant, material information related to the processing of Plaintiffs grievances, including refusing to file a claim against United for failing to do so; and

(k)     extinguished Plaintiffs' rights to pursue their grievances regarding the owed wages by unilaterally, and without any legitimate reason, reasonable explanation, or prior adequate notice of, justification for, or consent, by withdrawing Plaintiffs' grievances and not providing the written demand to United to initiate the Third Step of the grievance process as requested by Plaintiffs.

267.    The Union Defendants have threatened, deprived, and interfered with the Class' owed wages by illegitimately and unfairly reducing the bargained for wages agreed to by the parties in the CBA between the Class and United that the CBA was meant to deliver and rendering the agreed to, and statutorily required grievance process completely unavailable and inaccessible to Plaintiffs, one of the parties the process was directly created to benefit.

268.    As a result, neither Plaintiffs nor the Class can enforce, or remedy, the substantiated breaches of the CBA carried out on a routine basis by United for which Plaintiffs and the Class suffer severe financial hardships.

269.    The acts described in this Complaint, and above, relating to numerous dishonesties in calculating wage increases, systemic interference with the contractual grievance process to favor United, as well as the reckless disregard for the right of the Class to be paid their contractual wage for having diligently performed their work violates the RLA and state law.

270.    When unions fail to provide adequate notice of or justification for a decision to withdraw an employee's grievance, courts have found that the union acted arbitrarily in violation of the duty of fair representation. Robesky v. Qantas Empire Airways Ltd., 573 F.2d 1082, 1091 (9th Cir. 1978).

271.    Union Defendants officials admitted the result was arbitrarily altered and manipulated at the direction of, and for the express benefit of, United. Such an abandonment of their duties to the Class is unlawful and Plaintiffs seek relief for all available and applicable damages.

272.    As a direct and proximate result of the Unions breach of the duty of fair representation, the Class has suffered damages in an amount to be proven at trial.

## Count II – Breach of Contract, Third Party Beneficiary
### In Violation Of California Civil Code, § 1559
### (On Behalf of Plaintiffs and the Class Against All Union Defendants)

273.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

274.    On information and belief, on or before, February 5, 2017, the Union Defendants entered into a written contract with Dan Akins, an actuary. The contract involved performing the LOA #29 Adjustment Calculation referenced herein, creating an Excel version of the Cost Model, and analyzing the calculation utilizing the Cost Model referenced herein, in order to determine, and confirm, the accurate, resultant wage increase for the Class under LOA #29, which Akins would report to the Union Defendants to inform the Class of their raise, for which Akins was paid by the Teamsters.

275.    The contract was for the benefit of the Class because only the Class were to receive the raise determined through Dan Akins' performance.

276.    On information and belief, Dan Akins performed his obligations under the contract in that he performed the calculation and reported the results to the Union Defendants.

277.    The Union Defendants failed to perform their obligations under the contract in that they falsified the results arrived at by Akins in performing the calculation, reported an inaccurate calculation result to the Class, misrepresenting the false result as Akins true result.

278.    As a result of the Union Defendant's non-performance under the contract Plaintiff, and the Class, have suffered damages in that their raise was grossly unreported, all to the Class' detriment, damaging the Class in an estimated sum at present of over $156,000,000 million dollars. Plaintiffs and the Class are entitled to the full measure of damages of all categories permissible under applicable law and in an amount according to proof.

## Count III – Breach of Contract
### Failure To Exert Every Reasonable Effort To Make And Maintain Agreements
### In Violation Of The Railway Labor Act, 45 U.S.C. § 152, First, Seventh
### (On Behalf of Plaintiffs and the Class Against All United Defendants)

279.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

59

280. Railway Labor Act Section 102 First provides "[i]t shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions … ." , 45 U.S.C. § 152 First. A failure to perform the obligations undertaken in a collective bargaining agreement constitutes breach of that contract. Scribner v. WorldCom, Inc., 249 F.3d 902, 910 (9th Cir. 2001). The Supreme Court has held that the requirement of Section 102 First, 45 U.S.C. § 152, First is a legal obligation that is judicially enforceable. Chicago and North Western Railway Co. v. United Transportation Union, 402 U.S. 570 (1971).

