United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THOMSA NEAL MULLINS, et al.,

          Plaintiffs,

    v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, et al.,

          Defendants.

Case No. 23-cv-03939-EMC   (EMC)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS**

Docket Nos. 77-78

      Plaintiffs Thomas Neal Mullins and John R. Scholz III are employees of United Airlines, Inc. ("United") and members of the International Brotherhood of Teamsters ("Teamsters") and its local chapter Teamsters Local 986 ("Local 986"). They have filed a class and representative action against two groups of defendants: (1) the Union Defendants (*i.e.*, Teamsters and Local 986) and (2) United Defendants (*i.e.*, United and its parent United Airlines Holdings, Inc.).

      Previously, the Court granted motions to dismiss that were filed by both sets of Defendants. Some claims were dismissed with prejudice (*e.g.*, claims against individual union officers) but most were dismissed with leave to amend. Now pending before the Court are motions to dismiss filed by each set of Defendants. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motions to dismiss.

## I.     FACTUAL & PROCEDURAL BACKGROUND

      The operative pleading is the second amended complaint ("SAC"). In that complaint, Plaintiffs allege as follows.

United States District Court
Northern District of California

A.    <u>Parties</u>

Plaintiffs are employees of United.  Specifically, Mr. Mullins is a nonexempt aircraft inspector and Mr. Scholz a nonexempt hydraulic mechanical technician.  *See* SAC ¶¶ 15, 17.  In addition, Plaintiffs are members of Local 986, which indirectly makes them members of Teamsters as well.  *See* SAC ¶¶ 16, 18.  Teamsters and Local 986 are labor organizations and share bargaining representative duties for Plaintiffs and the class.  *See* SAC ¶¶ 19-20, 27.

B.    <u>CBA and LOA #29</u>

Plaintiffs' employment with United is governed by a collective bargaining agreement ("CBA") covering technicians and related employees.  The CBA covers the period 2016 to 2022.  *See* SAC ¶¶ 33-34 & Ex. 3 (CBA).

The CBA includes a three-step grievance procedure.  *See* SAC ¶ 44, 53; *see also* CBA, art. 19, § B (laying out steps).  In the First Step, the employee presents the complaint to his supervisor.  The employee has the right, but not the obligation, to be represented by a union official.  See CBA, art. 19, § B.1.  If the decision of the supervisor is not satisfactory, the employee and/or union representative may initiate the Second Step and appeal to a managing director.  *See* CBA, art. 19, § B.4.  If the decision of the managing director is not satisfactory, the grievance process provides for a Third Step, which involves an appeal to the system board of adjustment.  *See* SAC ¶ 98; CBA, art. 19, § B.6.  The language of the CBA states that "the *Union* may appeal such grievance to the System Board of Adjustment."  CBA, art. 19, § B.6 (emphasis added).  The CBA does not state that an employee has the right to individually grieve his complaint to the system board of adjustment.

That being said,

> since 2008, in a case where a grievant wanted to advance his or her grievance from the Second Step to the Third Step System Board of Adjustment, where the Union found [the grievance] meritless and did not want to participate, Local 986 would *notify* United of the parties' positions – grievant proceeding and Local 986 releasing as a no-fund case.  This would initiate the Third Step process, if done timely, relieving Local 986 of any responsibility whilst respecting the grievant's rights.

SAC ¶ 98 (emphasis added).

The CBA also includes a Letter of Agreement – known as LOA #29 – that addresses wage increases. Under the LOA, every two years, wages were to be set at "102% of the combined average compensation level of . . . counterparts at United's two main competitor airlines, American Airlines and Delta Airlines through the use of an 'Adjustment Calculation.'" SAC ¶ 58. Specifically, the LOA states as follows with respect to the Adjustment Calculation.

> Adjustment Calculation. If the results of the analysis demonstrate that, as of the Measurement Date, [United]'s Annual Wages and Benefits is less than 102 percent (102%) of the combined average of Annual Wages and Benefits under [American] CBA and [Delta] CBA, then [United] shall adjust basic wages effective at the beginning of the first pay period after each measurement date to be 102 percent of the combined average. . . .
>
> The parties shall meet to review the Cost Model for the purposes of reaching an understanding of the adjustment analysis. In the event the parties are unable to reach an understanding relative to the adjustment analysis, the matter may be submitted for expedited arbitration as provided in Article 1 G.

LOA #29, ¶ 2. "Cost Model" is defined as

> an economic model, based in MS Excel, which calculates Annual Employee Cost. The model is to be agreed upon by economic experts from the company and the union within two months after the date of ratification of [United's] agreement as Exhibit "A." If an agreement is not reached within this timeframe, the matter may be submitted for expedited arbitration as provided in Article 1 G.

LOA #29, ¶ 1.j.

The Union Defendants had an economist and actuary, Dan Akins, to assist them during the bargaining of the CBA and LOA #29. *See* SAC ¶ 59. The Union Defendants also relied on Mr. Akins to assist in explaining the CBA and LOA #29 to union members after the agreements were negotiated. For example,

> [o]n October 18, 2016, the Unions held an informational meeting or "roadshow" at SFO to explain the CBA rules, terms, and conditions, including LOA #29. At this meeting, Akins, as a negotiating committee member and economist, provided a comprehensive explanation of LOA #29, meticulously going over all of its elements, functions, and application, utilizing and providing a corresponding PowerPoint presentation Akins referred to as a draft of the Cost Model referenced in LOA #29.

SAC ¶ 65; *see also* SAC, Ex. 4 (PowerPoint presentation).

The draft Cost Model identified five elements that would factor into the Adjustment Calculation: (1) pay, (2) time off, (3) benefits, (4) profit sharing, and (5) scope.  *See* SAC ¶ 66; *see also* SAC, Ex. 4 (ECF Page 630) ("A Reset Model has been created to measure the sum value of 5 key contract elements in [the United] contract, including[] Pay, Time Off, Benefits, Profit Sharing and Scope.  The total value [the United] contract elements is then weighed against the average of the same elements for Technicians who work for [American and Delta]."); SAC, Ex. 4 (ECF Page 632) ("A reset model has been created to measure and compare the value of a selected set of primary contractual elements covering pay, benefits, work rules and retirement contribution level for Technician[]s at United to that of Technicians at American and Delta.  The model's structure will not change, only the periodic updates of data elements being analyzed will change."); *accord* SAC, Ex. 4 (ECF Page 634) ("Model Comparative Elements").  During the roadshow, Mr. Akins emphasized that "the information needed to do the Adjustment Calculation, to provide the data inputs, is all *publicly available*."  SAC ¶ 72 (emphasis added).  This was

> to allow for the highest level of transparency and ease of actually doing the Adjustment Calculation.  Indeed, due to the comparative analysis requiring the information of United's two main competitor airlines, all information being publicly accessible was compulsory.

SAC ¶ 60 (emphasis added); *see also* SAC ¶ 59 (alleging that "LOA #29 was negotiated and ratified . . . to establish an objective, standardized method for raises in order to reduce typical drawn out and contentious wage negotiations").

C.    2018 Adjustment Calculation

The first Adjustment Calculation pursuant to LOA #29 took place in 2018.[1]  Before the

---

[1] Plaintiffs allege that, in 2017, about six months after the CBA was ratified but before the first Adjustment Calculation in 2018, "Teamsters received a $1.5 million dollar payment from United," and "[n]either the Teamsters nor United have ever accounted for this payment as a valid payment for legitimate reasons."  SAC ¶ 117.  Plaintiffs have not explained the relevance of this allegation.  Nor can the Court divine the relevance particularly because, as discussed below, Plaintiffs seem to take the position that United only decided to change the method for the Adjustment Calculation *after* a suit was brought against it in 2018.  *Cf. Seitz v. Int'l Bhd. of Teamsters*, No. 22-15902, 2023 U.S. App. LEXIS 19626, at *3 (9th Cir. July 31, 2023) (stating that plaintiff "Seitz points to a $ 1.5 million payment that the IBT received from United and insinuates that the IBT agreed to ratify and underenforce the CBA in exchange for that payment[,] [b]ut Seitz alleges no facts to connect this payment to the negotiation of the CBA, or to any other alleged misconduct").

United States District Court
Northern District of California

1   Adjustment Calculation was made, a union business agent advised members that the Cost Model

2   "would not be provided for the upcoming 2018 reset as previously promised" because,

3   purportedly, the National Mediation Board ("NMB") had ordered that it be kept secret on its

4   servers "to protect the Cost Model's highly sensitive nature."[2]  SAC ¶ 95.  This claim turned out to

5   be false.  *See* SAC ¶ 95.

6          After the 2018 Adjustment Calculation was made, a union member, Jim Seitz, initiated a

7   grievance, challenging the calculation.  *See* SAC ¶ 94.  The Adjustment Calculation did not

8   comply with LOA #29 because the United Defendants had secretly changed the method of

9   calculation, with the assistance of the Union Defendants.

10         The United Defendants' decision to change the method of calculation was prompted by a

11  lawsuit that union members had filed against the United Defendants and the unions shortly before

12  the Adjustment Calculation was to be made.[3]  The SAC contains a fairly lengthy discussion on this

13  point, but it is confusing and difficult to follow.