281. Section 102 Seventh of the Act states, "[n]o carrier shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of [the RLA]." 45 U.S.C. § 152 Seventh.

282. Failure to pay contracted wages is an enforceable action for breach of contract. See Scribner v. Worldcom, Inc., 249 F.3d 902, 910 (9th Cir.2001) (remarking that Commentary on the Second Restatement of Contracts "provide[s] that [g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . [and] that [s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified") (internal quotation marks omitted).

283. By intentionally altering, falsifying, and misrepresenting the LOA #29 Adjustment Calculation result for financial gain, United has failed to exert every reasonable effort to maintain the agreement, in violation of Railway Labor Act Section 102 First, 45 U.S.C. § 152 First, and has "unilaterally changed the rates of pay, pay rules, or working conditions of its employees" in violation of Railway Labor Act Section 102 Seventh, 45 U.S.C. § 152 Seventh.

284. By failing to respond within a reasonable time to Plaintiffs' communications which sought to abide by the grievance process set forth in the CBA for the Third Step (System Board of Adjustment) of the grievance process, or process timely notification and request by Plaintiffs to initiate this next step of the grievance process, United abandoned and repudiated the agreed to, and required, grievance process in violation of Railway Labor Act Section 102 First, 45 U.S.C. § 152

60

First. Rather than making a good faith attempt to address the merits of the dispute, United poisoned the process, with the Unions assistance, in refusing to convene the Third Step System Board of Adjustment.

285.    The United Defendants secret agreements with the Union Defendants contrary to the terms of the in-force CBA, in an effort to unilaterally change the written terms of the CBA, is a violation of Railway Labor Act Section 102 First, 45 U.S.C. § 152 First and Seventh.

286.    The United Defendants cannot unilaterally add terms to the CBA. The CBA must be conspicuously and purposefully amended, including any letters of agreement, by bargaining and ratification vote. By unilaterally altering the agreed to LOA #29 Adjustment Calculation as expressly provided for in the CBA, and LOA #29, without bargaining or ratification vote, United has violated Railway Labor Act Section 102 Seventh, 45 U.S.C. § 152 Seventh, and this failure to pay contractual wages pursuant to the terms of the CBA is enforceable as breach of the CBA in violation of Railway Labor Act Section 102 First, 45 U.S.C. § 152 first.

287.    By refusing to process Plaintiffs' legitimate grievances through the Third Step of the contractually mandated grievance process, by ignoring and abandoning the grievance process promulgated in the CBA, for grievances making a good faith attempt to address the merits of the issues related to the LOA #29 Adjustment Calculation, United has failed to exert every reasonable effort to maintain the agreement, in violation of RLA § 2, First, 45 U.S.C. § 152, and is in breach.

288.    United has engaged in a tactic of refusing reasonable information requests that are related to enforcement of the CBA. These refusals are calculated to, or have the foreseeable effect of, avoiding complying with the CBA for the United Defendants financial gain at the expense of Plaintiffs and the Class and demonstrate legitimately participating in the grievance process is mere pretext.

289.    United's conduct and unwillingness to honestly administer the grievance process is a violation under the Railway Labor Act Section 102 First, 45 U.S.C. § 152 First. By deploying this tactic of refusing reasonable information or document requests related to the enforcement and administration of the CBA, United's true purpose is to convey or imply an unwillingness to reach agreement with, and to undermine, Local 986 in order to undermine the chosen representatives of

the Class, and to force Local 986 to acquiesce to United's  demands to not process the grievances, all for United's interests and at the expense of Plaintiffs, the Class, and Local 986 and contrary to the terms of the CBA.

290.    By and through this conduct, United has demonstrated an intent not to follow the express terms of the CBA, and to not reach a mutual agreement regarding these grievances but rather to delay and frustrate the grievance process, and to impose unnecessary cost and hardship on Plaintiffs in order to force Local 986 to acquiesce to United's unilateral demand to reduce Plaintiffs raise. By and through this conduct, United has and remains in violation of 45 U.S.C. § 152, First.