14         From what the Court can divine, it appears that, in the lawsuit, union members claimed

15  that pre-merger United technicians[4] (also referred to as subUA technicians) were being deprived

16  of pension rights and profit-sharing monies.  *See* SAC ¶¶ 101-02.  United and Teamsters allegedly

17  had agreed that United could delay pension enrollment for premerger United technicians.  *See*

18  SAC ¶ 109, SAC ¶¶ 106, 108 (referring to secret dealings between United and Teamsters that

19  "prevented and delayed[,] for over 7[] years[,] subUA technicians from being enrolled in any

20  pension plan").  Teamsters purportedly made this agreement "for its own financial benefit so that

21  ─────────────────────

22  [2] "The National Mediation Board helps to maintain helps to maintain the flow of interstate
    commerce in the airline and railway industries through representation, mediation and arbitration
23  services."  https://nmb.gov/NMB_Application/ (last visited 3/13/2025); *see also* see also 45
    U.S.C. §§ 154-55, 183 (addressing National Mediation Board).

24  
25  [3] The United Defendants identify the suit as *Bybee v. International Brotherhood of Teamsters*, No.
    18-cv-06632-JD, 2022 U.S. Dist. LEXIS 136561 (N.D. Cal. Aug. 1, 2022), *affirmed by* No. 22-
    16280, 2023 U.S. App. LEXIS 29754 (9th Cir. Nov. 8, 2023).

26  
27  [4] The merger to which Plaintiffs refer is that between United and Continental.  It appears that the
    merger took place around 2010.  *See* https://www.prnewswire.com/news-releases/united-and-
    continental-announce-merger-of-equals-to-create-world-class-global-airline-92652809.html (last
28  visited 3/13/2025).

*United States District Court*
*Northern District of California*

it could gain control of the pension required to be part of the post-merger CBA." SAC ¶ 103; *see also* SAC ¶ 107 (alleging that "the Teamsters pushed for, and proposed, plan after plan to United of a Teamsters controlled multi-employer plan, a Teamsters controlled single employer plan, and a Teamsters controlled Adjustable Pension Plan"). Teamsters also "illicitly gave profit sharing monies to then pre-merger Continental ("subCO") technicians in order to sway sub-CO votes in favor of Teamster pension plan offers." SAC ¶ 103; *see also* SAC ¶ 109 (alleging that "Teamsters turned a blind eye while United diluted subUA technician profit sharing pool monies, allowing United to include subCO technicians in the subUA technicians profit sharing pool monies").

Though not clear, it seems that (as alleged), because of the above lawsuit, United began to increase the contribution payments it was making to CARP (a retirement plan) – *i.e.*, "out of concern for an adverse ruling in the lawsuit that would require it to make restitution for the years' long failure to include subUA technicians in CARP." SAC ¶ 105. Again, though not clear, presumably, if United was now paying *more* in contribution payments, it wanted to compensate by paying *less* for future wage increases and thus it departed from the Adjustment Calculation provided for in LOA #29. The Union Defendants went along with United's plan to depart from the Adjustment Calculation provided for in the LOA because they did not want "the full breadth and depth of [their] betrayal of its membership [described above to] be exposed by United" and thus were willing to "alter . . . the LOA #29 formula for United's financial benefit." SAC ¶ 115.

According to Plaintiffs, both United and the unions later admitted that the change to the Adjustment Calculation was related to pension rights. For example, "[s]ince the original filing of the complaint, United has now volunteered that the 'confidential and proprietary information' [that cannot be shared with Plaintiffs and the class] is solely the amount of the funding contributions to the defined benefit plan, CARP." SAC ¶ 245. As for the unions, in February 2023, a business agent for an affiliated local union, Javier Lectora, told Mr. Scholz that

> "it is all about the pensions" and that "we do not use any accurate American or Delta information. We guess. The economist and United make it up. United Airlines does not get the numbers. United analyzes public information and does not want to give you any of the numbers because you will be able to reverse engineer and check it. It is not about you or the union."

1    SAC ¶ 217.

2         As noted above, Mr. Seitz pursued his grievance of the 2018 Adjustment Calculation.

3    However, he was not satisfied with the grievance process and thus filed suit in federal court,

4    claiming that the 2018 Adjustment Calculation was incorrect.  Ultimately, Mr. Seitz's suit was

5    dismissed on the basis that it was untimely.  The merits of his suit were not adjudicated.  *See* SAC

6    ¶ 116.

7    D.    2020 Adjustment Calculation

8         In 2020, another Adjustment Calculation was made.  Several grievances were initiated

9    challenging the calculation, including one by Mr. Seitz.  *See* SAC ¶¶ 122-23.  Mr. Seitz again was

10   not satisfied with the grievance process and thus filed suit in federal court.  During this time, Mr.

11   Seitz learned through a FOIA request that NMB, *see* note 2, *supra*, did not, in fact, have the Cost

12   Model stored on its servers as union members had previously been told.  *See* SAC ¶ 129.  When

13   Mr. Seitz asked for the Cost Model, he was now given a different excuse for its nonproduction:

14                United and the Unions now claimed in their motions to dismiss that
             the real reason there was no information available as to how United
15           was calculating Technician pay was because the Cost Model
             actually contained highly confidential and proprietary information of
16           the kind so sensitive, that if it were to be revealed to anyone, . . .
             United would be at immediate and perilous competitive
17           disadvantage [–] despite the clear bargaining history to the contrary,
             i.e., everything, every element, every value, is publicly available.
18

19   SAC ¶ 130.

20        Mr. Seitz's suit was eventually dismissed.  *See Seitz* 2023 U.S. App. LEXIS 19626, at *3

21   (holding, *inter alia*, that the union did not breach its duty of fair representation; "[a] union's

22   negotiation over wages, its agreement to keep confidential an employer's proprietary information

23   used to calculate those wages, and its determination that a grievance is meritless all involve

24   reasonable exercises of judgment to which this court must defer").

25   E.    2022 Adjustment Calculation

26        In 2022, a third Adjustment Calculation was made.  This is the only calculation at issue in

27   this case.  As above, grievances were initiated, including by Plaintiffs, asserting that the

28   calculation was incorrect.  United refused to provide information about the calculation, once again

United States District Court
Northern District of California

on the basis that the information was confidential and proprietary (and the unions agreed). *See* SAC ¶ 145; *see also* SAC ¶¶ 159, 190. Plaintiffs allege the claim of confidentiality was not credible for several reasons:

> (1) The bargaining history for the CBA reflects Mr. Akins's statements to union membership that the information used for the Adjustment Calculation would be publicly available.
>
> (2) "The same information would be needed from American and Delta to correctly perform the calculation as written and agreed upon," so "[h]ow could this information be confidential only to United?" SAC ¶ 145.
>
> (3) During a union meeting held on November 29, 2022, Bob Fischer – at that time, the Teamsters Airline Division Deputy Director – admitted that Mr. Akins had actually shared with union officials (during a meeting held a week earlier) the 2022 Adjustment Calculation and the Cost Model and had "explained [to them] in detail the results" *without* their having signed any NDA. *See* SAC ¶ 227.
>
> (4) The United Defendants have claimed that information about the calculation is confidential because it relates to "the amount of the funding contributions to the defined [retirement] benefit plan, CARP. . . . [But] [t]he IRS and the Department of Labor require this exact information to be not only publicly disclosed in mandatory reporting documents to the government but United is also required by law to provide such information to the Class as participants in the pension plan." SAC ¶ 245.

Plaintiffs asked their grievances to be advanced to the Third Step. However, they were subsequently told in February 2023 that the grievances lacked merit, could not be appealed, and were closed. *See* SAC ¶¶ 167-68, 203-04. The Union Defendants refused to initiate the Third Step by sending a request to United, as was the standard practice. *See* SAC ¶ 169; *see also* SAC ¶ 98.

F.      <u>Claims</u>

Based on, *inter alia*, the above allegations, Plaintiffs have asserted the following causes of

action in their SAC[5]:

> (1) Breach of the duty of fair representation in violation of the Railway Labor Act ("RLA") (against the Union Defendants only).
>
> (2) Breach of contract in violation of third-party beneficiary rights in violation of California state law (against the Union Defendants only).
>
> (3) Breach of contract in violation of the RLA (against the United Defendants only).
>
> (4) Interference with the designated representative in violation of the RLA (against the United Defendants only).
>
> (5) Violation of statutory due process rights as provided for in the RLA (against all Defendants).
>
> (6) Fraud in violation of California state law (against all Defendants).

## II.    LEGAL STANDARD

Defendants' motions to dismiss are predicated on Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).

A.    Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss a cause of action for failure to state a claim for relief.  To overcome a Rule 12(b)(6) motion after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135

---

[5] The SAC has several attachments: (1) Exhibit 1 is the Teamsters Constitution, dated June 2021; (2) Exhibit 2 is the Teamster Bylaws, dated 2017; (3) Exhibit 3 the CBA, dated 2016-2022, and Exhibit 4 is the PowerPoint that was given during the roadshow, titled "Technicians' Industry Reset Overview: Data Methodology, and Timing."

United States District Court
Northern District of California

(internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

B.    Rule 12(b)(1)

Under Rule 12(b)(1), a party may move to dismiss for lack of subject matter jurisdiction.  A Rule 12(b)(1) jurisdictional attack may be factual or facial.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack," "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Id.*  The court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6):  Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

### III.    UNION DEFENDANTS' MOTION TO DISMISS

Plaintiffs have asserted the following claims against the Union Defendants (*i.e.*, Teamsters and Local 986):

- Breach of the duty of fair representation in violation of the RLA.
- Breach of contract in violation of third-party beneficiary rights in violation of California state law.
- Violation of statutory due process rights as provided for in the RLA.
- Fraud in violation of California state law.

In their motion to dismiss, the Union Defendants launch a 12(b)(6) challenge to each of the causes of action.