291.    As a party to the CBA entered into with United, the Class have a right to information as to United's performance under the CBA, including a right to information United contractually agreed to provide when determining whether United is adhering to all terms and conditions of the CBA. United's refusal to provide requested relevant, material information related to a grievance filed by Plaintiffs grieving a violation of United's performance under the CBA, is a violation of Railway Labor Act Section 102 First, and United is in breach of the CBA.

292.    As a direct and proximate result of the breaches of the CBA by United, the Class have been damaged by the loss of a significant amount of wages in a sum the Class would have earned under the CBA had United not breached in an amount to be determined according to proof.

### Count IV - Interference With The Designated Representative
**In Violation of RLA 45 U.S.C. § 152, Third, and Fourth**
**(On Behalf of Plaintiffs and the Class Against All United Defendants)**

293.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

294.    Under Section 102 Third of the RLA, a carrier is prohibited from "in any way interfer[ing] with, influenc[ing], or coerc[ing]" the employees in their "choice of representatives." 45 U.S.C. § 152 Third. "Influence," as used in Section 102 of the RLA, means pressure, use of authority to induce action or to corrupt or override the will of another. Texas & N.O.R. Co. v. Brotherhood of R. & S.S. Clerks, 281 U.S. 548 (1930). This requirement is judicially enforceable because noninterference with employees' chosen representation is a statutory right crucial to the RLA's functioning. Id.; see also Virginian Ry. Co. v. Sys. Fed'n., 300 U.S. 515, 545–46, (1937).

295.    The Section 102 Fourth of the Act, provides in part:

No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, ... .

45 U.S.C. § 152 Fourth.

296.    By frustrating and undermining the effectiveness of the Union Defendants in administering the CBA through asserting baseless and non-existent CBA wage rules, terms, and conditions, i.e., LOA #29 permitted United to unilaterally reduce the members wages without any substantiation because such conduct involved highly confidential and proprietary information that United was not required to divulge, followed up by using the grievance process as the guise to undermine the effectiveness of the Union Defendants in challenging those actions, United has violated Section 2, Third of the RLA. *See* <u>Fennessy v. Sw. Airlines</u>, 91 F.3d 1359, 1362–63 (9th Cir. 1996).

297.    By and through its conduct of exerting economic pressure on the Union Defendants, and the Class to undermine the integrity of the Unions and the ability to bargain on the employees' behalf and in effect coerce the Class into decertifying the Union Defendants, the United Defendants compromised the Union Defendants representation by their conduct in violation of RLA Section 102 Fourth, 45 U.S.C. § 152 Fourth.

298.    By demanding the Union Defendants agree to the contractual reduction of the raise, by demanding changes to the terms and conditions of the CBA without bargaining or a ratification vote, United interfered with employee rights to freely associate under the RLA. The CBA mandates United must provide the Unions with relevant information necessary for the proper performance of its duties as exclusive bargaining representatives. Exhibit 3, art. 19.E.3; *see also* <u>Detroit Edison Co. v. NLRB</u>, 440 U.S. 301, 303 (1979). The United Defendants "duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement." <u>NLRB v. Acme Industrial Co.</u>, 385 U.S. 432, 436 (1967).

1

**Count V – Violation of Statutory Due Process**
**In Violation of the Railway Labor Act ("RLA"), 45, U.S.C. § 184.**
**(On Behalf of Plaintiffs and the Class Against All Defendants)**

2

3        299.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as

4   though fully set forth herein.

5        300.    The Fifth Amendment directs that before a governmental actor may deprive a person

6   of "life, liberty, or property," it must first afford that person "due process of law." U.S. Const.,

7   amend. V. The interests at stake in Railway Labor Act proceedings are "property" for purposes of

8   the Fifth Amendment. Nord v. Griffin, 86 F.2d 481, 483 (7th Cir. 1936).