A.    Breach of the Duty of Fair Representation

1.    Correct Defendant

The claim for breach of the duty of fair representation ("DFR") is asserted against both Union Defendants – *i.e.*, Teamsters and Local 986.  As in their prior motion to dismiss, the Union

Defendants argue that the sole proper defendant for this claim is Teamsters. Such a claim may be maintained against the exclusive bargaining representative alone. *See Dycus v. NLRB*, 615 F.2d 820, 827 (9th Cir. 1980) (stating that "[a] labor organization that is not the exclusive representative of a bargaining unit . . . owes no duty of fair representation to the members of the unit"). According to the Union Defendants, Teamsters is the only exclusive bargaining representative for Plaintiffs and the class. In response, Plaintiffs contend that Teamsters and Local 986 *jointly* represent them and the class.

The Court begins its analysis by taking into account that, Local 986 and Teamsters – though affiliated – are distinct entities. *Cf. Harris v. Am. Postal Workers Union*, No. 98-1734, 1999 U.S. App. LEXIS 26601, at *10 (6th Cir. Oct. 19, 1999) (noting that courts "have held that a local and its national union are normally separate legal entities for breach of duty of fair representation purposes"). That being said, the Union Defendants have not pointed to any authority indicating that, for purposes of the RLA, it is not possible for affiliated unions to jointly represent union members. *See* 45 U.S.C. § 152, Fourth (simply stating that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing"); *see also Office & Prof'l Emples. Int'l Union Local 109 & Office v. Air Methods Corp.*, No. 08-C-0806, 2010 U.S. Dist. LEXIS 96140, at *3 (E.D. Wisc. Sept. 14, 2010) (stating that the international union and "its Local 109 became the certified bargaining representative for a nationwide bargaining unit of the AMC pilots"); *cf. First Student Inc.*, 366 N.L.R.B. No. 13, at *1 & n.4, 10 (Feb. 6, 2018) (finding both the international and local unions to be the exclusive bargaining representative).[6]

---

[6] In *Newsome v. Northwest Airlines Corp.*, 225 F. Supp. 2d 822 (W.D. 2002), the district court did state that "'[o]ne could no more have two exclusive representatives than . . . "two men on second base."'" *Id.* at 832-33 (quoting *AFA v. United Airlines Inc.*, 71 F.3d 915, 918 (D.C. Cir. 1995). But *Newsome* is distinguishable: there, two unaffiliated unions were at issue. *See id.* at 826 (noting that, "[p]rior to 1999, IAM represented Northwest employees who were members of the Mechanics and Related craft or class" but, effective June 1999, "AMFA, another unincorporated labor organization became the representative"). It was in this context that the court said union members could have only one representative. *See also AFA*, 71 F.3d at 918 (addressing situation were two companies merge and employees in the same jobs are represented by different unions; "[t]he application of one union's collective bargaining agreement to another union's members would create a situation where those members would have, in effect, two representatives").

1          The Court also bears in mind that the only signatory to the CBA was Teamsters, and not

2     Local 986.  *See* Docket No. 59 (Order at 13) (noting that "[t]he signature block for the CBA

3     reflects that the signatories are (1) United and (2) the Teamsters[;] [t]hough multiple individuals

4     signed on behalf of the Teamsters – not only representatives of the Teamsters but also

5     representatives of numerous local unions (including Local 986) – nothing indicates that those

6     individuals were signing on behalf of those local unions as opposed to Teamsters," especially as

7     the preamble to the CBA stated that the agreement was between United and Teamsters only).[7]  But

8     it is not clear that a union's status as a nonsignatory to a CBA bars it from being an exclusive

9     bargaining representative (*i.e.*, so long as an affiliated union *does* sign the CBA).  What matters

10    under the RLA is that employees *choose* who will represent them.  *See* 45 U.S.C. § 152, Fourth

11    (providing that "[e]mployees shall have the right to organize and bargain collectively through

12    representatives of their own choosing").  Thus, the critical issue in this case is whether the union

13    members at issue *chose* Local 986 to represent them (along with Teamsters who did sign the

14    CBA).  *Cf. Borg v. Greyhound Lines*, No. C 83 4827 RHS, 1984 U.S. Dist. LEXIS 24852, at *8

15    (N.D. Cal. July 17, 1984) (stating that "international unions are routinely dismissed from duty of

16    fair representation suits when they are *neither* the recognized collective bargaining representative

17    *nor* a party to the contract") (emphasis added).

18          As discussed below, Plaintiffs have plausibly alleged that union members chose both

19    Union Defendants to jointly represent them.  Thus, there is a question of fact as to whether Local

20    986 (in addition to Teamsters) is the exclusive bargaining representative, and dismissal of the DFR

21    claim against the local union is not appropriate, at least not at this time.  *Cf. id.* (at summary

22    judgment, dismissing the DFR claim against the international union; "[t]he duty is not imposed on

23    an international union simply because it is the 'parent' of the designated representative; and

24    boilerplate allegations that a local union is an agent of its international, or *vice versa*, do not create

25    a factual issue was to whether the international owes a duty of fair representation").

26          There is a question of fact as to whether Local 986 is, along with Teamsters, the exclusive

27

28    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
      [7] The cover page and preamble of the CBA likewise indicate that the agreement is between United
      and Teamsters only.  *See* Docket No. 59 (Order at 12-13).

bargaining representative in light of language from the Teamsters Constitution and Local 986's Bylaws. For example, Article XIV, § 3 of the Teamsters Constitution states as follows:

> Every member covered by a collective bargaining agreement at their place of employment authorizes the Local Union to act as his or her exclusive bargaining representative with full and exclusive power to execute agreements with the employer governing terms and conditions of employment and to act for him or her and have final authority in presenting, processing, and adjusting any grievance, difficulty, or dispute arising under any collective bargaining agreement or out of their employment with such employer in such manner as the Local Union or its officers deem to be in the best interests of the Local Union . . . .

SAC, Ex. 1 (Teamsters Const., art. XIV, § 3). Local 986's Bylaws contain the same basic language. *See* SAC, Ex. 2 (Local 986 Bylaws § 20(E)(2)).

Admittedly, the Constitution and Bylaws, by themselves are not dispositive. *See* Reply at 3 (arguing that "[a]n employee organization cannot *designate itself* as an exclusive representative . . . through its bylaws or constitution; they must be selected through the RLA representation process") (emphasis added). That fact that the local can be chosen as a bargaining representative does not necessarily mean that it was. But it is a reasonable inference that union members *did* choose Local Union 986 to represent them given that both Plaintiffs went through the grievance process with the local union. *See, e.g.*, SAC ¶ 158 ("Mitchell, a Local 986 Chief Steward, transferred [Mullins's] handwritten grievance to, and entered it into, the electronic grievance system that only Local 986 officials can access."); SAC ¶ 189 ("Scholz asked repeatedly for assistance from Local 986 to support his grievance and to look into his calculation.").

The Union Defendants protest that the NMB has certified Teamsters alone as the exclusive bargaining representative. *See* Union Mot. at 3 (citing 40 N.M.B. 253 (2013)); *see also* SAC, Ex. 3 (CBA, preamble) (stating that CBA is entered into between United and Teamsters, "representing the employees composing the Craft or Class of Mechanics and Related employees, as certified by the National Mediation Board in case R-7363 on August 6, 2013"). NMB's certification authority arises from 45 U.S.C. § 152, Ninth, which states as follows:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute,

United States District Court
Northern District of California

1

2

3

4

> to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier.  Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter.

5   45 U.S.C. § 152, Ninth; *see also* 29 C.F.R. § 1202.3.

6          The NMB decision on which the Union Defendants rely, however, must be placed in

7   context.  That decision was issued because Teamsters had filed an application to represent United

8   mechanics and related employees *after* United and Continent had merged in 2010.  In other words,

9   there was a need to determine who represented the employees at issue post-merger of the two

10  companies.  The NMB noted first that Teamsters was the certified representative for employees at

11  pre-merger United, Continental, and Continental Micronesia.  *See* 40 N.M.B. at 255.  It then

12  stated: "In cases where an organization has certifications covering the same craft or class at *both*

13  carriers prior to a merger, the Board has certified the organization as the representative of the

14  combined craft or class at the merged carrier."  *Id.* (emphasis added).  Accordingly, the NMB

15  certified that Teamsters "has been duly designated and authorized to represent the craft or class of

16  Mechanics and Related Employees, employees of United, its successor and assigns."  *Id.*

17         As indicated by the above, while the NMB did certify that Teamsters was the exclusive

18  bargaining representative, it was not called upon to address whether any local union affiliated with

19  Teamsters was a joint representative with respect to a particular CBA.  The Union Defendants also

20  have not cited any authority indicating that a certification by the NMB would be preemptive of a

21  claim that an affiliated union was a joint representative.  *Cf.* 45 U.S.C. § 152, Fourth (providing

22  that "[e]mployees shall have the right to organize and bargain collectively through representatives

23  of their own choosing").