9        301.    Section 204 of the RLA, governs resolution of disputes as applied to the airline

10  industry, providing for a compulsory remedy of a system adjustment board:

11          "The disputes between an employee or group of employees and a carrier or carriers
            by air growing out of grievances, or out of the interpretation or application of
12          agreements concerning rates of pay, rules, or working conditions … shall be handled
            in the usual manner up to and including the chief operating officer of the carrier
13          designated to handle such disputes; but, failing to reach an adjustment in this
            manner, the disputes may be referred by petition of the parties or by either party to
14          an appropriate adjustment board … ."

15      45 U.S.C. § 184.

16      302.    Under Section 204 of the RLA therefore, an individual air carrier employee has a

17  statutory right to due process before an adjustment board. 45 U.S.C. § 184. When a dispute arises

18  between "an employee" and "a carrier" concerning the interpretation of labor agreements, and is not

19  amicably resolved, "either party" may unilaterally bring that dispute before the adjustment board. 45

20  U.S.C. § 184. Any attempt to deny such a right is unenforceable and invalid. Int'l Ass'n of Machinists,

21  AFL-CIO v. Central Airlines, Inc., 372 U.S. 682 (1963).

22      303.    The Ninth Circuit has in fact found there is no clear evidence of congressional intent

23  to remove the right of due process protection from RLA governed proceedings. Edelman v. Western

24  Airlines, 892 F.2d 839, 846 (9th Cir. 1989). It follows then that preservation of due process right

25  permits Plaintiffs to enforce its deprivation, with or without their union. Fennessy v. S.W. Airlines,

26  91 F.3d 1359, 1363-64 (9th Cir. 1996) (without judicial recognition of a claim based on the statutory

27  dictates of the RLA, there would be no remedy to enforce the statutory commands of the RLA, ...

28

64

because the claim arises under a statute and not the CBA, such a claim may be brought directly to district court.).

304.    Article 19 of the CBA provides for a System Board of Adjustment, in the event a Second Step grievance resolution is unsatisfactory, at Third Step of the grievance process. Article 20 provides for neutral, or a Board of Arbitration, for the final step of the grievance process. Exhibit 3, art. 19.

305.    Nothing in the Article 19, or any other provision in the CBA, waives, or otherwise excludes Plaintiffs and the Class to their statutory right to access and utilize these higher stages of the congressionally mandated grievance process. Nor is there any provision in the CBA giving the Union exclusive authority to effectuate the grievance process; the CBA does state the Union "may" effectuate the process. Plaintiffs requested, in writing, that their grievances be advanced to the Third Step to continue the challenging their claims that they were underpaid. *See* Exhibit 3.

306.    By refusing to allow Plaintiffs to complete the congressionally mandated grievance process for a grievance arising under the CBA, and by refusing to initiate the Third Step System Board of Adjustment as provided for under the CBA for such purpose, all Defendants are violating Section 204 of the RLA, 45 U.S.C. § 184, and depriving Plaintiffs of their statutory due process.

307.    As set forth above, the Unions and United inhibited, prohibited, and refused to make available to Plaintiffs this required step in the grievance process in order to exhaust their mandated contractual dispute resolution process independently despite Plaintiffs timely written requests to invoke these procedures to resolve their grievances as the statute dictates.

308.    The Defendants, unilaterally and arbitrarily, through their own conduct or by secret agreement, sought to divest and deprive Plaintiffs of their statutorily prescribed rights over such a dispute, in violation of the RLA, as well as sought to divest and deprive the unique system boards with the statutorily prescribed jurisdiction over a dispute, in violation of the RLA.

309.    While the Union Defendants may not have wanted to represent Plaintiffs in the higher stages of the grievance process, their decision not to does not bar Plaintiffs from so doing. A "union's exclusive control over the manner and extent to which an individual grievance is presented" is inconsistent with the full protection of substantive individual statutory rights. Alexander v. Gardner-Denver Co., 415 U.S. 36, 58 n.19 (1974). Air carrier employees covered by the RLA have a statutory