24         To the extent the Union Defendants suggest that only the NMB has jurisdiction to decide

25  the issue of who is properly deemed the exclusive bargaining representative, the parties have not

26  sufficiently briefed the issue.  The Court takes note, however, that whether the NMB has exclusive

27  jurisdiction may turn on the kind of relief being sought.  For example, in *Association of Flight*

28  *Attendants v. Delta Air Lines, Inc.*, 879 F.2d 906 (D.C. Cir. 1989), the D.C. Circuit noted that

[a]ll of the courts of appeals to have considered the issue (as this court has not) have held that the question whether a union's certification [as the exclusive bargaining representative] survives an airline merger is a matter within the exclusive jurisdiction of the NMB.  The result is no different if the union frames its action as a contract dispute arising from a successorship clause in a CBA.  A claim seeking either *specific performance* of such a clause or a *declaration* that it is binding is nonjusticiable because the relief sought is, *in effect*, a certification within the meaning of [45 U.S.C. § 152], Ninth; and as such, it is within the exclusive competence of the NMB.

*Id.* at 912.  However, if an award of *damages* is sought, a plaintiff is not "truly [seeking] the functional equivalent of the certificate that the NMB alone can issue"; that is, the plaintiff is not asserting a "*de facto* claim to judicial certification of the . . . union's representative status." *Id.* (emphasis in original); *see also Indep. Fed'n of Flight Attendants v. Cooper*, 141 F.3d 900, 903 (8th Cir. 1998) ("[W]e read *Delta* to hold that certain causes of action arising out of representation disputes are not preempted by the RLA.  The test for RLA preemption is whether an award of damages would be the functional equivalent of resolving the representation dispute.").

Accordingly, the Court denies the motion to dismiss the DFR claim asserted against Local 986.  To be clear, the Court is not making any holding here that Local 986 is in fact a joint representative with Teamsters.  It is possible, for instance, that only Teamsters is the exclusive bargaining representative because a *nationwide* bargaining unit for the employees was needed.  *See* Union Reply at 3.  However, at this early juncture, a definitive factual determination cannot be made.

### 2.    Arbitrary, In Bad Faith, or Discriminatory

The Union Defendants argue next that, regardless of who is a proper defendant for the DFR claim, the DFR claim must be dismissed because (1) it is time barred and (2) it is not plausible.  The Court need not address the first argument because it agrees with the second – *i.e.*, Plaintiffs have not pled a plausible cause of action.

"A union breaches its duty of fair representation 'when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith.'  Plaintiffs bear the burden of proving that a union breached such duty." *Demetris v. Local 514, Transp. Workers Union of Am.*, 862 F.3d 799, 804-05 (9th Cir. 2017).  "'Whereas the arbitrariness analysis looks to the objective

adequacy of the Union's conduct, the discrimination and bad faith analyses look to the subjective motivation of the Union officials.'" *Simo v. Union of Needletrades*, 322 F.3d 602, 618 (9th Cir. 2003).

With respect to arbitrary conduct, the Ninth Circuit has noted that a union's conduct is generally not arbitrary when the union exercises its judgment. *See Demetris*, 862 F.3d at 805 (contrasting conduct that involves judgment with conduct that is "merely ministerial or procedural in nature"). "When a union exercises its judgment, its action can be classified as arbitrary" only "if it is so far outside [the] wide range of reasonableness that it is wholly irrational." *Id.* (internal quotation marks omitted).

As for discriminatory or bad faith conduct, there is a relative highly standard where the union exercises its judgment.

> To establish that the union's exercise of judgment was discriminatory, a plaintiff must adduce "*substantial evidence* of discrimination that is intentional, severe, and unrelated to legitimate union objectives." To establish that the union's exercise of judgment was in bad faith, the plaintiff must show "*substantial evidence* of fraud, deceitful action or dishonest conduct."

*Beck v. UFCW, Local 99*, 506 F.3d 874, 880 (9th Cir. 2007) (emphasis added).

As noted above, Plaintiffs' DFR claim primarily rests on allegations that the Union Defendants capitulated to the United Defendants as to how the wage increase would be calculated; the wage increase was not calculated in compliance with LOA #29; and therefore the Union Defendants effectively modified LOA #29 (part of the CBA) "without a ratification vote, as required by the Teamsters constitution." SAC ¶ 226(a). According to Plaintiffs, this conduct was, at the very least, wholly irrational and undertaken in bad faith. The Union Defendants argue in response that there is no plausible claim for breach of the duty of fair representation.

In evaluating the parties' dispute, the Court bears in mind its prior holding that (1) the Union Defendants exercised judgment in evaluating what was required under the CBA and LOA #29 and that (2) the Union Defendants' interpretation of the same was reasonable. *See* Docket No. 59 (Order at 16-19) (holding, *inter alia*, that it was reasonable for the Teamsters to conclude that, under LOA #29, the Cost Model was part of the Adjustment Calculation; also holding that it was

United States District Court
Northern District of California

1    reasonable for the Teamsters not to provide the underlying information for the Adjustment

2    Calculation since the LOA on its face did not require such and did not preclude the use of

3    confidential information).

4         Faced with this holding, Plaintiffs have essentially taken the position that, even if the

5    Union Defendants' interpretation of the CBA and LOA #29 was reasonable, that does not make

6    their claim of wholly irrational or bad faith conduct implausible because that interpretation was

7    *inconsistent* with how the Union Defendants had originally interpreted the agreements.  As alleged

8    by Plaintiffs, back in October 2016, the Union Defendants gave a roadshow presentation to union

9    members about the CBA and LOA (*i.e.*, after the CBA/LOA had been negotiated and the unions

10   were providing information to members to get them to ratify the agreement).  During that

11   presentation, the Union Defendants' economist, Mr. Akins, provided the unions' interpretation of

12   the LOA: to wit, that the Cost Model would be based on five specific elements, each of which was

13   objective in nature *and* publicly available.  *See* SAC ¶¶ 65-66.  According to Plaintiffs, it can

14   reasonably be inferred that this interpretation was consistent with how the United Defendants

15   interpreted the CBA and LOA, or that information would not have been presented to membership

16   in the first place.[8]

17        Plaintiffs also allege that this was clearly the original understanding of the CBA and LOA

18   because, on November 29, 2022, after the 2022 Adjustment Calculation was released, there was a

19   meeting involving union officials, and several officials expressly stated that the calculation was

20   wrong and should have been $5-$6 higher (*i.e.*, under the draft Cost Model that Mr. Akins had

21   explained).  *See* SAC ¶ 223.

22        Plaintiffs maintain that the Union Defendants only adopted a different interpretation in

23   2018 – post-ratification – after the Union and United Defendants were sued for allegedly depriving

24   pre-merger United technicians of pension rights and profit-sharing monies.  As alleged (as best the

25   Court can understand), United and Teamsters had agreed that United could delay pension

26   enrollment for premerger United technicians, with Teamsters making this agreement "so that it

27   _____

28   [8] Plaintiffs do not contend that Mr. Akins made fraudulent representations about the Cost Model
     to union members as a way to get them to ratify the CBA.

17

United States District Court
Northern District of California

could gain control of the pension required to be part of the post-merger CBA." SAC ¶ 103. Because of the potential liability in the 2018 lawsuit, United wanted to depart from the Adjustment Calculation provided for in LOA #29 (*i.e.*, to pay a smaller wage increase to offset the potential liability); the Union Defendants capitulated because they did not want "the full breadth and depth of [their] betrayal of its membership [to] be exposed by United." SAC ¶ 115.

According to Plaintiffs, the fact that the 2018 suit and the pension rights played a role in what happened with the Adjustment Calculation is supported by statements made by Mr. Lectora, a union business agent. Mr. Lectora had been present at a union meeting on November 22, 2022, where Mr. Akins (the Unions' economist) had reviewed the elements of the Cost Model for purposes of the 2022 Adjustment Calculation. *See* SAC ¶¶ 226, 239. Mr. Akins stated during that meeting that "'you are not going to like this but I have a s**t sandwich to share with you[,]' [t]he implication being United insisted on reducing the number and the Unions were going to go along with it." SAC ¶ 226. Mr. Lectora later told one of the plaintiffs in February 2023 that the "'union did not agree with the company'" and that "'it is all about the pensions.'" SAC ¶ 217.

Plaintiffs also allege that, to cover up the manipulation of the Adjustment Calculation, the Union Defendants went along with the United Defendants' claim that information used for the Adjustment Calculation, including the Cost Model, contained confidential and propriety information and thus could not be shared with union membership. The assertion of confidentiality was false as demonstrated by the following:

> (1) During the October 2016 presentation to union membership, Mr. Akins expressly stated that the information used for the Adjustment Calculation would be publicly available.

> (2) "The same information would be needed from American and Delta to correctly perform the calculation as written and agreed upon," so "[h]ow could this information be confidential only to United?" SAC ¶ 145.

> (3) During a union meeting held on November 29, 2022, Mr. Fischer, a union official, admitted that Mr. Akins had actually shared with union officials (during a meeting held a week earlier) the 2022 Adjustment Calculation and the Cost Model and had

18

United States District Court
Northern District of California

1    "explained [to them] in detail the results" *without* their having signed any NDA.

2    *See* SAC ¶ 227.

3        (4) Any claim by United that pension information is the confidential element in the

4        Cost Model ignores the fact that "[t]he IRS and the Department of Labor require

5        this exact information to be not only publicly disclosed in mandatory reporting

6        documents to the government but United is also required by law to provide such

7        information to the Class as participants in the pension plan." SAC ¶ 245

8        The Court holds that Plaintiffs have failed to plausibly allege either wholly irrational or

9    bad faith conduct by the Union Defendants. Plaintiffs' assertion of bad faith is particularly

10   problematic. Plaintiffs claim that there was collusion between the Union Defendants and the

11   United Defendants, but there must be "substantial evidence" of such to support a DFR claim,

12   *Beck*, 506 F.3d at 880, and Plaintiffs' theory of collusion – *i.e.*, that the unions went along with

13   United because they were fearful about their own misconduct being revealed (*e.g.*, agreeing to

14   delay pension enrollment so that the unions could get control of the pensions post-merger) – is

15   convoluted, as well as speculative and implausible.