65

right to process their grievances individually under the RLA. <u>Pyles v. United Airlines, Inc.</u>, 79 F.3d 1046, 1052 (11th Cir. 1996) (*citing* <u>Stevens v. Teamsters Local 2707, Airline, Aerospace & Allied Emp.</u>, 504 F. Supp. 332, 334 (W.D. Wash. 1980) (individual airline employee entitled to convene special boards of adjustment as a matter of statutory right without union assistance ); *see also* <u>Elgin, Joliet, & E. Ry. Co. v. Burley</u>, 325 U.S. 711, 740 n. 39 (1945) (individual statutory rights for RLA employees "cannot be nullified merely by agreement between the carrier and the union"); <u>Pratt v. United Airlines</u>, 468 F.Supp 508, 513 (N.D. Cal. 1978) (under the RLA, the union does not have exclusive control over grievances).

310.    Furthermore, the failure of the Union Defendants to provide Plaintiffs with any prior warning or notice such a drastic step of withdrawing and permanently terminating their grievances would be taken, without giving Plaintiffs any opportunity to assume responsibility for these grievances individually as provided for under the statute, violates the RLA. Consequently, Plaintiffs grievances, which could be remedied through the grievance process to the Plaintiffs' benefit were it not for the Defendant Unions blocking Plaintiffs from the grievance process, were effectively resolved in favor of United, at Plaintiffs' expense, categorically foreclosing Plaintiffs from any relief.

311.    But for the general jurisdiction of the federal courts, there would not be a remedy to enforce the statutory commands Congress has written into the RLA to adjudicate such grievances. The congressionally mandated arbitral remedial was not designed to shield employers from the natural consequences of their breaches of bargaining agreements by wrongful union conduct in the enforcement of such agreements.

312.    Plaintiffs request the Court declare that the Class have the statutory right to access and complete the grievance process independently pursuant to, and in accordance with the Railway Labor Act, and congressional intent.

313.    Plaintiffs have been deprived of their right to due process, suffering significant damages for which the Unions and United are liable to the Class for and therefore, the Class is entitled to the full measure of damages of all categories permissible under applicable law and in an amount according to proof.

1

**Count VI – Fraud and Intent to Deceive**
**In Violation of California Civil Code §§ 1709 and 1710.**
**(On Behalf of Plaintiffs and the Class Against All Defendants)**

2

3      314.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as

4    though fully set forth herein.

5      315.    Defendants willfully and intentionally engaged in fraudulent concealment and deceit

6    as defined by the California Civil Code §§ 1709 and 1710, in failing to disclose the true results of

7    the LOA#29 Adjustment Calculation result to the Class, on which they would reasonably rely, so

8    as to deprive them of significant owed wages.

9      316.    All Defendants concealed from, and failed to disclose to the Class that Defendants

10   statements related to the result of the LOA #29 Adjustment Calculation were false when Defendants

11   made them to the Class, as the true LOA #29 Adjustment Calculation result despite the truth of all

12   of the related communications regarding the result having been known to them, and only to them.

13   No one in the Class could discover the true facts regarding the LOA #29 Adjustment Calculation,

14   such as the LOA #29 Adjustment Calculation result was artificially adjusted for the Defendants'

15   financial gain, because all of the related relevant material facts were purposely withheld from them.

16     317.    The Union Defendants had a duty to disclose truthfully all facts to the Class, in their

17   roles as exclusive bargaining representatives.

18     318.    All Defendants had superior knowledge of the LOA #29 Adjustment Calculation

19   true result because the Defendants were the only parties allowed in the November 22, 2022 meeting

20   with the actuary tasked with performing the LOA #29 Adjustment Calculation, Dan Akins, where

21   the true LOA #29 Adjustment Calculation results were disclosed and discussed.

22     319.    Teamsters Airline Division then Deputy Director, Bob Fisher, admitted intentionally

23   misleading and deceiving the Class of the true LOA #29 Adjustment Calculation result, and the

24   confidential nature of the Adjustment Calculation and the Cost Model, during a craft meeting for

25   Local 210, in Newark, New Jersey on November 29, 2022.

26     320.    Likewise, Local 856 Business Agent, Javier Lectora, admitted to Plaintiff Scholz to

27   intentionally misleading and deceiving the Class of the true LOA #29 Adjustment Calculation result

28   on February 7, 2022, during a conversation at United's SFO Maintenance Facility.