16       To the extent Plaintiffs argue that the Union Defendants acted wholly irrationally, they still

17   fare no better. Plaintiffs' position is, in essence, that the unions initially interpreted the LOA as

18   requiring the use of public, objective information for the Adjustment Calculation but then

19   suddenly changed course, and that change in course was irrational. The problem for Plaintiffs is

20   that the unions' "new" interpretation was not unreasonable (as the Court previously held), and,

21   even if the Adjustment Calculation was promoted as using public, objective inputs, there is no

22   allegation that union members were unconditionally promised that only public, objective

23   information would be used. Furthermore, any such claim would not be plausible given that the

24   plain language of the LOA specifically stated that the Cost Model still needed to be agreed upon

25   by the unions' and United's respective experts *post-ratification*. The outlines of the Cost Model

26   had yet to be determined. Finally, Plaintiffs have not identified the motive the unions would have

27   for allegedly changing course except for the collusion theory which, as stated above, is not

28   plausible.

1    Accordingly, the Court dismisses the DFR claim, this time with prejudice.  Plaintiffs were

2  given an opportunity to replead the DFR claim but it is still deficient.

3  B.    Breach of Contract

4    Plaintiffs' claim for breach of contract is based on an alleged written agreement between

5  the Union Defendants and their economist, Mr. Akins.  According to Plaintiffs,

6    [t]he contract involved [Mr. Akins] performing the LOA #29
       Adjustment Calculation . . . , creating an Excel version of the Cost
7      Model, and analyzing the calculation utilizing the Cost Model . . . ,
       in order to determine, and confirm, the accurate, resultant wage
8      increase for the Class under LOA #29, which Akins would report to
       the Union Defendants to inform the Class of their raise, for which
9      Akins was paid by the Teamsters.

10  SAC ¶ 274.

11    Plaintiffs acknowledge that they are not parties to the agreement between the unions and

12  Mr. Akins.  However, they maintain that they may still assert a claim for breach of contract

13  because they are third-party beneficiaries of the agreement.  *See* Cal. Civ. Code § 1559 ("A

14  contract, made expressly for the benefit of a third person, may be enforced by him at any time

15  before the parties thereto rescind it.").  Plaintiffs further allege that the Union Defendants breached

16  the agreement because they failed to perform their obligations under it "in that they falsified the

17  results arrived at by Akins in performing the calculation, [and] reported an inaccurate calculation

18  result to the Class, misrepresenting the false result as Akins['s] true result."  SAC ¶ 277.

19    In the motion to dismiss, the Union Defendants argue that the breach-of-contract claim

20  should be dismissed because "[i]t is impossible to imagine [the unions] entering in a contract for

21  [Mr. Akins's] actuarial services that required [them] to do anything other than compensate [him]

22  for his work."  Union Mot. at 16.  The Court agrees.  California Civil Code § 1559 provides that

23  "[a] contract, made expressly for the benefit of a third person, may be *enforced* by him at any time

24  before the parties thereto rescind it."  Cal. Civ. Code § 1559 (emphasis added).  Plaintiffs have not

25  pointed to any provision in the contract between the Union Defendants and Mr. Akins that they

26  seek to have enforced.  As alleged by Plaintiffs, the contract involved Mr. Akins performing the

27  Adjustment Calculation, and presumably the Union Defendants paid him for his services.  That the

28  Union Defendants, as alleged, subsequently falsified Mr. Akins's results is conduct independent of

United States District Court
Northern District of California

1    the contract.

2         Furthermore, even if this problem could be overcome, Plaintiffs have failed to show that

3    they are plausibly third-party beneficiaries under the test articulated by the California Supreme

4    Court.

5              [U] nder California's third party beneficiary doctrine, a third party . .
              . may bring a breach of contract action against a party to a contract
6              only if the third party establishes not only (1) that it is likely to
              benefit from the contract, but also (2) that a motivating purpose of
7              the contracting parties is to provide a benefit to the third party [*i.e.*,
              not simply knowledge that a benefit to the third party may follow],
8              and further (3) that permitting the third party to bring its own breach
              of contract action against a contracting party is consistent with the
9              objectives of the contract and the reasonable expectations of the
              contracting parties.
10

11   *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 821 (2019).  In particular, Plaintiffs have not

12   sufficiently alleged the third factor above.  The Court therefore dismisses the claim for breach of

13   contract.  The dismissal is with prejudice because the Court previously gave Plaintiffs an

14   opportunity to amend the claim, but the claim is still deficient.  Furthermore, Plaintiffs have failed

15   to show that amendment of the claim would not be futile.

16   C.    Violation of Statutory Due Process Rights/Right to Grieve[9]

17         As the Court noted in its prior order,

18            Plaintiffs assert that the RLA provides for certain due process with
              respect to grievances and that they were not given that process.
19            Specifically, Plaintiffs contend that, even if the Union Defendants
              did not want to take the grievance to the Third Step – *i.e.*, to present
20            the grievance to the System Board of Adjustment – Plaintiffs had the
              right under the RLA to *individually* pursue the grievance with the
21            System Board of Adjustment (even if the CBA specified that only
              the union could appeal an unfavorable Second Step decision).
22

23   Docket No. 59 (Order at 26) (emphasis in original); *see also* Docket No. 59 (Order at 9).  In

24   support of their position, Plaintiffs relied on 45 U.S.C. § 184, which states as follows:

25            The disputes between *an employee or group of employees and a*
              *carrier or carriers by air* growing out of grievances, or out of the
26            interpretation or application of agreements concerning rates of pay,

27   ────────────────────

28   [9] This claim is also asserted against the United Defendants.  The viability of the claim against the
     United Defendants is addressed in Part IV.C.

United States District Court
Northern District of California

> rules, or working conditions, . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition *of the parties or by either party* to an appropriate adjustment board, as hereinafter provided, with a full statement of the facts and supporting data bearing upon the disputes.
>
> It shall be the duty of every carrier and of its employees, acting through their representatives, selected in accordance with the provisions of this title [45 U.S.C. § 181 et seq.] to establish a board of adjustment . . . .
>
> Such boards of adjustment may be established by agreement between employees and carriers either on any individual carrier, or system, or group of carriers by air and any class or classes of its or their employees . . . .

45 U.S.C. § 184 (emphasis added).

In its prior order, the Court took note that "[c]ourts have reached different conclusions as to whether § 184 . . . gives individual employees (and not just the union) the right to take a grievance to the appropriate adjustment board." Docket No. 59 (Order at 26-27). Ultimately, the Court did not adopt a definitive position and dismissed the claim against the Union Defendants because, even if Plaintiffs were correct in their view of § 184, they

> have simply alleged that the Union Defendants withdrew and closed the grievance that they were pursuing and took the position that, under the CBA, only the union could take the grievance to the system adjustment board. *See, e.g.*, Compl. ¶¶ 72-73, 147. Plaintiffs have not alleged that, *e.g.*, the Union Defendants prevented Plaintiffs from individually petitioning, or coerced them not to petition individually, the system adjustment board for relief. *Cf.* Union Mot. at 13 ("Either Plaintiffs have a right to proceed on their own or they did not.").

Docket No. 59 (Order at 29).

In the SAC, Plaintiffs have included allegations as to how the Union Defendants' actions prevented them from exercising their Third Step rights. They allege as follows:

> [S]ince 2008, in a case where a grievant wanted to advance his or her grievance from the Second Step to the Third Step System Board of Adjustment, where the Union found [the grievance] meritless and did not want to participate, *Local 986 would notify United of the parties' positions* – grievant proceeding and Local 986 releasing as a no-fund case. This would initiate the Third Step process, if done timely, relieving Local 986 of any responsibility whilst respecting the grievant's rights.

United States District Court
Northern District of California

1    SAC ¶ 98 (emphasis added); *see also* SAC ¶ 174 (alleging that there was a "*recognized practice*"

2    where the union "would alert United to proceed directly with the grievant for the higher stages of

3    the process, either Third Step System Board of Adjustment, or the Final Step Board of

4    Arbitration").  In other words, according to Plaintiffs, absent initiation by the Union, no individual

5    grievance could proceed.

6           Plaintiffs indicate that this was the practice because, even though the CBA provided for

7    establishment of the system board of adjustment, *see* SAC, Ex. 3 (CBA, art. 19, ¶ D) (stating that

8    "[t]he System Board of Adjustment ('the Board') shall be composed of two (2) members

9    designated by the Company and two (2) members designated by the Union [and that] [t]he Board

10   will meet on a monthly or bi-monthly basis upon mutual agreement by the Parties during the

11   course of the calendar year at stations throughout the system on a rotating basis"), the CBA

> does not provide any necessary details to permit a grievant to
> independently access it.  The essential details required such as
> contact person, telephone number, email address, location, projected
> schedule, or even who comprises the SBA, are not stated in the CBA
> and are not available to the members or a grievant.  Only Local 986
> officials with a high enough rank can access such information to
> initiate referral of the grievance to the SBA, i.e., a business agent
> must advance a grievance to the Third Step.

17   SAC ¶ 55; *see also* SAC ¶ 212 ("At United, the SBA is not a separate entity nor does it have its

18   own office, separate phone number, email address, or even any stated list as to who comprises it.