321.    All Defendants knew, understood, and intended that the concealment of the true LOA #29 Adjustment Calculation result would cause severe financial harm to the Class by United withholding earned, due, and owed wages belonging to them. Because all Defendants secretly entered into side deals in order to deprive the Class of earned and owed wages, this claim is not premised on the CBA, or any interpretation of it, but instead on the deceit and dishonestly of all Defendants.

322.    The Class members reasonably and justifiably relied on the Defendants to perform the LOA #29 Adjustment Calculation honestly, accurately, and according to its terms. The Class reasonably believed the Defendants would not act illegally or put the Class at risk of substantial and continuing financial harm.

323.    The Class reasonably and justifiably relied on Defendants' statements that they had performed the LOA #29 Adjustment Calculation honestly, accurately, and according to its terms when Defendants provided statements claiming to have so performed the calculation and providing the result as 2.6% or approximately $1.20 per hour wage increase.

324.    Despite having actual knowledge these statements were false and nothing more than a scheme to defraud the Class of their earned, due, and owed wage increases when made to them, all Defendants continued to recklessly make, and repeat, these false statements.

325.    All Defendants concealed the true facts from the Class by providing false documents and recklessly stating that the required information for the LOA#29 Adjustment Calculation was proprietary and therefore could not be provided to the Class. These acts were done intentionally and willfully with the actual intent to deceive the Class, to conceal the true nature of the above-referenced material facts.

326.    The Defendants concealment was continuous, and continues today, and has caused great economic losses, distress, and harms to the Class.

327.    As a result of the deceptions and concealments of facts, the Class suffered significant damages for which all Defendants are liable to the Class for the full measure of damages of all categories permissible under applicable law in an amount according to proof.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, the individual Plaintiffs named above, on behalf of themselves and the Class, respectfully pray this Court accept jurisdiction of this action and grant Plaintiffs' demand:

A.    For certification of Plaintiffs' claims as a class action pursuant to Rule 23;

B.    For Plaintiffs to be appointed as Class Representatives;

C.    For Plaintiffs' counsel to be appointed as Class Counsel;

D.    For compensatory damages in an amount according to proof with interest thereon;

E.    For such other general, special, or punitive damages as may be appropriate;

F.    For an order directing the Defendants to cease from further refusal to allow the Class access the congressionally mandated and contractually required grievance process;

G.    For pre-judgment, and post judgment, interest, at the legal rate;

H.    For an award of attorney's fees and costs as permitted by applicable law; and

I.    For such other and further relief as the Court may deem just, proper, and equitable.

## IX.    JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial as provided by Rule 38 (a) of the Federal Rules of Civil Procedure.

Dated:_____June 24, 2024_____          LAW OFFICE OF JANE C. MARIANI

By: __/s/ Jane C. Mariani_____
JANE C. MARIANI,
jcm@marianiadvocacy.com
Law Office Of Jane C. Mariani
584 Castro Street, #687
San Francisco, CA 94114
Tel.: (415) 203-2453

*Attorney for Plaintiffs,*
THOMAS NEAL MULLINS
JOHN R. SCHOLZ, III

1

## CERTIFICATE OF ELECTRONIC SERVICE

2          I, Jane C. Mariani, hereby certify that on June 24, 2024, I electronically transmitted the

3  attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of electronic filing to the CM/ECF registrants for this case.

5  Dated:_____June 24, 2024_____          LAW OFFICE OF JANE C. MARIANI

6                                              By: ___/s/ Jane C. Mariani_____
                                               JANE C. MARIANI,
7                                              jcm@marianiadvocacy.com
                                               Law Office Of Jane C. Mariani
8                                              584 Castro Street, #687
                                               San Francisco, CA 94114
9                                              Tel.: (415) 203-2453

10                                             *Attorney for Plaintiffs,*
                                               THOMAS NEAL MULLINS
11
                                               JOHN R. SCHOLZ, III
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT      CASE NO.: 3:23-CV-03939-EMC