19   At least none that Plaintiffs can access or know about.  A Technician can only ask his or her union

20   representative to initiate the process with United after which United and the union decide who will

21   comprise the board, when and where it will be held, and the time despite the CBA-provisions

22   stating otherwise.").  Plaintiffs contend that, even if the union did not want to proceed to the Third

23   Step, they still had the right to individually grieve under the RLA.

24          In their motion to dismiss, the Union Defendants largely make the same arguments that

25   one or both Defendants previously made – *i.e.*, that § 184 does not give Plaintiffs a statutory right

26   to take a grievance to the system board of adjustment but, even if it does, the unions did nothing

27   wrong since "[e]ither Plaintiffs have a right to proceed on their own or they did not."  Union Mot.

28   at 16.

The Court concludes that § 184 does, in fact, give Plaintiffs a right to individually grieve. The plain language of § 184 states that a *party* may take a grievance to the system adjustment board.  *See* Docket No. 59 (Order at 26-27) (citing case authorities).  *See, e.g.*, *Santiago v. United Air Lines, Inc.*, 969 F. Supp. 2d 955, 966-69 (N.D. Ill. 2013) (holding that "the text of § 184 precludes United from deciding, on its own or with the [union], to bar [plaintiff] from bringing her grievance to the System board").[10]  Furthermore, there is no dispute that railroad employees have the ability to individually grieve, *see Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 49 n.11 (1979) (stating that the RLA "is somewhat more solicitous of individual rights" compared to the National Labor Relations Act because the RLA "authorizes employees who are unsuccessful at the grievance level to seek relief in their own right from the National Railroad Adjustment Board"), and there is no principled reason why that same right should not be afforded to airline employees. *See Pyles v. United Air Lines*, 79 F.3d 1046, 1052 n.9 (11th Cir. 1996) (noting that "Congress intended to extend to airline employees 'the same benefits and obligations available and applicable in the railroad industry'"); *see also* Docket No. 59 (Order at 27) (noting that § 184, which governs airline industry employees, uses language similar to that used in the First paragraph of 45 U.S.C. § 153, which applies to railroad employees); *Stevens v. Teamsters Local 2707*, 504 F. Supp. 332, 334 (W.D. Wash. 1980) (stating that "airline industry employees have the same right individually to process grievances [under § 184] as do railroad industry employees [under § 153, First]").  This is especially true given that "§ 184, which governs airline industry employees, uses language similar to that used in the First paragraph of § 153," which governs railroad employees.[11]  Docket No. 59 (Order at 27).

---

[10] The Court acknowledges the language in § 184 stating that a carrier and a *union* (as the representative of the carrier's employees) have the duty to establish a system board of adjustment. But once the board is established, then an employee has the right to individually take a grievance to the board.

[11] *See, e.g.*, 45 U.S.C. § 153 First (i) ("The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.").

1    Finally, the Court takes note of a recent decision, *Wood v. International Brotherhood of*

2  *Teamsters*, No. 3:24-cv-00053-SLG, 2025 U.S. Dist. LEXIS 6736 (D. Alaska Jan. 14, 2025),

3  where the district court reached the same holding herein for largely the same reasons.  *See id.* at

4  *11-17; *see also Wood v. Int'l Bhd. of Teamsters*, No. 3:24-cv-00053-SLG, 2025 U.S. Dist.

5  LEXIS 18481 (D. Alaska Feb. 3, 2025) (denying motion to reconsider on the issue).  To be sure,

6  as the United Defendants have pointed out, another district court recently ruled to the contrary.

7  *See Scheffler v. Int'l Ass'n of Machinists & Dist. Lodge 142*, No. 24-cv-11023-MJJ, 2025 WL

8  595329 (D. Mass. Feb. 20, 2025).  However, the Court respectfully declines to follow the decision

9  in *Scheffler* because it did not address the Supreme Court's statement in *Foust*, 442 U.S. at 49

10  n.11), nor did it address the language used in § 184 that a "party" has the right to take a grievance

11  to the system adjustment board.

12    That being said, the Court takes note that Plaintiffs are seeking not only declaratory relief

13  for this statutory due process claim but also damages – *i.e.*, Plaintiffs are not simply asking that

14  the system board of adjustment to be convened so that they may arbitrate their individual

15  grievances.  *See* SAC ¶¶ 312-13 (asking for declaration and damages).  *Compare Wood v. Int'l*

16  *Bhd. of Teamsters*, No. C-24-0053 SLG (Docket No. 1) (complaint seeking declaratory and

17  injunctive relief only).  Plaintiffs' request for damages is problematic, particularly because the

18  Court previously held that any failure of the Union Defendants to act here was not a breach of the

19  duty of fair representation (*i.e.*, because there was a split of authorities as to whether an airline

20  employee has the right to individually grieve before the system board of adjustment).  Moreover,

21  Plaintiffs have not cited any authority supporting their position that damages may be awarded for a

22  violation of statutory due process under the RLA.  The Court is aware of at least one case –

23  admittedly addressing a situation in which an employer sued a union (in a railroad case) for not

24  submitting a minor dispute to binding arbitration – where the court stated it was not aware of

25  damages being awarded for a violation of § 153, First (i), the analogous statute to § 184.  *See*

26  *Burlington N. R. Co. v. Brotherhood of Maintenance of Way Employees*, 961 F.2d 86, 89 (5th Cir.

27  1992) ("We are also not aware of any case in which damages have been awarded for violation of §

28  153 First (i) [the analogous statute to § 184].");  *id.* 89 n.12 ("In *Chicago River* the Supreme Court

United States District Court
Northern District of California

held that an injunction could issue to enjoin compliance with § 153 First (i); the Court did not address the question of whether damages could be awarded.").  The Court holds here, consistent with *Burlington* and the interest in having grievances of minor disputes arbitrated, that damages are not available.  In short, even though the Court is denying the Union Defendants' motion to dismiss the statutory due process claim, Plaintiffs may seek only declaratory (or injunctive) relief.

Because the Court holds that Plaintiffs have the right to individually grieve, but no right to damages under this claim, whether the Union Defendants wrongfully interfered with Plaintiffs' statutory right to individually grieve at the Third Step is effectively moot.  Whether the Union Defendants retrospectively prevented the grievance from moving forward, Plaintiffs have a statutory right to pursue the grievance and are thus entitled to declaratory/injunctive relief.  Accordingly, the Court directs the parties to meet and confer and reach agreement on how the Third Step grievance process sought by Plaintiffs can be effectuated.

D.   Fraud[12]

Finally, Plaintiffs have asserted a claim for fraud against the Union Defendants.  Plaintiffs allege that the Union Defendants "willfully and intentionally engaged in fraudulent concealment and deceit as defined by . . . California Civil Code §§ 1709 and 1710, in failing to disclose the true results of the LOA#29 Adjustment Calculation result to the Class, on which they would reasonably rely, so as to deprive them of significant owed wages."  SAC ¶ 315; *see also* SAC ¶ 325 (alleging that the Union Defendants falsely claimed that information used for the Adjustment Calculation was confidential and proprietary).

In their motion to dismiss, the Union Defendants argue that the fraud claim is preempted by the RLA.  *See Alaska Airlines, Inc. v. Schurke*, 898 F.3d 904, 913-914 (9th Cir. 2018) (en banc) (recognizing that there is "RLA and LMRA § 301 preemption only where a state law claim [1] arises entirely from or [2] requires construction of a CBA").  The Court previously dismissed the fraud claim asserted by Plaintiffs on that basis.  *See* Docket No. 59 (Order at 37-38).  In response, Plaintiffs argue that the fraud claim as now pled is not preempted because nothing about the claim

---

[12] This claim is also asserted against the United Defendants.  The viability of the claim against the United Defendants is addressed in Part IV.D.

26

requires interpretation of the CBA.  *See* Opp'n to Union at 23 (arguing that "[t]he SAC alleges the reason provided to Plaintiffs to substantiate the wage rate was that the information was secret and confidential, not that Plaintiffs had interpreted or construed or applied any part of the CBA improperly"; also contending that "[t]he Union Defendants violated a separate duty imposed not by the CBA but a law to promote the fundamental public policy contained in the California Civil Code").

The Court is dubious of Plaintiffs' position for the reasons stated in its prior order.  *See* Docket No. 59 (Order at 37-38) ("[T]he only way that the Union Defendants . . . could be said to have concealed a fraud from Plaintiffs is if the CBA/LOA #29 should have been interpreted as Plaintiffs advocate wherein United agreed to provide employees with objectively calculated raises according to a set formula [and based on publicly available information].").

In any event, even if Plaintiffs were correct that there is no RLA preemption, their fraud claim fails for a more fundamental reason.  Plaintiff argue that the Union Defendants made affirmative misrepresentations and concealed information "upon which Plaintiffs were meant to rely, and in fact did rely, to their detriment."  Opp'n to Union at 23; *see also* SAC ¶ 322 (alleging that "[t]he Class members reasonably and justifiably relied on the Defendants to perform the LOA #29 Adjustment Calculation honestly, accurately, and according to its terms").  But that conclusory allegation of reliance cannot be credited given other specific allegations in the SAC. Specifically, when the Union Defendants allegedly lied about the amount of the Adjustment Calculation and/or lied about information underlying the calculation being confidential and proprietary, Plaintiffs and union members implicitly knew those were lies because, *e.g.*, during the October 2016 roadshow, Mr. Akins specifically told union members that the Adjustment Calculation would be based on five specific elements that were objective in nature and publicly available.  The entire reason grievances were made about the Adjustment Calculation was because union members, including Plaintiffs, did their own independent calculations based on, *inter alia*, the five criteria.  *See, e.g.*, SAC ¶ 139 ("Some technicians, including Plaintiffs, 'checked the math' in an attempt to verify the reported result [on the Adjustment Calculation].  Unsurprisingly, the results were wildly divergent from the results provided by United, and allegedly reviewed and

confirmed by the Union Defendants.  Notably, all of the Class Technicians' results were within cents of one another; none were dollars apart.  The same cannot be said in comparison to the reported results of United and the Unions."); SAC ¶ 140 ("Thereafter, grievances were filed throughout the system by members of the Class, including by Plaintiffs, complaining of these severe computational anomalies.").  In short, Plaintiffs have failed to plausibly plead reliance on any alleged misrepresentations by the Union Defendants in conjunction with the 2022 Adjustment Calculation.

Accordingly, the Court dismisses Plaintiffs' fraud claim against the Union Defendants, this time with prejudice.

## IV.    UNITED DEFENDANTS' MOTION TO DISMISS

Plaintiffs have asserted the following claims against the United Defendants:

- Breach of contract in violation of the RLA.

- Interference with the designated representative in violation of the RLA.

- Violation of statutory due process rights as provided for in the RLA.

- Fraud in violation of California state law.

A.    Breach of Contract

Plaintiffs' claim for breach of contract against the United Defendants is predicated on the following RLA provisions: 45 U.S.C. § 152, First and Seventh.  These provisions state as follows:

> First. Duty of carriers and employees to settle disputes
>
> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.
>
> . . . .
>
> Seventh.  Change in pay, rules, or working conditions contrary to agreement or to section 156 forbidden
>
> No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

28

45 U.S.C. § 152.

According to Plaintiffs, the United Defendants "failed to exert every reasonable effort to maintain [LOA #29]," thus violating § 152, First, because they "intentionally alter[ed], falsif[ied], and misrepresent[ed] the LOA #29 Adjustment Calculation result."[13] SAC ¶ 283.  This same alleged misconduct constituted a violation of § 152, Seventh – *i.e.*, the United Defendants were, in effect, unilaterally trying to change the written terms of the CBA.  *See* SAC ¶¶ 285-86.

As an initial matter, the Court must address whether Plaintiffs' breach-of-contract claim here constitutes a "minor" dispute or a "major" one.  Courts have jurisdiction over major disputes only; minor disputes are resolved instead through binding arbitration before the system board of adjustment.  *See Ass'n of Flight Attendants v. Horizon Air Indus.*, 280 F.3d 901, 904 (9th Cir. 2002).  According to the United Defendants, the Court lacks subject matter jurisdiction over the breach-of-contract claim because it is only a minor dispute.

In *Conrail v. Railway Labor Executives Association*, 491 U.S. 299 (1989), the Supreme Court noted that it had

> not articulated an explicit standard for differentiating between major and minor disputes.  It adopted the major/minor terminology, drawn from the vocabulary of rail management and rail labor, as a shorthand method of describing two classes of controversy Congress had distinguished in the RLA: major disputes seek to *create* contractual rights, minor disputes to *enforce* them.

*Id.* at 302 (emphasis added).

In *Conrail*, the Supreme Court expressly noted that § 152, Seventh, disputes are major disputes:

> This statutory category [in the Seventh paragraph] "relates to disputes over the formation of collective agreements or efforts to secure them.  They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.  They look

---

[13] Plaintiffs also suggest a violation of § 152, First, because the United Defendants "refus[ed] to convene the Third Step System Board of Adjustment."  SAC ¶ 284.  However, as the Court noted in its prior order, the CBA stated that only the unions could initiate the Third Step.  Because, as alleged, the unions did not initiate the Third Step under the CBA, the United Defendants cannot be said to have breached the CBA (or LOA #29).  Whether the United Defendants violated Plaintiffs' statutory due process rights under § 184, by not participating in the Third Step, is a different matter discussed below.

United States District Court
Northern District of California

> to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past."
>
> . . . .
>
> In contrast, the minor dispute category is predicated on § [152,] Sixth[14] and [§ 153,] First (i) of the RLA, which set forth conference and compulsory arbitration procedures for a dispute arising or growing "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." This second category of disputes
>
>> "contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case."

*Id.* at 302-03.

Because, in the case at bar, Plaintiffs have invoked § 152, Seventh, as part of the basis for their claim, an argument could be made that there is automatically a major dispute before the Court (which would substantiate jurisdiction over Plaintiffs' claim). But in *Conrail*, the Supreme Court recognized "there is a danger in leaving the characterization of the dispute solely in the hands of one party." *Id.* at 306. Thus, it went on to hold that "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is *arguably* justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are *frivolous or obviously insubstantial*, the dispute is major." *Id.* at 307 (emphasis added). The Supreme Court acknowledged that this was a "relatively light burden" on

---

[14] Section 152, Sixth, states in relevant part:

> Sixth. Conference of representatives; time; place; private agreements
>
> In case of a dispute between a carrier or carriers and its or their employees, arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, it shall be the duty of the designated representative or representatives of such carrier or carriers and of such employees, within ten days after the receipt of notice of a desire on the part of either party to confer in respect to such dispute, to specify a time and place at which such conference shall be held . . . .

45 U.S.C. § 152, Sixth.

United States District Court
Northern District of California

1   the employer to "establish[] exclusive arbitral jurisdiction under the RLA." *Id.*

2   In the instant case, that relatively light burden has been met. Plaintiffs' basic position is

3   that the United Defendants are not complying with the terms of LOA #29 – *i.e.*, how the

4   Adjustment Calculation would be carried out. But the United Defendants' action is arguably

5   justified by the terms of the LOA; the LOA – on its face – indicates that the Adjustment

6   Calculation will be based on a Cost Model and explicitly states that the exact terms of the Cost

7   Model will be decided upon after ratification. There is accordingly a minor dispute before the

8   Court, not a major one.

9   Plaintiffs protest that there is a major dispute here because the Court previously held that

10   the Cost Model is not part of the CBA. They characterize the Cost Model as an agreement

11   independent of the CBA. But the Cost Model is not an agreement. It is an economic model. That

12   United and union experts had to agree on what that model would entail does not make the Cost

13   Model itself an agreement. It was a tool to be used in carrying out and implementing the CBA and

14   LOA #29.

15   What Plaintiffs ignore is that the Cost Model is fundamentally related to LOA #29, which

16   is undisputedly part of the CBA. The Cost Model is used to carry out the Adjustment Calculation

17   provided for by LOA #29 and thus, at the end of the day, Plaintiffs' claim here is predicated on an

18   interpretation of the CBA/LOA – *i.e.*, did the United Defendants comply with how the wage

19   increase was to be calculated? [15] *See* United Reply at 4 (asking whether "adjudication of

20

21   ─────────────────────
22   [15] Plaintiffs suggest that, even if the Cost Model is not an agreement, there was an agreement
      between the United Defendants and the Union Defendants that was independent of the CBA – *i.e.*,
23   the two sets of Defendants entered into a nondisclosure agreement ("NDA") so that the
      information underlying the Adjustment Calculation was claimed as confidential and proprietary
      and would not be shared with union membership.

24   But Plaintiffs are missing the point. Even if the NDA was an agreement separate from the
25   CBA, their basic position is that Defendants were not complying with the CBA and/or LOA #29
      by entering into this side agreement. This Court previously held that nothing about the CBA
26   and/or LOA barred Defendants from claiming information as confidential. *See* Docket No. 59
      (Order at 18) ("[E]ven though LOA #29 does not say anything about confidential and/or
27   proprietary information being used in the Adjustment Calculation, that does not preclude such
      information from being used, especially in light of the fact that the Cost Model was something to
28   be agreed upon later based on negotiations between United and the Teamsters, the precise terms of
      which were unknowable at the time.").

Plaintiffs' claims – be they based on the Cost Model, the Non-Disclosure Agreement (or something else) – would require the Court to interpret the CBA, . . . and not whether the Cost model and Non-Disclosure Agreement are 'part' of the CBA").  Interpreting an existing CBA to determine whether a party thereto has complied with the CBA is a minor dispute within the meaning of the RLA.

Because there is a minor dispute before the Court, the Court has no jurisdiction over the claim for breach of contract against the United Defendants unless Plaintiffs have plausibly alleged that (1) the unions breached their duty of fair representation (a matter that the Court does have jurisdiction over) *and* that (2) the unions acted in concert with the United Defendants to discriminate against the union membership.  In such a situation, jurisdiction is proper because arbitration before a panel of employer and union representatives would be futile.  *See* Docket No. 59 (Order at 35) (citing *Beckington v. Am. Airlines, Inc.*, 926 F.3d 595, 606-07 (9th Cir. 2019)); *see also Seitz v. Int'l Bhd. of Teamsters*, No. 22-15902, 2023 U.S. App. LEXIS 19626, at *5-6 (9th Cir. July 31, 2023) (taking note of a "narrow exception" that "permits a claimant to bypass union grievance and arbitration procedures when 'the effort to proceed formally with contractual or administrative remedies would be wholly futile'[;' [t]his exception, however, is generally limited to situations in which a claimant cannot rely on contractual or administrative procedures because the union is conspiring with the employer against the employee").  The problem for Plaintiffs here is that, as discussed above, their contention that the Union and United Defendants were colluding is implausible.  Accordingly, the Court dismisses the claim for breach of contract.

B.    Interference with Designated Representative

According to Plaintiffs, the United Defendants have also violated the RLA by interfering with the designated representatives of the United technicians (*i.e.*, the unions).  The RLA provides in relevant part as follows:

> Third.  Designation of representatives
>
> Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its *choice* of representatives. . . .

United States District Court
Northern District of California

> Fourth.  Organization and collective bargaining; freedom from interference by carrier; assistance in organizing or maintaining organization by carrier forbidden; deduction of dues from wages forbidden
>
> Employees shall have the right to organize and bargain collectively through representatives of their own *choosing*.  The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter.  No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to *interfere in any way with the organization of its employees*, . . . or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . .

45 U.S.C. § 152, Third and Fourth (emphasis added).

As reflected by the italicized language above, the Third and Fourth paragraphs of § 152 concern an employer who interferes with: (1) its employees' freedom to choose who to represent them, and (2) its employees' freedom to organize.  Consistent with this language, the Supreme Court has explicitly noted that the paragraphs were intended to "address[] primarily the *precertification* rights and freedoms of unorganized employees." *Trans World Airlines, Inc. v. Independ. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989) (emphasis added); *see also Flight Attendants*, 280 F.3d at 905 (stating that "[p]recertification disputes are disputes that occur prior to the formation of a union" and that § 152, Fourth, "'was directed particularly at control over the initial step in collective bargaining – the determination of the employees' representatives'").

Where there is an alleged violation of § 152, Third and/or Fourth, a court has jurisdiction over the dispute (*i.e.*, there is no arbitration before the system board of adjustment).  This makes sense because, as noted above, the paragraphs were intended to address primarily precertification disputes, and "once a bargaining representative *is* certified, the RLA dispute-resolution system is put in place and judicial intervention is generally unnecessary and undesirable." *Fennessy v. Southwest Airlines*, 91 F.3d 1359, 1362-63 (9th Cir. 1996) (emphasis added).  To be sure, the Ninth Circuit has not foreclosed the possibility that a post-certification dispute could still implicate § 152, Third and/or Fourth and thereby provide a basis for a court to have jurisdiction.  *See id.* at 1363 (noting that "the grievance procedure is designed . . . to deal with *contractual* issues arising

United States District Court
Northern District of California

United States District Court
Northern District of California

1  under the [CBA]"; the jurisdiction of the courts may be still invoked when "there would be no

2  remedy to enforce the statutory commands which Congress has written into the [RLA]")

3  (emphasis in original; internal quotation marks omitted).  But the Ninth Circuit has also indicated

4  that would likely not be the case for most post-certification disputes.  For example, the court

5  characterized *Fennessy* as

6          actually involv[ing] a de facto precertification dispute because
         Fennessy sought to replace the existing union with a new one.
7          *Fennessy* did not reject the precertification/post-certification
         dichotomy recognized in earlier cases. . . . This Court concluded that
8          *Fennessy* was one of "those cases where 'but for the general
         jurisdiction of the federal courts there would be no remedy to
9          enforce the statutory commands which Congress had written into the
         Railway Labor Act.'"
10

11  *Flight Attendants*, 280 F.3d at 905-06 (emphasizing that "*Fennessy* involved a unique factual

12  setting that justified judicial intervention").  *Compare Flight Attendants*, 280 F.3d at 906 ("Unlike

13  *Fennessy*, the facts in this case do not reveal any 'exceptional circumstances' necessitating judicial

14  intervention, such as a policy motivated by anti-union animus or circumstances that significantly

15  undermine the functioning of the union.").

16          In their motion to dismiss, the United Defendants argue that Plaintiffs' claim for violation

17  of § 152, Third and/or Fourth, should be rejected because they have not alleged a sufficient basis

18  to invoke this Court's jurisdiction – *e.g.*, Plaintiffs' claim does not rest on a precertification

19  dispute, nor have Plaintiffs alleged exceptional circumstances that would require judicial

20  intervention.  Instead, the United Defendants contend, Plaintiffs have at most raised a dispute that

21  should be subject to the grievance process and arbitration because Plaintiffs take issue with the

22  interpretation of the CBA and LOA #29.

23          The Court agrees.  In the SAC, Plaintiffs allege that the United Defendants violated § 152,

24  Third, "[b]y frustrating and undermining the effectiveness of the Union Defendants in

25  administering the CBA through asserting baseless and non-existent CBA wage rules, terms, and

26  conditions" and further violated § 152, Fourth, by "exerting economic pressure on the Union

27  Defendants" and "demanding the Union Defendants to agree to the contractual reduction of the

28  raise."  SAC ¶¶ 296-98.  Ultimately, these are arguments that the United Defendants somehow

1    convinced the Union Defendants not to follow the terms of the CBA and LOA.  The wages scale

2    that properly should have been derived from LOA#29 remains a minor dispute that should be

3    grieved and arbitrated.  Plaintiffs try to avoid this result by arguing that "the reduction in the

4    wages was in essence failure to bargain over a mandatory subject of bargaining such as wage

5    rates."  Opp'n to United at 13.  But, as the Court held above, Plaintiffs' characterization of the

6    parties' dispute as falling under § 152, Seventh, is not justified.  The interference claim is,

7    accordingly, dismissed.

8    C.    Violation of Statutory Due Process Rights

9          The Court has addressed above Plaintiffs' claim for violation of statutory due process

10   rights against the Union Defendants.  Here, the Court addresses the same claim but against the

11   United Defendants.  As above, the Court holds that Plaintiffs do have the right under the RLA to

12   individually grieve – *i.e.*, they had the right to take their dispute to the Third Step even if the

13   Union Defendants had no interest in doing so.

14         In its prior order, the Court dismissed the due process claim against the United Defendants

15   because, even if Plaintiffs had directly asked the United Defendants to continue the grievance

16   process, that was not sufficient: "asking the United Defendants to continue the grievance process

17   with the system adjustment board is not the same thing as petitioning the adjustment board for

18   relief[;] [t]here is no allegation that Plaintiffs individually petitioned the system adjustment board

19   for relief and that the United Defendants then failed to participate."  Docket No. 59 (Order at 29).

20   Plaintiffs, however, have now made allegations explaining why they asked United for relief[16]

21   instead of the system adjustment board.  Specifically, Plaintiff allege that, even though the CBA

22   provided for establishment of the system board of adjustment, *see* SAC, Ex. 3 (CBA, art. 19, ¶ D)

23   (stating that "[t]he System Board of Adjustment ('the Board') shall be composed of two (2)

24   members designated by the Company and two (2) members designated by the Union [and that]

25   [t]he Board will meet on a monthly or bi-monthly basis upon mutual agreement by the Parties

26

27   _____

28   [16] *See, e.g.*, SAC ¶ 207 (alleging that Mr. Scholz sent an email to both United employees and
     union employees in February 2023, stating that he wanted to appeal the grievance to the system
     board of adjustment).

United States District Court
Northern District of California

1    during the course of the calendar year at stations throughout the system on a rotating basis"),

> [a]t United, the SBA is not a separate entity nor does it have its own
> office, separate phone number, email address, or even any stated list
> as to who comprises it.  At least none that Plaintiffs can access or
> know about.  A Technician can only ask his or her union
> representative to initiate the process with United after which United
> and the union decide who will comprise the board, when and where
> it will be held, and the time despite the CBA-provisions stating
> otherwise.

SAC ¶ 212; *see also* SAC ¶ 55 ("The essential details required such as contact person, telephone number, email address, location, projected schedule, or even who comprises the SBA, are not stated in the CBA and are not available to the members or a grievant.  Only Local 986 officials with a high enough rank can access such information to initiate referral of the grievance to the SBA, i.e., a business agent must advance a grievance to the Third Step.").

There is, accordingly, a question of fact on the statutory due process claim that the Court cannot resolve at the 12(b)(6) phase.  As above, however, the Court holds that any relief here is limited to declaratory or injunctive relief, and not damages.

D.    <u>Fraud</u>

Plaintiffs' claim for fraud against the United Defendants is based on the same factual predicate as their claim for fraud against the Union Defendants – *i.e.*, Plaintiffs allege that both sets of Defendants "willfully and intentionally engaged in fraudulent concealment and deceit as defined by . . . California Civil Code §§ 1709 and 1710, in failing to disclose the true results of the LOA#29 Adjustment Calculation result to the Class, on which they would reasonably rely, so as to deprive them of significant owed wages."  SAC ¶ 315.

The United Defendants, like the Union Defendants, argue that the fraud claim is preempted by the RLA.  As above, the Court is inclined to agree, *see* United Reply at 11 (arguing that "Plaintiffs' allegations of fraud are based entirely on *their interpretation* of LOA #29, which, in their view, required United to use a different formula to calculate the wage adjustments") (emphasis in original); however, even if Plaintiffs were correct that there is no RLA preemption, their fraud claim is not viable because they have failed to sufficiently allege reasonable reliance on the alleged fraud.  Accordingly, the Court dismisses Plaintiffs' fraud claim with prejudice.

United States District Court
Northern District of California

United States District Court
Northern District of California

### V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss.  All claims are dismissed except for the RLA statutory due process claim, which is asserted against both sets of Defendants.  As noted above, the Court concludes that no damages are available as relief for the RLA statutory due process claim; instead, the Court's determination that Plaintiffs have the right to individually grieve affords them the right to declaratory/injunctive relief.  The parties shall meet and confer as to how best to effectuate the Third Step and shall report back to the Court within two weeks of the date of this order.

This order disposes of Docket Nos. 77 and 78.

**IT IS SO ORDERED**.

Dated: March 13, 2025

_____
EDWARD M. CHEN
United States District Judge

37